No. 24-30420

# In the United States Court of Appeals for the Fifth Circuit

VOICE OF THE EXPERIENCED, A MEMBERSHIP ORGANIZATION ON BEHALF OF ITSELF AND ITS MEMBERS; MYRON SMITH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; DAMARIS JACKSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; NATE WALKER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; DARRIUS WILLIAMS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; KEVIAS HICKS; JOSEPH GUILLORY; KENDRICK STEVENSON; ALVIN WILLIAMS,
*Plaintiffs-Appellees*

v.

JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; TIM HOOPER, WARDEN, LOUISIANA STATE PENITENTIARY; MISTY STAGG, IN HER OFFICIAL CAPACITY AS DIRECTOR OF PRISON ENTERPRISES, INCORPORATED; LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; PRISON ENTERPRISES, INCORPORATED,
*Defendants-Appellants*

———————————————

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 23-cv-1304, Hon. Brian A. Jackson

———————————————

**EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND FOR STAY OF THE DISTRICT COURT'S JULY 2 ORDER PENDING APPEAL**

———————————————

*(Counsel listed on inside cover)*

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ........................................................................... 2

BACKGROUND .............................................................................. 4

JURISDICTIONAL STATEMENT ........................................................... 8

ARGUMENT ................................................................................. 8

  I.  THE ORDINARY STAY FACTORS CUT IN FAVOR OF A STAY. .................... 9

    A.  The State Is Likely to Succeed on the Merits. ............................. 9

    B.  The State Faces Irreparable Harm Absent a Stay .................... 19

    C.  The Equities and the Public Interest Favor a Stay. ................. 20

  II.  MOVING FIRST FOR A STAY IN THE DISTRICT COURT WAS IMPRACTICABLE. ...................................................................... 21

CONCLUSION ............................................................................. 23

CERTIFICATE OF SERVICE ............................................................. 24

CERTIFICATE OF COMPLIANCE ....................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ................................................................. 20

*Alex A. v. Edwards,*
    2022 WL 3701169 (M.D. La. Aug. 26, 2022) ......................... 12

*Ball v. LeBlanc,*
    792 F.3d 584 (5th Cir. 2015) .......................................... 12, 13

*Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.,*
    996 F.3d 37 (1st Cir. 2021) .............................................. 9, 22

*Campaign for S. Equality v. Bryant,*
    773 F.3d 55 (5th Cir. 2014) ..................................................... 9

*Commonwealth v. Beshear,*
    981 F.3d 505 (6th Cir. 2020) ........................................... 9, 22

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ............................................................... 16

*Gooch v. Life Invs. Ins. Co. of Am.,* 6
    72 F.3d 402 (6th Cir. 2012) ................................................. 12

*In re Abbott,*
    800 F. App'x 296 (5th Cir. 2020) (per curiam) ...................... 8

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022) ............................................. 19

*Maryland v. King,*
    567 U.S. 1301 (2012) ............................................................ 20

*Planned Parenthood of Greater Tex. Servs. v. Abbott,*
    734 F.3d 406 (5th Cir. 2013) ........................................... 9, 22

*Rest. L. Ctr. v. DOL*,
  66 F.4th 593 (5th Cir. 2023) ................................................................. 19

*Rizzo v. Goode*,
  423 U.S. 362 (1976) ............................................................................ 19

*Sampson v. King*,
  693 F.2d 566 (5th Cir. 1982) ............................................................. 18

*Valentine v. Collier*,
  956 F.3d 797 (5th Cir. 2020) .............................. 4, 13, 16, 17, 18, 20, 21

*Valentine v. Collier*,
  993 F.3d 270 (5th Cir. 2021) ......................................................... 15, 20

*Veasey v. Abbott*,
  870 F.3d 387 (5th Cir. 2017) ............................................................. 21

*Veasey v. Perry*,
  769 F.3d 890 (5th Cir. 2014) ............................................................... 9

*Yang v. Kellner*,
  458 F. Supp. 3d 199 (S.D.N.Y. 2020) ................................................. 12

**Statutes**

18 U.S.C. § 3626 ............................................................................ 3, 10, 11

28 U.S.C. § 1292 ..................................................................................... 8

**Rules**

Fed. R. App. P. 8 ..................................................................... 1, 9, 21, 22

Fed. R. App. P. 27 ................................................................................... 1

Fed. R. App. P. 32 ................................................................................. 25

Under Federal Rule of Appellate Procedure 27 and this Court's Rule 27.3, Appellants (collectively, the State) file this emergency motion (a) for an immediate administrative stay of the district court's July 2, 2024, Order, Ex. A, and (b) for a stay of the Order pending appeal. Urgency exists because the Order is a temporary restraining order that requires the State to "immediately" change and develop a wide swath of prison policies—and to submit a memorandum on the State's progress by Tuesday, July 9. Ex. A at 76–78. Given the extraordinary time constraints, moving for a stay first in the district court would be "impracticable." Fed. R. App. P. 8(a)(2)(A)(i); *see infra* Argument Section II. <u>Accordingly, the State respectfully requests that this Court administratively stay the Order **by Friday, July 5**, and thereafter grant a full stay pending appeal.</u>[1]

---

[1] Pursuant to this Court's Rule 27.4, counsel for the State notified Appellees of the State's intent to file this motion. Counsel for Appellees advised that they oppose the requested relief and will file an opposition.

# INTRODUCTION

Approximately 24 hours before Louisiana state employees leave the office for a four-day weekend, *see* Proclamation No. 41 JML 2024 (declaring July 5 a legal State holiday), the district court in this case issued a 78-page temporary restraining order demanding that the State "immediately" change and develop a host of prison policies—and demonstrate compliance within seven days. Ex. A. at 77. But this case has been pending since September 2023. And Plaintiffs, who challenge conditions at Louisiana State Penitentiary (LSP), waited until May 13, 2024, to seek a preliminary injunction and a temporary restraining order. The district court held a hearing on June 18, where it took no evidence. Then, two weeks later—at the close of business on July 2—the court entered the 78-page Order now on appeal.

The Order demands that the State "immediately" alter "equipment policies" and directives; "revise[]" and "expand[]" its current medication policy; and "[c]reate" and "[d]evelop" new procedures and policies regarding heat and health conditions. *Id.* The Order unambiguously states that the State "shall make every effort to provide for immediate implementation." *Id.* at 76. Finally, the Order requires the State to

"submit a memorandum containing their proposed remedies within seven (7) days of the entry of this Ruling and Order"—this Tuesday. *Id.* at 77.

This Court will almost certainly reverse the Order. Time constraints prevent a full catalogue of the district court's errors, but a few bear mentioning here and below. Most important, the Order squarely violates the Prison Litigation Reform Act (PLRA) in numerous ways, not least of which is there is no "violation of the Federal right of a particular plaintiff or plaintiffs" that can sustain the Order. 18 U.S.C. § 3626(a)(1)(A). It is undisputed that no named Plaintiff is actually subject to the challenged prison conditions. Under the PLRA, therefore, the district court was legally barred from issuing prospective relief, since there is no violation of a Plaintiff's rights to remedy. And for the same reason (and others), the district court erred in its Eighth Amendment analysis: The Supreme Court has squarely held that a plaintiff must identify a current Eighth Amendment violation to secure an injunction— and no such violation exists here.

The remaining stay factors likewise cut in favor of a stay. Because the State is the appealing party, its interests and harm merge with the public's. And it faces obvious irreparable harm: The Order compels the

State to immediately expend time and resources, which are unrecoverable compliance costs. Further, by directing the State to change and adopt prison policies, the Order directly intrudes on the State's sovereign prerogative to administer its prison policies. The Court credited these interests in entering a stay pending appeal in *Valentine v. Collier*, 956 F.3d 797, 803–04 (5th Cir. 2020); it should do the same here.

Accordingly, the State moves for an emergency administrative stay of the Order **by Friday, July 5,** and a stay of the Order pending appeal.

## BACKGROUND

This case nominally turns on a discrete aspect of LSP operations, but has been transformed into an enterprise to remake Department of Public Safety and Corrections (DPSC)-wide policies and procedures.

**1.** Every inmate at LSP has a job. Some work in kitchens, some work in maintenance, and so on. Each inmate's job depends on their own "duty status" as determined by a medical health care provider, as well as their interests and the needs of the facility.

This case involves work on LSP's Farm Line. Broadly speaking, the Farm Line comprises agricultural operations through which fresh fruits and vegetables are planted, cultivated, and harvested according to

industry standards solely for prisoner consumption. *See* Ex. B at 4–5. The crops are not sold to the public, and LSP does not profit. *Id.*

The parties in this case dispute working conditions on the Farm Line. But the State submitted voluminous evidence to the district court establishing, among other things, that prisoners work only until about 11:30am; that water, Gatorade, and breaks are available as needed; that prisoners receive protective clothing and equipment, including boots, gloves, and hats; and—at the district court's urging—the State now provides sunscreen and canopies for shade. *Id.* at 5–7; Ex. D at 3.

One final and important note on the Farm Line: The singular "Line" is a misnomer because there are multiple "lines" to which prisoners are assigned. *See* Ex. A at 2. That nuance matters in this case because, as discussed below, only one named Plaintiff is actually assigned to a "line" challenged at this stage—and he has not worked on the line since May.

**2.** Plaintiffs in this Eighth Amendment lawsuit demanded that the district court "enjoin all operations on the Farm Line when heat index values reach or exceed eighty-eight degrees Fahrenheit." *Id.* The district court construed Plaintiffs' request to be limited to "only Lines 15a, 15b, 24, and 25, which are staffed by approximately fifty incarcerated persons

at any given time." *Id.* at 72–73. And Plaintiffs' request is more questionable still: Only two named Plaintiffs were assigned to any of these four lines. As the district court acknowledged, Plaintiff Myron Smith is assigned to Line 15b, but has been "informed [] that he w[ill] no longer be required to work in the field." *Id.* at 5. In addition, Plaintiff Alvin Williams was previously assigned to Line 25, *id.* at 8, but he submitted a supplemental affidavit in this case admitting that he is no longer on the Farm Line, Dist. Ct. ECF No. 51-4 at 1, ¶¶ 2, 7, 8. The district court did not acknowledge this fact. <u>The upshot: No Plaintiff is or has ever been assigned to Lines 15a and 24, which Plaintiffs challenge; no Plaintiff is assigned to Line 25, which Plaintiffs challenge; and no Plaintiff works on the Farm Line at all.</u>

Nonetheless, the district court's Order issues a sweeping injunction that affects not only the Farm Line and not only LSP, but also DPSC more generally. Specifically, the Order requires the State "to immediately":

1. Correct the deficiencies of Directive No. 13.067 noted herein, including the lack of shade and adequate rest to incarcerated persons laboring on the Farm Line;
2. Correct the problems with Defendants' equipment policies noted herein, including the failure to provide sunscreen

and other necessary protective clothing and equipment to those laboring on the Farm Line;

3. Submit a revised and expanded Heat Pathology Medications list;

4. Create a procedure to ensure that all incarcerated persons suffering from health conditions that significantly inhibit thermoregulation are assessed by medical personnel and are granted heat precaution duty status; and

5. Develop an additional heat-related policy to protect those laboring outdoors when heat index values reach or exceed 113 degree Fahrenheit, the temperature at which the National Weather Service issues excessive heat warnings.

Ex. A. at 77. The Order also requires the State to "submit a memorandum containing their proposed remedies within seven (7) days of the entry of this Ruling and Order," *id.*—*i.e.*, by Tuesday, July 9—while also ordering the State to "make every effort to provide for immediate implementation," *id.* at 76.

To clarify references in the Order, Directive No. 13067 is an LSP policy that provides "a mechanism to identify offenders more vulnerable to heat and to enforce provisions to reduce heat pathology among all offenders." Ex. E (Directive No. 13.067). It mirrors DPSC's Health Care Policy HCP 8, which applies to all DPSC facilities. *See* Ex. F (HCP 8). In addition, the referenced "Heat Pathology Medications list" is an attachment to HCP 8, *see id.* at 7, which identifies medications that

present special health and heat risks. If a prisoner is on one of the listed medications, he will receive heat precaution duty status, which, for example, would mean that he is not allowed to work outside when the temperature exceeds 88 degrees Fahrenheit. *Id.* at 3. As with HCP 8, the Heat Pathology Medications list applies to all DPSC facilities.

The State filed a notice of appeal immediately after the district court issued its order. Dist. Ct. ECF No. 71. It now files this emergency stay motion within 24 hours of the Order's issuance.

## JURISDICTIONAL STATEMENT

On July 2, 2024, the district court issued its Order, which is a temporary restraining order against the State. Ex. A. The State appealed that ruling the same day. Dist. Ct. ECF No. 71. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ARGUMENT

The Court should immediately enter an administrative stay of the Order and thereafter enter a full stay pending appeal. *See, e.g.*, *In re Abbott*, 800 F. App'x 296, 298 (5th Cir. 2020) (per curiam) ("Entering temporary administrative stays so that a panel may consider expedited briefing in emergency cases is a routine practice in our court."). "In determining whether to grant a stay pending appeal, [this Court]

considers four factors: '(1) whether the stay applicant has made a strong showing that he [or she] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Campaign for S. Equality v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014) (quoting *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014)). Each factor is easily satisfied.

Moreover, given the extraordinary time constraints presented by the Order, this is the rare case where the State need "not [first] seek a stay in the district court" since "moving in the district court initially would be impracticable." *Planned Parenthood of Greater Tex. Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013) (quoting Fed. R. App. P. 8(a)(2)(A)(i)); *Commonwealth v. Beshear*, 981 F.3d 505, 508 (6th Cir. 2020) (same); *Boston Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.*, 996 F.3d 37, 44 (1st Cir. 2021) (similar).

## I.   THE ORDINARY STAY FACTORS CUT IN FAVOR OF A STAY.

### A.   The State Is Likely to Succeed on the Merits.

A stay is principally warranted because this Court will likely—if not certainly—reverse the Order. As noted above, time constraints

prevent a full catalogue of the district court's errors, but two warrant mentioning here. *First*, the Order violates the PLRA, not least because no Plaintiff currently works on the Farm Line (and thus no Plaintiff is allegedly harmed), and yet the district court has awarded relief that spans the Farm Line, LSP more generally, and all DPSC facilities even more generally. That alone warrants a stay. *Second*, even if the Court reached the merits, the district court's analysis is riddled with Eighth Amendment mistakes. Across the board, therefore, the State is likely to succeed on the merits.

### 1. The Order plainly violates the PLRA.

Start with the PLRA. The district court paid lip service to it (Ex. A at 74), but did not cite the provision that principally requires reversal of the Order. The PLRA begins by stating that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A); *see also id.* ("The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means

necessary to correct the violation of the Federal right."). The Order violates that PLRA rule in no fewer than three different ways, each independently requiring reversal.

*First*, no prospective relief is available under the PLRA because there is no "violation of the Federal right of a particular plaintiff or plaintiffs." *Id.* It is undisputed that no Plaintiff currently works on the Farm Line—on *any* line. Plaintiff Williams admits that he is no longer on the Farm Line. Dist. Ct. ECF No. 51-4 at 1, ¶¶ 2, 7, 8. And Plaintiff Smith admits that, although he is technically assigned to Line 15b, "he w[ill] no longer be required to work in the field." Ex. A at 5. It is thus undisputed that any allegedly unconstitutional condition regarding the Farm Line has no bearing on Plaintiffs—because none of them work on the Farm Line. In the PLRA's terms, therefore, the Order must be reversed in its entirety because there is no "violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A).

*Second*, the Order—by the district court's admission—"grants relief to any putative class member" even though no class has been certified. Ex. A at 59. But this Court previously reversed this district court for exactly this reason under the PLRA. *See Ball v. LeBlanc*, 792 F.3d 584,

599 (5th Cir. 2015) ("The PLRA limits relief to the particular plaintiffs before the court."). The State reminded the district court of *Ball*, but the district court found no reason that "preclude[s] the Court from issuing a preliminary injunction that grants relief to any putative class member." Ex. A at 59. And again, that decision is particularly notable since not one named Plaintiff actually works on the Farm Line.

The district court tried to bolster its improper class-wide—and indeed, DPSC-wide—relief by citing (*id.*) a smattering of decisions that are not binding on this Court. Critically, however, none of those decisions was governed by, let alone cited, the PLRA and two did not even enter an injunction. *See Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012) (dismissing appeal of motion to dissolve injunction in breach-of-contract case); *Yang v. Kellner*, 458 F. Supp. 3d 199, 218 n.5 (S.D.N.Y. 2020) (entering injunction as to First and Fourteenth Amendment claims regarding the removal of names from a presidential primary ballot); *see also Alex A. v. Edwards*, 2022 WL 3701169, at *3 (M.D. La. Aug. 26, 2022) (surmising about, but not entering, a class-wide preliminary injunction). *Ball* controls here and it requires reversal.

*Third*, and finally, the Order demands demonstrably overbroad prospective relief—and again, this Court reversed this district court for exactly this reason in *Ball*. *See* 792 F.3d at 599 (Under the PLRA, "[b]efore a district court can award [injunctive] relief, it must find that 'such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation.'"). To take one example, the Order demands that the State change its policies to make "sunscreen" and "shade" available to prisoners, Ex. A at 70, but the State already has done so (*because the district court suggested it at the hearing*) and notified the district court accordingly two weeks ago, Ex. D at 3. That the Order expressly orders prospective relief that already exists is a telltale sign that the Order is not carefully and narrowly drawn. *See Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) (holding that the Texas Department of Criminal Justice was "likely to succeed on appeal insofar as the district court enjoined the State to follow its own laws and procedures," because "*Pennhurst* plainly prohibits such an injunction").

There are even more troubling examples. For instance, the policies that the district court has directed the State to immediately change are

not limited to the challenged conditions at LSP, or even to LSP itself—they extend to all DPSC facilities. That is because HCP 8—which governs all DPSC facilities—is the basis for LSP's Directive No. 13.067, which the district court has identified for revision. Ex. A at 77. That is a DPSC-wide issue. The same goes for the Heat Pathology Medications list, which must be changed under the Order. *Id.* That list comes from HCP 8, which, again, governs all DPSC facilities.

And these are just the existing policies. The Order also instructs the State to develop entirely new policies, which, by their nature, are DPSC-wide. For example: "Create a procedure to ensure that all incarcerated persons suffering from health conditions that significantly inhibit thermoregulation are assessed by medical personnel and are granted heat precaution duty status." *Id.* That is DPSC-wide. Or: "Develop an additional heat-related policy to protect those laboring outdoors when heat index values reach or exceed 113 degrees Fahrenheit, the temperature at which the National Weather Service issues excessive heat warnings." *Id.* That is DPSC-wide.

In sum, the sheer magnitude of the district court's Order is unmistakable—and it accentuates the preceding PLRA violations:

Because no Plaintiff is actually harmed on the Farm Line since no Plaintiff actually works on the Farm Line, it beggars belief that the district court has commanded sweeping policy changes across DPSC. With all due respect, the Order "harkens back to the institutional-reform litigation of yesteryear—back before the [PLRA], when federal supervision of state prisons was normal. It's not normal today." *Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021) (Oldham, J., concurring in the judgment). And the State is likely—if not certain—to obtain reversal of the Order.

## 2. The Order's Eighth Amendment analysis is flawed.

Although the Court need not reach the merits of Plaintiffs' Eighth Amendment claim to grant a stay, it bears noting that the district court's Eighth Amendment analysis is plainly wrong. Given space and time constraints, the State highlights here only a few examples.

*First*, and as a corollary to the fatal PLRA defects, the district court's Eighth Amendment analysis—the basis for the prospective relief in the Order—never mentions a single example of a current Eighth Amendment violation against a named Plaintiff. *See* Ex. A at 60–71. For good reason: None exists, because no Plaintiff currently works on the

Farm Line. That means Plaintiffs' Eighth Amendment claim is squarely barred under *Farmer v. Brennan*, 511 U.S. 825 (1994). There, the Court emphasized that a prisoner seeking an Eighth Amendment injunction "must demonstrate the continuance of [the Eighth Amendment violation] during the remainder of the litigation and into the future"—and defendants "may rely on ['developments that postdate the pleadings and pretrial motions'] to establish that the inmate is not entitled to an injunction." *Id.* at 846. That is the case here: It is undisputed that no Plaintiff currently works on the Farm Line, and thus, there is no Eighth Amendment violation as to any Plaintiff that could warrant the injunctive relief ordered by the district court. That ends this appeal on the merits.

*Second*, like the district court in *Valentine*, the district court here improperly "collapsed the objective and subjective components of the Eighth Amendment inquiry established in *Farmer*, treating inadequate measures as dispositive of the Defendants' mental state." 956 F.3d at 802. In *Valentine*, the district court pointed to the defendants' "general awareness of the dangers posed by COVID-19" as evidence that the defendants "subjectively believe[d] the measures they [were] taking

[were] inadequate." *Id.* But this Court rejected that tack because "the evidence shows that TDCJ has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus." *Id.* "Although the district court might do things differently, mere 'disagreement' with TDCJ's medical decisions does not establish deliberate indifference." *Id.* at 803.

So too here. For example, the district court pointed to (and deemed inadequate) the State's "own policies" *created to protect prisoners* as evidence of deliberate indifference. Ex. A at 68 ("Such policies make it clear that Defendants are cognizant of the threats that high heat imposes to human life and safety, both for the regular population of inmates and those exhibiting enhanced heat-susceptibility."). Similarly, the district court pointed to the fact that the State summarily denied 11 heat-related grievances on the ground that they "were 'false' and held 'no merit.'" *Id.* at 67. That, the district court said, "weighs in favor of a finding of deliberate indifference." *Id. How?* The district court identified no basis to dispute the grounds for denial, and so how could evidence like this suggest deliberate indifference? Again, "mere 'disagreement' with [the State's] medical decisions does not establish deliberate indifference,"

*Valentine*, 956 F.3d at 803—and the district court never parsed between the objective and subjective elements of deliberate indifference as this Court requires. *See id.* at 802–03.

*Finally*, the district court relied on private labor guidelines "from various national and state agencies" to suggest that somehow the State is deliberately indifferent. Ex. A at 64. But this Court has long held that, "[i]n operating a prison," "the state is not constitutionally required to observe all the safety and health standards applicable to private industry." *Sampson v. King*, 693 F.2d 566, 569 (5th Cir. 1982). Instead, federal courts "must use constitutional standards as the measure." *Id.* And that is especially so in agricultural cases such as this where the conditions faced by America's farmers are obvious comparators. *See id.* ("Prison officials should not be held to a higher standard of care than that practiced by responsible farmers in the surrounding agricultural community. A prison farm which adheres to the reasonable customs and usages of the surrounding area cannot be said to be imposing cruel and unusual punishment.").

For these reasons, and many more to be presented in the State's forthcoming merits brief, the State is likely to obtain reversal of the Order.

**B.    The State Faces Irreparable Harm Absent a Stay.**

The irreparable-harm factor likewise is easily satisfied in at least two respects. *First*, the State's compliance with the Order—which the district court has demanded *now*—will cost time and money that are unrecoverable from the federal courts or Plaintiffs. That is quintessential irreparable harm. *See Rest. L. Ctr. v. DOL*, 66 F.4th 593, 597 (5th Cir. 2023) ("Under our precedent, the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm."); *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs"). And again, there is here-and-now irreparable harm: The district court ordered the State to "[c]reate" and "[d]evelop" at least two new policies and amend at least two existing policies—at the State's unrecoverable expense. Ex. A at 77.

*Second*, the Order irreparably intrudes on the State's sovereignty. *See Rizzo v. Goode*, 423 U.S. 362, 379 (1976) (when federal courts

interfere with state prisons, "appropriate consideration must be given to principles of federalism"); *Valentine*, 956 F.3d at 803 (since the Legislature has "assigned the prerogatives of prison policy to" DPSC, "[t]he district court's injunction prevents the State from effectuating the Legislature's choice and hence imposes irreparable injury"); *Valentine*, 993 F.3d at 291 (Oldham, J., concurring in the judgment) ("this sort of federal-court intervention" in State prisons "imposes grave federalism costs"). Indeed, the Order strips the State of its ability to enforce its own policies and orders the State to replace them with policies of the court's choosing. Whether that directive is lawful or not (it is not), the *harm* to the State right now is textbook irreparable harm. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State[.]" (citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers))).

### C. The Equities and the Public Interest Favor a Stay.

The remaining factors confirm that a stay is proper. On the equities, the State's irreparable harm easily wins the day because Plaintiffs, well, do not actually work on the Farm Line whose conditions they challenge in this case—and it is important to remember that this is

a *Farm Line* case. Since they do not stand to benefit from any possible Farm Line changes compelled by the Order, a stay of the Order would not affect Plaintiffs' non-existent work on the Farm Line.

As for the public interest, the public has no interest in the State bleeding unrecoverable time and money due to an Order that plainly violates the PLRA. To the contrary, it is in the public interest to *protect* the public fisc and the taxpayer dollars that fund public employees' salaries. *See Valentine*, 956 F.3d at 804 ("Because the State is the appealing party, its interest and harm merge with that of the public." (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017))). Because all factors favor a stay, therefore, the Court should stay the Order.

## II. MOVING FIRST FOR A STAY IN THE DISTRICT COURT WAS IMPRACTICABLE.

Finally, the State notes for the Court that it did not first seek a stay in the district court. That is because doing so would have been "impracticable" in light of the extraordinary time constraints presented by the Order. Fed. R. App. P. 8(a)(2)(A)(i) (permitting a stay motion to be filed for the first time in this Court if "moving first in the district court would be impracticable"). Specifically, the Order demands "immediate[]" (Ex. A at 77) changes to existing policies and the creation of new policies

(and a report by Tuesday)—which would affect not only LSP, but also all other DPSC facilities. Given that State and federal offices will not be open for three or four of the next six days, it would be exceedingly impracticable to seek relief first in the district court—particularly because of the herculean task that lies ahead if the State does not receive immediate relief.

This Court and its sister circuits have consistently recognized that, under Rule 8(a)(2)(A)(i), such compressed timeframes permit parties to file a stay motion first in the court of appeals. *See Planned Parenthood of Greater Tex. Servs.*, 734 F.3d at 410 (challenged law would take effect "the day after the district court issued its opinion and final judgment"); *Commonwealth*, 981 F.3d at 508 (permitting stay motion regarding November 25 injunction against executive order intended to take effect on November 29); *see also Boston Parent Coal. for Acad. Excellence Corp.*, 996 F.3d at 44 (entertaining injunction motion initially filed in the court of appeals because of the "tight timeframe"—days or weeks—that "render[ed] prior recourse to the district court sufficiently impracticable"). Just so here, where the Order's demands are "immediate" and call for a progress report by this Tuesday, July 9.

## CONCLUSION

The State respectfully requests that the Court enter an administrative stay of the Order **by Friday, July 5**, and a full stay of the Order pending appeal.

Respectfully submitted,

Dated:  July 3, 2024

ELIZABETH B. MURRILL
Attorney General of Louisiana

*J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

## CERTIFICATE OF SERVICE

I certify that on July 3, 2024, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 27 (d)(2) because it contains 4,585 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

Dated:   July 3, 2024

# EXHIBIT A

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

VOICE OF THE EXPERIENCED, A                          CIVIL ACTION
MEMBERSHIP ORGANIZATION ON
BEHALF OF ITSELF AND ITS
MEMBERS, ET AL.

VERSUS

JAMES LEBLANC, ET AL.                          NO. 23-01304-BAJ-EWD

RULING AND ORDER

Before the Court is Plaintiffs' **Application For A Preliminary Injunction
And Temporary Restraining Order (Doc. 37)**, which requests that the Court
immediately enjoin all agricultural labor performed by incarcerated persons on the
Farm Line at the Louisiana State Penitentiary in Tunica, Louisiana, otherwise
known as "Angola" or "LSP," when heat index values exceed eighty-eight degrees
Fahrenheit. Defendants have filed an Opposition, (Doc. 49), to which Plaintiffs filed
a reply, (Doc. 51). Considering these pleadings and the materials submitted in
support thereof, along with the statements offered by the parties at the June 18, 2024,
Oral Argument on Plaintiffs' Motion, and for all of the reasons to follow, Plaintiffs'
Motion will be granted in part and denied in part. The Court will not enjoin labor on
the Farm Line at this time but will order Defendants to alter Farm Line working
conditions to preserve human health and safety.

I.  **BACKGROUND**

At Angola, incarcerated persons are sometimes required to perform
agricultural labor for a variety of prison programs. The usefulness and sophistication

1

of the labor involved in the various programs allegedly differs substantially, with some programs resembling modern-day farming operations and others, such as the Farm Line, serving an almost purely penological function. At this time, Plaintiffs have defined the Farm Line as those compulsory, punitive agricultural or farming labor programs operated at Angola, including but not limited to Lines 15a, 15b, 24, and 25.[1] (Doc. 37-1 at p. 8 fn. 2). Plaintiffs request that the Court enjoin all operations on the Farm Line when heat index values reach or exceed eighty-eight degrees Fahrenheit.[2] According to Defendants, this definition of the Farm Line encapsulates the work assignments for fewer than fifty inmates on any given day. (Doc. 49 at p. 4 fn. 11).

Plaintiffs filed an Amended Complaint on December 15, 2023, seeking, among other relief, certification of various classes; declaratory judgment in favor of Plaintiffs finding that Defendants are violating the constitutional rights of the members of the putative classes by forcing them to work on the Farm Line in unsafe and inhumane conditions; declaratory judgment in favor of Plaintiffs that those incarcerated persons convicted by non-unanimous juries may not be forced to work on the Farm Line under the Thirteenth Amendment; declaratory judgment in favor of Plaintiffs declaring that Defendants are violating the rights of each member of the putative disability class by

---

[1] The pleadings and arguments contained therein do not identify the crops grown on these Lines, or any other information outside of that which is provided.

[2] The heat index is "[t]he perceived temperature in degrees Fahrenheit derived from a combination of the temperature and humidity for the indicated hour." (Doc. 37-38 at p. 2). It is a more accurate portrayal of how conditions are felt by the human body, and is a metric that has been accepted by numerous courts. *E.g., Ball v. LeBlanc*, 792 F.3d 584, 591–592 (5th Cir. 2015); *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004).

requiring them to labor on the Farm Line; and a permanent injunction enjoining Defendants from conducting compulsory agricultural labor at Angola. (Doc. 21). The Court dismissed Plaintiffs' Thirteenth Amendment claims in its June 5 Ruling and Order, finding that such claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Edwards v. Vannoy*, 593 U.S. 255 (2021). (Doc. 56). On May 13, 2024, Plaintiffs filed a motion asking that the Court issue a temporary restraining order and provide preliminary injunctive relief by enjoining Defendants from operating the Farm Line when heat index values reach or exceed eighty-eight degrees Fahrenheit. (Doc. 37). The Court held a Telephone Status Conference to discuss the motion with the parties on May 16, 2024. At this Status Conference, the Court ordered additional briefing from the parties. (Doc. 45). Defendants filed an Opposition, (Doc. 49), to Plaintiffs' request. Plaintiffs filed a Reply to Defendants' Opposition. (Doc. 51). On June 18, 2024, the Court heard Oral Argument on Plaintiffs' request for injunctive relief. (Doc. 62).

## II. THE PLAINTIFFS

The named Plaintiffs in this action comprise certain incarcerated persons who have labored on the Farm Line at Angola, along with a grassroots nonprofit organization, the Voice of the Experienced, which advocates for the civil, constitutional, and human rights of its members. (Doc. 21 at pp. 4-8). The named Plaintiffs are and allege as follows.

### A. Myron Smith

Plaintiff Myron Smith is over fifty years old and has been incarcerated at Angola since 1998. (Doc. 37-14 at ¶ 1, hereinafter "Smith Declaration"). Smith avers,

based on his personal knowledge of Angola disciplinary policies and practices, that

nearly all incarcerated persons must work on the Farm Line when they first arrive

at Angola, and that anyone may be reassigned to and remain on the Farm Line as

punishment for a disciplinary infraction. (*Id.* at ¶ 3).

Smith has served on the Farm Line three times, once when he arrived at

Angola in 1998, once when he received a disciplinary write-up in 2005, and finally

after receiving another disciplinary write-up in 2022. (*Id.* at ¶¶ 4-5, 7). Smith provides

that work on the Farm Line earns him as little as two cents an hour, or roughly one-

fourth and one-tenth of the wages from his previous prison work assignments as a

kitchen orderly and ranch hand. (*Id.* at ¶¶ 5-6, 19). Smith is still working on Line 15b

of the Farm Line. (*Id.* at ¶ 7). There, he works "in the fields from approximately 7

a.m. until mid-morning, and then again from around 11 a.m. to around 1:30 p.m." (*Id.*

at ¶ 8). The work consists of "pick[ing] crops, cut[ting] grass, and sometimes []

maintenance." (*Id.*). While Smith is sometimes afforded tools such as "weed eaters,"

"other times [prisoners] are forced to use [their] hands." (*Id.*). Smith declares that the

working conditions on the Farm line:

> are harsh. The drinking water is dirty, in a moldy cooler that often
> contains dead insects. There is no shade. Breaks are rare. Armed guards
> patrol the fields, sometimes riding four-wheelers. My understanding is
> that guards generally don't use horses anymore because the weather is
> too hot for them. There is often no place to use the bathroom. When there
> are portapotties [sic], they are extremely unsanitary.

(*Id.* at ¶ 9). Smith alleges that due to the "unsanitary water," he has had to purchase

his own water at "significant expense." (*Id.* at ¶ 10). To the best of Smith's

recollection, he has "never been provided with sunscreen, proper work gloves, proper

work boots, sunglasses, or other safety equipment necessary to safely work in the fields." (*Id.*). Smith further avers that the "heat and humidity in the fields are unbearable." (*Id.* at ¶ 12). He provides that he "often feel[s] woozy, dehydrated, and dizzy." (*Id.*). Smith described one such experience on the Farm Line as follows:

> I was working on Line 15b when my muscles began locking up. I could barely move. An emergency medical technician arrived and told me to drink more water and rest. But instead of being taken inside to cool off, I was forced to sit in the field, in the hot sun, for the rest of the shift.

(*Id.*). Allegedly, on Line 15b, "heat advisories are ignored." (*Id.* at ¶ 13). Smith asserts that despite the heat advisories being "clearly audible from the prison official's radios," those advisories are "completely ignored," and prisoners are forced to continue working in the heat. (*Id.*).

Some of the tasks that Smith has been ordered to perform on the Farm Line have been needlessly difficult. For instance, Smith asserts that:

> [e]arlier this year, officials gave me a five[-]gallon bucket and a [S]tyrofoam cup and forced me to hand-water rows of watermelons. This was physically painful and difficult work, particularly given the extreme heat and humidity in the fields. I have also been forced to hand-pick grass. I could not refuse to do this make-work without risking disciplinary action and serious harm.

(*Id.* at ¶ 15). Smith reiterated his above claims via supplemental declaration on May 28, 2024. (Doc. 51-6, hereinafter "Smith Supplemental Declaration"). Therein, he stated that after laboring on the Farm Line on May 16, 2024, a prison official informed him that he would no longer be required to work in the field. (*Id.* at ¶ 2). He was not provided with an explanation for this change. (*Id.*). Smith again stated he had never been issued adequate safety equipment for labor on the Farm Line, and

that he did "not recall ever being directed or permitted to take breaks every 30 minutes for five minutes." (*Id.* at ¶ 7).

On May 23, 2023, Smith filed a Request for Administrative Remedy (ARP),[3] in which he restated the above, and alleged that prisoners working on the Farm Line were not provided with shade, sanitary toilets, or proper safety equipment, including gloves, work boots, sunscreen, hats, and safety glasses. (Doc. 37-61 at p. 3). Smith stated that work on the Farm Line was "extremely dangerous," in large part due to the "extreme temperatures and high humidity." (*Id.*). Smith requested that Angola officials grant him a "permanent no duty status for all field work, including any future assignment to the [F]arm [L]ine," that the Farm Line be ended, that all work at Angola be made safe for persons with disabilities, and that persons laboring at Angola be provided "safety equipment, adequate breaks and access to shade, clean drinking water, and sanitary toilets." (*Id.* at pp. 3-4). Angola officials denied Smith's ARP, and asserted that his statements regarding working conditions on the Farm Line were "false and untrue," that toilets were provided to persons laboring on the Farm Line, that work gloves were provided on request, that water, Gatorade, and breaks were provided to all prisoners, and that all prisoners laboring on the Farm Line "have been seen and cleared by medical personnel to work in that job." (*Id.* at p. 5). Smith contested this denial, and again asserted that no safety equipment had been provided

---

[3] An ARP is a request for administrative relief submitted to LSP officials, and is generally the first step in the process for an incarcerated person to challenge the legality of prison policies, practices, or events.

to persons laboring on the Farm Line, and that heat advisories issued for the Farm Line were not observed. (*Id.* at p. 6). Smith's ARP was again denied. (*Id.* at p. 2).

Dr. Susi Vassallo, a licensed physician and an expert on thermoregulation,[4] reviewed Smith's medical records. (Doc. 54-1). She concludes that Smith's medical records reflect a significant history of physical injuries, "including a left humerus fracture; ailments related to gunshot wounds in the back, knee, and foot . . . and injuries to the right ankle and left rib." (*Id.* at p. 6). Angola medical personnel prescribe or have prescribed Smith with a variety of medications relating to these injuries, including "Benadryl []; methocarbamol, a muscle relaxant; Demerol [], an opioid used to treat pain; loratadine, an antihistamine; and non-steroidal anti-inflammatory drugs like Advil [], Toradol [], Dolobid [], Celebrex [], and meloxicam." (*Id.*). According to Dr. Vassallo, many of these medications affect the body's ability to regulate temperature, and place Smith "at greater risk of heatstroke and heat related disorders." (*Id.*). Dr. Vassallo also notes that Smith has a history of heat-stress disorders, exhibited by an event in 2021 wherein Smith complained of stomach cramps and was advised to drink more water to stay hydrated. According to Dr. Vassallo, "[t]his symptom is consistent with heat-related illness. . . [and] 'drink more

---

[4] Dr. Vassallo has been admitted as an expert on thermoregulation, or the process by which the human body regulates internal temperatures, on numerous occasions. *See, e.g., Yates v. Collier,* 868 F.3d 354, 363-64 (5th Cir. 2017) ("Dr. Vassallo is a licensed physician and a recognized expert in the field of thermoregulation and hyperthermia, with over twenty-five years treating heat stroke and heat related disorders. Dr. Vassallo has previously served as an expert witness in lawsuits challenging prison conditions, and this court has (at least) twice upheld district court findings that relied heavily on Dr. Vassallo's testimony.") (citations omitted); *Ball,* 792 F.3d at 593; *Gates,* 376 F.3d at 339.

water' is a nonspecific instruction that does not, on its own, mitigate the risk of heat-related illness." (*Id.* at p. 7).

**B. Alvin Williams**

Plaintiff Alvin Williams is a thirty-eight-year-old man who has been incarcerated at Angola since 2009. (Doc. 37-17 at ¶¶ 1-2, hereinafter "Alvin Declaration").[5] Alvin likewise avers that "nearly all incarcerated people must work on the Farm Line when they first arrive at Angola, and that anyone may be reassigned to the Farm Line as punishment for a disciplinary infraction." (*Id.* at ¶ 3). In 2022, due to a disciplinary write-up, Alvin was placed on Line 25 within the Farm Line. (*Id.* at ¶ 5). He has worked on the Farm Line ever since, a period of two years. (*Id.*). Alvin offers a similar account to Smith, and avers that on the Farm Line:

> work in the fields [starts] around 7 a.m. Around 9 a.m., there will sometimes be an announcement about whether there is a heat advisory that day. A heat advisory means that the heat and humidity are dangerously high. [Inmates] are still forced to work in the fields, even when there is a heat advisory, until around 11:30 a.m.

(*Id.* at ¶ 6). Laborers are paid two cents an hour. (*Id.* at ¶ 19). Like Smith, Alvin has been assigned such Sisyphean tasks as "goose picking" "where [he] [is] forced to pick blades of grass, by hand, from the dirt." (*Id.* at ¶ 7). Alvin asserts that on the Farm Line, "working conditions are harsh. The drinking water is dirty, in a moldy cooler that often contains dead insects. There is no shade. [] [B]reaks are rare." (*Id.* at ¶ 8). Alvin additionally asserts that he has "never been provided with sunscreen, proper

---

[5] The Court would otherwise refer to Alvin Williams as "Mr. Williams" or "Williams," but because another named Plaintiff possesses the surname "Williams," the Court will respectfully refer to him as "Alvin."

work gloves, proper work boots, sunglasses, a sunhat, or other safety equipment." (*Id.* at ¶ 9). Alvin provides that on several occasions, "prison officials threatened to punish me if I stopped working, encouraged other incarcerated men to stop working, complained about the unsafe work conditions, or failed to work 'efficiently.'" (*Id.* at ¶ 18). Finally, Alvin declares that "[t]he heat and humidity in the fields are unbearable. I often feel lightheaded and exhausted from doing manual labor . . . . I have felt my heart racing and felt chilled, despite the heat. I often feel dehydrated. I have suffered from blistered hands and feet, sunburns." (*Id.* at ¶ 20). According to Alvin, the allegations of Angola's failure to provide sufficient protective equipment and the sporadic and infrequent nature of breaks on the Farm Line were true as of at least the week of May 13, 2024. (Doc. 51-4 at ¶¶ 3, 5, hereinafter "Alvin Williams Supplemental Declaration"). Alvin stated that he did "not recall ever being directed or permitted to take breaks every 30 minutes for five minutes," as Defendants claim. (*Id.* at ¶ 5).

Alvin submitted an ARP setting forth similar accusations on July 6, 2023. (Doc. 37-60 at p. 3). Alvin informed prison officials that Farm Line conditions have been "horrible and unsafe" due to the "extreme heat conditions and high humidity." (*Id.*). Alvin provided that he had been given "dangerous drinking water" with "black mold inside the coolers." (*Id.*). He additionally averred that laborers on the Farm Line have "never" been given "proper breaks, shade, sanitary toilets, proper equipment, like thick gloves and work boots, sunscreen and hats." (*Id.*). Alvin further stated that he had been "denied medical assistance" when he complained about suffering from

9

"dizziness, dehydration and body temperatures reaching high and unsafe temperatures." (*Id.*). Alvin closed his ARP by asking for relief identical to that requested by Smith. (*Id.* at p. 5). Prison officials denied Alvin's ARP, stating that his claims were "false, and hold no merit," and that Alvin had "not provided sufficient evidence to substantiate [his] claim." (*Id.* at p. 6). Alvin appealed this denial, and prison officials again denied his claim. (*Id.* at p. 2).

Alvin's medical records show that while laboring on the Farm Line, he reported to Angola medical personnel after exhibiting partial numbness in one of his extremities. (Doc. 47-3 at p. 2). Several months prior to this, Alvin again placed a sick call while staffed on the Farm Line. Medical personnel found that he suffered from severe abdominal pain, associated high blood pressure, dizziness, and nausea. (Doc. 47-3 at pp. 7-9). Several weeks prior to this sick call, in mid-October 2023, Alvin reported that he suffered from numbness in his extremities. (*Id.* at p. 13). Throughout the entirety of these medical visits, Alvin repeatedly stressed that work on the Farm Line was exacerbating his symptoms and that such work was especially difficult due to what Alvin believed to be several ruptured tendons in his ankle. (*See, e.g., id.* at p. 14). In September 2023, Alvin again received medical treatment after laboring on the Farm Line. (*Id.* at p. 17). The medical logs show that Alvin was brought to medical personnel by prison officials after he was allegedly "dancing around in the field and had had [sic] slurred speech so they think he is intoxicated." (*Id.*). Alvin informed medical personnel that he thought he was "dehydrated" and that he "got dizzy and sat down." (*Id.*). Alvin exhibited a blood pressure consistent with Stage 2

hypertension at this medical visit. (*Id.*).[6] Medical personnel at this visit noted that Alvin was compliant and his speech was clear. (*Id.* at p. 19).

Dr. Vassallo reviewed Alvin's medical records, and noted that his known conditions included a history of high blood pressure, tuberculosis, and mobility impairments. (Doc. 54-1 at p. 2). These conditions, according to Dr. Vassallo, put Alvin at greater risk of heatstroke and heat related disorders. (*Id.* at pp. 2-3). According to Dr. Vassallo, exacerbating these risks to Alvin are the prescribed medications he is currently taking or has taken in the past. (*Id.* at p. 3). Those medications include rifampin and dicyclomine, each of which inhibit the body's ability to self-regulate temperature. (*Id.*).

### C. Darrius Williams

Plaintiff Darrius Williams is thirty-three-years old and has been incarcerated at Angola since 2011. (Doc. 37-18 at ¶¶ 1-2, hereinafter "Darrius Declaration").[7] Darrius provides similar statements to those of Alvin and Smith, and states that "nearly all incarcerated people must work on the Farm Line when they first arrive at Angola, and that anyone may be reassigned to the Farm line as punishment for a disciplinary infraction." (*Id.* at ¶ 3). Darrius asserts that he has been placed on the Farm Line on three separate occasions, and that, in total, he has worked the Farm Line off and on for around eight years. (*Id.* at ¶¶ 4-6). On the last occasion, Darrius

---

[6] This blood pressure reading is associated with those at highest risk of cardiovascular events. *See* Thomas D. Giles & Barry J. Materson, <u>Treating Stage 2 Hypertension</u>, J. of Clinical Hypertension, 464 (2005).

[7] For considerations previously provided in footnote 5, the Court will respectfully refer to Darrius Williams as "Darrius."

actually refused to go to the Farm Line because he was not provided with "sufficient work boots, jeans, or work gloves," and therefore believed that working on the Farm Line would be unsafe. (*Id.* at ¶ 6). He was given a month in disciplinary segregation for this refusal. (*Id.*). Darrius confirms that laborers on the Farm Line are paid two cents an hour. (*Id.* at ¶ 8). Darrius describes work on the Farm Line as follows:

> [W]e arrived in the fields around 7 a.m., we would be told to pick crops, like digging up sweet potatoes by hand. We were still forced to work, even when there was a heat advisory. . . To the best of my recollection, I have never been provided with sunscreen, proper work gloves, proper work boots, sunglasses, a sunhat, or other safety equipment necessary to safely work in the fields. Conditions in the field are brutal and unsafe. There is no shade. The heat and humidity in the fields are unbearable. It can get to 105 to 110 degrees outside. It's so hot out in the corn fields that it's hard to breathe. I've had to make several medical calls. Once, I was forced to work the Farm Line in the summer and was in the corn fields. The temperature was over 100 degrees and I started feeling chills. I was shaking, as though it was freezing. I started sweating profusely. I started to feel dizzy. I lost control of limbs and fainted. Medical came and reported that my blood pressure was very high. Despite all this, prison officials sent me back out into the field the next day. I refused. I was placed in lockdown.

(*Id.* at ¶¶ 9-13). Additionally, Darrius provides that, like Alvin, on several occasions, "prison officials threatened to punish me if I stopped working, encouraged other incarcerated men to stop working, complained about the unsafe work conditions, or failed to work 'efficiently.'" (*Id.* at ¶ 17).

Like Smith and Alvin, Darrius submitted an ARP setting forth the above and requesting that he be taken off Farm Line duties. (Doc. 37-40). Darrius informed prison officials in this ARP of how he had fainted from the heat on a previous occasion, how this fainting had required emergency medical care, and how his refusal to go out into the fields the next day resulted in him being placed in lockdown. (*Id.* at p. 3).

Darrius also stated that laborers were "not given adequate safety equipment" and were not given enough breaks. (*Id.* at ¶ 8). Darrius's ARP was denied because, according to Defendants, his claims were deemed to be 'false, and hold no merit"— the form response also given to Smith and Alvin. (*Id.* at p. 5).

Darrius's medical records show that he has reported to Angola medical personnel with symptoms such as weakness and dizziness. (Doc. 47-52 at p. 23). Darrius's medical records also show that in December 2022, several months after Darrius was placed on disciplinary segregation for refusing to report to the Farm Line for unsafe conditions, he reported to medical personnel after suffering a cardiac event in the early morning. (*Id.* at p. 41). Darrius is currently in "preventative segregation."[8] (Doc. 49 at p. 10). Dr. Vassallo reviewed Darrius's medical records and noted that he has "a history of illness and symptoms consistent with heat-stress disorders." (Doc. 54-1 at p. 9). She states that "[a]s one example, his records indicate that on October 11, 2018, [Darrius] [] presented to the ATU after working in the field, complaining of weakness, tiredness, diarrhea, and vomiting." (*Id.*). Dr. Vassallo also opines that the medications currently or previously prescribed to Darrius have the effect of weakening his ability to thermoregulate. (*Id.*).

**D. Nate Walker**

Plaintiff Nate Walker is forty-three-years old, and has been incarcerated at Angola since 2009. (Doc. 37-16 at ¶¶ 1-2, hereinafter "Walker Declaration"). Walker offers similar descriptions of the Farm Line to those given above. (*Id.*). Like Smith,

---

[8] The Court has not been provided with a description of what preventative segregation is or what preventative segregation is used for.

Alvin, and Darrius, Walker was placed on the Farm Line upon arriving at Angola and was placed back on the Farm Line upon receiving disciplinary write-ups. (*Id.* at ¶¶ 3-4). Walker has roughly thirteen years of experience laboring on the Farm Line. (*Id.* at ¶ 4). He states that work on the Farm Line occurs from approximately "7.am. [sic] until mid-morning, and then sometimes again from around 11 a.m. to around 3:00 p.m." (*Id.* at ¶ 5). Walker avers that recently, laborers were not allowed to go to lunch until they met a work quota. (*Id.* at ¶ 6). Walker also swears that "working conditions are harsh. The drinking water is dirty. There is no shade. Breaks are rare. . . There is often no place to use the bathroom. When we have access to a port-a-potty [sic], they are extremely unsanitary." (*Id.* at ¶ 7). He states that in his decades plus of labor on the Farm Line, he has "never been provided with sunscreen, proper work gloves, sunglasses, or other safety equipment necessary to safely work in the fields." (*Id.* at ¶ 8). Walker also asserts, like other named Plaintiffs, that "[t]he heat and humidity in the fields are unbearable." (*Id.* at ¶ 9). Walker further provides that he underwent a similar experience to Darrius. In his words:

> "[I]n approximately 2017, I was working in the field on a hot day. I was feeling weak and light headed [sic]. I notified the guards that I was not feeling good, but I was ignored. I could barely stand or walk. When I tried to walk, I began to sway. The guards called medical and told them that I was intoxicated. I was arrested and received a disciplinary write-up for intoxication. I was not intoxicated."

(*Id.*). Walker suffers from glaucoma, and working in the fields causes him "severe eye pain." (*Id.*). In addition to glaucoma, Walker asserts that he suffers from high blood pressure, depression, thyroid cancer and other thyroid issues, stomach issues, sleeping problems, and heart arrhythmia. (*Id.* at ¶ 10). He is prescribed a variety of

medications to deal with these medical issues. (*Id.*). Walker avers that despite this, Angola officials have refused to give him a permanent duty status that excuses him from labor on the Farm Line. (*Id.* at ¶ 11). In response, Defendants note that Walker has a heat related duty status, but they have neglected to attach documentation supporting this assertion. (Doc. 49 at p. 10).[9] Regardless, Defendants claim that Walker is now staffed on a line located at the "Raven dorms," and that "Raven dorms have not been out to the field since December 2021." (*Id.*).

Walker submitted an ARP to Angola officials on June 1, 2023, wherein he set forth the facts outlined above and requested to be permanently removed from agricultural work, including work on the Farm Line. (Doc. 37-48). In this ARP, Walker stated that he was forced to work the Farm Line as recently as April 2023, that he has been called to work the Farm Line multiple times since, and that he was disciplined for any refusal to do so. (*Id.* at p. 3). Like other Plaintiffs, Walker informed Angola officials that conditions on the Farm Line were unsafe, primarily due to the lack of shade, lack of protective equipment, lack of adequate breaks, and the high heat and humidity. (*Id.*). He went on to report that he once fainted on the Farm Line due to the heat, and that after he fainted, he was "punished and sent to the dungeon." (*Id.*). Walker provided that he suffers from multiple disabilities under the ADA, and that laboring on the Farm Line forces him to perform work that is beyond his physical capabilities. (*Id.* at p. 4). Walker received the same form response as other named Plaintiffs, denying his claims as false. (*Id.* at p. 6).

---

[9] Defendants cite to "Exhibit B-10, Walker Heat Related Duty Status" to support this assertion. A review of the record shows that no such exhibit has been provided to the Court.

Walker's medical records reflect that he was seen by Angola medical personnel for emergency care in 2017 when he suffered from "H/S," presumably referring to heat syncope or fainting, along with feeling weak and dizzy, and being dehydrated. (Doc. 47-48 at p. 29). However, the Court notes that this occurred during or shortly after Walker staged a hunger strike, wherein he did not eat from at least May 26, 2017, to June 4, 2017. (*Id.* at p. 33). Dr. Vassallo reviewed Walker's medical history, and concluded that he suffers from borderline high blood pressure, hyperthyroidism, and a variety of mental illnesses. (Doc. 54-1 at p. 9). She further noted that the medications used to treat these conditions inhibit Walker's ability to regulate his bodily temperature. (*Id.*).

### E. Kendrick Stevenson

Plaintiff Kendrick Stevenson is forty-five-years old and has been incarcerated at Angola since 1999. (Doc. 37-15 at ¶¶ 1-2, hereinafter "Stevenson Declaration"). Stevenson declares that conditions on the Farm Line are as represented by other named Plaintiffs, and that the Farm Line is used as punishment for incarcerated persons at Angola. (*Id.* at ¶ 4). Stevenson declares that he has worked the Farm Line on and off since 2004. (*Id.* at ¶ 5). Defendants provide that Stevenson received a heat related duty status in March 2024 after being prescribed Zyprexa. (Doc. 49 at p. 10).[10] Stevenson avers that, while on the Farm Line and as recently as December 2023, he was forced to hand-pick crops. (Stevenson Declaration at ¶ 7). Stevenson says that the work was "back-breaking. We had to squat and pluck grass with our fingers."

---

[10] Defendants cite to "Exhibit B-9, Stevenson Heat Related Duty Status" for this assertion. A review of the record shows that no such exhibit has been provided to the Court.

(*Id.*). He also claims, like other named Plaintiffs, that prisoners were not given proper safety equipment or tools to engage in this type of labor. (*Id.* at ¶ 8). Stevenson further found the heat and humidity experienced in the fields to be similarly "unbearable." (*Id.* at ¶ 10). He states that prisoners were forced to continue laboring in the fields after the issuance of heat advisories. (*Id.*). While working on the Farm Line, Stevenson "often felt dehydrated, lightheaded, and dizzy." His "muscles have locked up, like a charley horse in my back and arms." (*Id.*). Those symptoms worsen when he labors in extreme heat. (*Id.*). Stevenson additionally alleges that on numerous occasions, he has been disciplined for failing to work "efficiently" while on the Farm Line. (*Id.* at ¶ 15). Stevenson provided a supplemental declaration on May 28, 2024, wherein he reiterated that he had never been issued adequate safety equipment, such as lace-up boots, and that he did "not recall ever being directed or permitted to take breaks every 30 minutes for five minutes," as Defendants claim. (Doc. 51-5 at ¶ 6, hereinafter "Stevenson Supplemental Declaration").

Stevenson also submitted an ARP to prison officials that set forth the above. (Doc. 37-64). Therein, Stevenson notified prison officials that laborers were not given shade, sanitary toilets, adequate safety equipment, or enough breaks. (*Id.* at p. 2). He also asserted that, in light of his disabilities, Angola required him to work beyond his physical capabilities. (*Id.* at p. 3). Stevenson's ARP was denied on procedural grounds. (Doc. 37-43).[11]

---

[11] The records provided to the Court indicate that Angola personnel denied Stevenson's ARP because Stevenson had an active preexisting ARP and "only one complaint may be addressed at a time." (Doc. 37-43).

Dr. Vassallo reviewed the medical chart for Stevenson and found that he had a noted history of "paroxysmal supraventricular tachycardia," a heart condition wherein those afflicted exhibit an elevated and irregular heartbeat, "pre-diabetes, presbyopia, astigmatism, hyperopia, history of syncope [(fainting)], hypomagnesemia, vitamin D deficiency, seasonal allergies, hyperlipidemia" and other afflictions that raise the risk of Stevenson suffering heat-related injury. (Doc 54-1 at p. 5). Dr. Vassallo notes that, according to the medical records provided by Defendants, on one occasion in August 2023, Stevenson was laboring on the Farm Line when he exhibited nausea, dry mouth, and abdominal pressure. (*Id.*). "He was sweating profusely, laying in the field, and could not get up." (*Id.*). He "had not urinated in 5-6 days. These symptoms are consistent with heat distress." (*Id.*). The Court notes that Stevenson submitted a urine sample upon receiving medical treatment on this occasion which registered as positive for the presence of various narcotics in his system. (Doc. 47-6 at p. 18). Stevenson has taken or continues to take approximately ten medications to address the ailments listed above, many of which allegedly impair his ability to regulate his bodily temperature. (Doc 54-1 at p. 6).

### F. Damaris Jackson

Plaintiff Damaris Jackson is forty-three-years old, and has been incarcerated at Angola since 2002. (Doc. 37-13 at ¶¶ 1-2, hereinafter "Jackson Declaration"). His Declaration is based on his personal knowledge and his intermittent experience on the Farm Line from 2002 to 2023. (*Id.* at ¶¶ 6, 17). According to Jackson, the Farm Line is used to punish inmates at Angola. (*Id.* at ¶ 5). Work on the Farm Line begins at 7:00 A.M., runs until 11:00 A.M. or 11:30 A.M., and prisoners are sometimes

required to perform a second shift in the afternoon. (*Id*. at ¶ 7). Those laboring on the Farm Line are not provided with protective gear and equipment. (*Id*. at ¶ 8). He often feels dehydrated, lightheaded, and dizzy. (*Id*. at ¶ 10). He has felt "chilled despite the extreme heat and humidity." (*Id*.). He "often" gets muscle aches and headaches. (*Id*.). Work on the Farm Line is especially difficult for Jackson because he alleges that he suffers from a disability, namely high blood pressure. (*Id*. at ¶ 11). Based on this disability, Jackson asserts that laboring on the Farm Line exceeds his physical capabilities. (*Id*.). Jackson refused to work the Farm Line in June 2023, because of its unsafe nature and because it served "no rehabilitative purpose." (*Id*. at ¶¶ 18-19). Jackson avers, like other named Plaintiffs, that on numerous occasions prison officials have threatened to punish him if he stops working while on the Farm Line. (*Id*. at ¶ 21). Defendants provide that Jackson does not currently have a job assignment. (Doc. 49 at p. 10).

Jackson filed an ARP on June 12, 2023, which set forth similar allegations to the above. (Doc. 37-51). He informed prison officials that conditions on the Farm Line were unsafe, primarily due to the lack of shade, safety equipment, and adequate breaks. (*Id*. at p. 3). Jackson also notified prison officials through his ARP that he suffers from high blood pressure, and that he was taking medication to combat this infirmity. (*Id*. at pp. 4-5). Because of these limitations, Jackson asserted that laboring on the Farm Line was beyond his physical capabilities. (*Id*. at p. 5). Jackson received the same form denial as other named Plaintiffs. (*Id*. at p. 7).

A review of Jackson's medical records shows that he has often complained to Angola medical personnel that he experiences lower extremity swelling and numbness while laboring on the Farm Line. (Doc. 47-4 at p. 7). In addition, Jackson reported to Angola emergency medical with lightheadedness and vomiting after laboring in the fields on August 14, 2023. (*Id.* at p. 11). On the date in question, Angola experienced heat indices ranging from 95 degrees Fahrenheit to 107 degrees Fahrenheit. (Doc. 49-10 at p. 30). Prior to this, in July 2021, Jackson filed a request for medical treatment wherein he reported that he was suffering from excessive sweating, loose bowels, stomach cramps, headaches, blurry vision, inability to keep food down, and dizziness upon standing. (Doc. 47-4 at p. 23). In addition to these two events, Jackson received emergency medical treatment while working on the Farm Line in 2010, when he reported experiencing weak and dizzy. (*Id.* at p. 39).

Dr. Vassallo reviewed Jackson's provided medical records, and concludes that he has exhibited a history of illness and symptoms consistent with heat-stress disorders. (Doc. 54-1 at p. 4). Contributing to this history are the lingering conditions found in Jackson's medical history, which include high blood pressure, depression, arthritis, and localized swelling and pain in his right ankle. (*Id.*). For these ailments, Jackson takes a variety of medications that Dr. Vassallo finds inhibit the body's ability to combat overheating. (*Id.* at p. 5).

### G. Kevias Hicks

Plaintiff Kevias Hicks is thirty-three-years old and has been incarcerated at Angola since 2013. (Doc. 37-12 at ¶¶ 1-2, hereinafter "Hicks Declaration"). Hicks corroborates the accounts of the Farm Line given above. He states that his crew

worked on the Farm Line "from about 7:30 until 11:30 a.m., even when there was a heat advisory. We rarely got breaks. There is not always drinking water or portapotties [sic]." (*Id.* at ¶ 4). Hicks also avers that "[r]ecently, I was forced to pick rotten watermelons with my hands. My understanding is that the temperature [was] so hot in the fields that the watermelons [were] rotting on the vine. We are forced to pick vegetables, goosepick grass, and sometimes dig ditches." (*Id.* at ¶ 5). Hicks says that because of the extreme heat, he has "seen people pass out in the sun." (*Id.* at ¶ 6). He declares that he once saw a man have a seizure. (*Id.*). Hicks states that he commonly feels light-headed and dizzy while in the fields, and often suffers from headaches and muscle cramps. (*Id.*). In addition, Hicks provides that his feet often swell. (*Id.*). Hicks attributes some of these maladies to Angola's failure to provide him and his fellow inmates with sufficient safety equipment. (*Id.* at ¶ 7). Similar to other named Plaintiffs, Hicks states that he is not at liberty to stop working while on the Farm Line. (*Id.* at ¶ 8). When he has done so, or when he has slowed down or otherwise failed to meet work quotas, he has been disciplined. (*Id.*). Additionally, Hicks asserts that he has been diagnosed with several disabilities, including depression and anxiety, and that working on the Farm Line exceeds his physical capabilities. (*Id.* at ¶ 11). Hicks has been prescribed medication for his mental conditions. (*Id.*). Defendants report that Hicks is now stationed as a "Grounds Keeper," and is no longer staffed on the Farm Line. (Doc. 49 at p. 10).

Based on the above allegations, Hicks submitted an ARP on June 8, 2023. At that time, Hicks was laboring on Lines 24/25 of the Farm Line. (Doc. 37-42). In his

ARP, Hicks notified prison officials that prisoners working on the Farm Line were not given adequate safety equipment or enough breaks. (*Id.* at p. 3). Hicks likewise stated that because of his disabilities, and the medications he was taking for treatment, laboring in the high heat on the Farm Line was especially dangerous for him. (*Id.* at p. 4). Hicks received the same form denial as other named Plaintiffs. (*Id.* at p. 6).

A review of Hicks's medical records shows that he reported for an emergency medical visit from the Farm Line on June 9, 2021, after exhibiting cramping and dehydration. (Doc. 47-8 at p. 2). Dr. Vassallo also reviewed Hicks's medical records and noted both that he suffers from a history of depression and that the medications he takes to address this illness weaken his body's ability to regulate temperature. (Doc. 54-1 at p. 7). Dr. Vassallo also noted that, based on the medical records provided by Defendants, Hicks had "a history of symptoms consistent with heat-stress disorders, like upset stomach diarrhea, and rashes." (*Id.*).

### H. Joseph Guillory

Plaintiff Joseph Guillory is forty years old, and has been incarcerated at Angola since 2005. (Doc. 37-11 at ¶¶ 1-2, hereinafter "Guillory Declaration"). Guillory was required to work the Farm Line in the summer of 2023. (*Id.* at ¶ 2). He affirms the accounts of the Farm Line given above. He states that his crew generally works for "about five hours a day, five days a week. . . . We can  work long hours and be forced to labor in extreme heat without food for long stretches of time." (*Id.* at ¶¶ 5-6). Guillory claims that he has "never been provided with proper work boots, proper work gloves, sunscreen, sunglasses, a sunhat, or other safety equipment necessary to

safely work in the fields." (*Id.* at ¶ 7). Instead, Farm Line workers are expected to "do all the field work by hand." (*Id.*). As to the conditions on the Farm Line itself, Guillory concludes that they are "brutal and unsafe." (*Id.* at ¶ 11). In his words:

> There is no shade. Sometimes there was a portable toilet in the field for everyone to share. It is often overflowing with human waste. . . . The drinking water was often dirty. The coolers are covered in mildew and there [sic] are often bug infested. When I have asked about the mildew or bugs in the water, the guards threatened to send me to the dungeon. In the triple-digit heat, the prison officials know we'll drink it no matter what.

(*Id.* at ¶¶ 11-12). Guillory further states that "[o]ther men on the Farm Line have been written up for complaining about the unsafe and unsanitary working conditions on the Farm Line." (*Id.* at ¶ 13). While working on the Farm Line, he has contracted "heat rashes and poison ivy rashes" due to the "unbearable" heat and humidity. (*Id.* at ¶ 14). Guillory avows that work on the Farm Line is especially dangerous for him due to his hyperthyroidism, for which he takes medication. (*Id.* at ¶ 15). Despite this, he has not been granted a permanent duty status preventing him from working on the Farm Line. (*Id.* at ¶ 16). Defendants claim that Guillory is presently staffed on Line 10, which has not been to the fields since 2021. (Doc. 49 at p. 10).

Guillory filed an ARP setting forth the above on August 2, 2023. (Doc. 37-41). Therein, he asserted that the conditions on the Farm Line are unsafe because of the heat, the humidity, and the inadequate measures put in place by Defendants to address both. (*Id.*). Guillory claims in his ARP that he was given access to one cooler with electrolytes, and several others with ice water. (*Id.* at p. 4). However, Guillory states that those coolers were "infested" with bugs, mildew, and trash. (*Id.*). Guillory

avers that laborers on the Farm Line are not provided with adequate protective gear. (*Id.*). Guillory's ARP was denied. (*Id.* at p. 7).

A review of Guillory's medical records shows that despite his thyroid issues spanning multiple years and his associated prescriptions being well documented, he was on "regular duty" with "no restrictions" as of July 3, 2023. (Doc. 47-10 at p. 23). Dr. Vassallo noted in her review of Guillory's medical records that he possesses a history of hypothyroidism, hypertension, hyperlipidemia, asthma, and allergies. (Doc. 54-1 at p. 8). These conditions, according to Dr. Vassallo, weaken Guillory's ability to remain cool in high temperatures. (*Id.*). Dr. Vassallo also notes that Guillory has been prescribed a variety of medications that impair Guillory's ability to regulate his bodily temperature efficiently. (*Id.*). Finally, Dr. Vassallo notes that Guillory's medical records show that he has presented with "chest pains, shortness of breath, and accelerated heart rate and tightness of chest and difficulty breathing. These symptoms may be consistent with heat-stress illness." (*Id.*).

### I. Additional Allegations

In addition to the foregoing, Plaintiffs have provided the Court with two ARPS submitted on behalf of Dexter Vassar and Patrick Ramirez, both of whom have labored on the Farm Line. (Docs. 37-44, 37-46). Vassar's ARP alleges that on July 11, 2023, he received emergency medical treatment after laboring on the Farm Line when he exhibited symptoms of dizziness when standing, elevated heart rate, fatigue, shortness of breath, and pain in the neck and back. (Doc. 37-44 at pp. 7-12). The materials in support of Vassar's ARP provide that at the time of incident, he was a

forty-seven-year-old man with a body mass index (BMI) of 33.37.[12] (*Id.* at p. 8). As a result of this event, Vassar was instructed to remain on bed rest for one week. (*Id.* at p. 3). Vassar claims in his ARP that the lack of shade was a major contributing factor to his overheating. (*Id.*). Vassar's ARP was denied. (*Id.* at p. 2). On the date of Vassar's injury, records show that the heat index at Angola was anywhere from 96 degrees Fahrenheit to 122 degrees Fahrenheit. (Doc. 49-10 at p. 21).

Ramirez's ARP sets forth similar allegations to those of the named Plaintiffs, and states that persons laboring on the Farm Line are not given adequate protective gear. (Doc. 37-46). Ramirez's ARP was denied. (*Id.* at p. 2).

Plaintiffs have also provided a declaration from Damion Thompson, who has been incarcerated at Angola since 2022. (Doc. 37-19 at ¶¶ 1-2, hereinafter "Thompson Declaration"). Thompson, like named Plaintiffs, avers that those working on the Farm Lines do not receive adequate safety equipment, clean drinking water, shade, or adequate breaks. (*Id.* at ¶¶ 7-8). Thompson alleges that he "often" feels dizzy and nauseous. (*Id.* at ¶ 18). Work on the Farm Lines is especially difficult for Thompson because he suffered nerve damage to his legs after sustaining a gunshot wound. (*Id.* at ¶ 17). Because of this, Thompson provides that he is an individual with an ADA disability, and that laboring on the Farm Line is beyond his physical capabilities. (*Id.* at ¶¶ 19-20). Thompson submitted an ARP setting forth the above, which was denied in July 2023. (*Id.* at ¶ 20).

---

[12] A BMI over 30 is considered obese. *See* About Adult BMI, Center for Disease Control, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html#InterpretedAdults (last visited on June 24, 2024).

### III.    POLICIES AND PRACTICES AT ANGOLA

There are essentially three policies at Angola which are at issue here. First, and most importantly, is Directive No. 13.067.

#### A. Directive No. 13.067

Effective as of March 21, 2019, this policy's stated purpose is "to establish provisions for the reduction of heat pathology and to reduce the exposure to offenders identified as more vulnerable to heat." (Doc. 37-38 at p. 2). Heat pathology is defined as "[h]eat induced syndromes, such as heat stroke, muscle cramps and heat exhaustion, due to a failure of the heat regulating mechanisms of the body." (*Id.* at p. 3). The policy applies to all Louisiana State Penitentiary security staff and medical staff. (*Id.* at p. 2). It is provided that:

> It is the Warden's policy that Louisiana State Penitentiary shall have a mechanism to identify offenders more vulnerable to heat and to enforce provisions to reduce heat pathology among all offenders. Offenders on certain types of medications may have increased sensitivity to heat and sunlight and are at a higher risk for developing heat pathology. In addition, offenders with specific chronic illnesses, such as morbid obesity, cardiovascular disease, respiratory disease and diabetes mellitus, may have a higher risk of heat pathology.

(*Id.*). According to Directive No. 13.067, when heat index values reach or exceed eighty-eight degrees Fahrenheit, a "heat alert" is triggered. (*Id.*). Directive No. 13.067 provides that those prisoners "identified by a healthcare practitioner with a chronic illness that may be affected by heat or those prescribed medication that may impact sensitivity to heat shall be evaluated and educated for potential adverse reactions concerning heat." (*Id.* at p. 3). The policy does not detail when this evaluation is to take place. (*Id.*). Those incarcerated persons that fall within this provision's ambit

are to be given a "heat precaution duty status." (*Id.*). A heat precaution duty status means that, from the period of May 1 through October 31, inmates with such status are to be brought indoors once heat index values reach or exceed eighty-eight degrees Fahrenheit. (*Id.* at p. 4). Once indoors, those offenders are to be provided with cold water and/or ice, cool showers and/or cool wet towels, and increased ventilation where possible. (*Id.*).

To maintain awareness on when heat alerts need to be issued, Directive No. 13.067 mandates that prison officials monitor outdoor temperatures using information from the National Weather Center and record such temperatures every two hours. These records are to be reviewed and approved "by the Warden or [a] designee." (*Id.* at p. 5). For those incarcerated persons who have not been given a heat precaution duty status, upon the announcement of a heat alert, "the following measures shall be provided while working outdoors: (a) Water and ice is available at least every 30 minutes; and (b) A rest break at least 5 minutes long is offered every 30 minutes." (*Id.*). These measures are to be documented and such records are to be maintained by prison officials. (*Id.*). In addition to these procedures, incarcerated persons laboring outdoors are to:

> [R]eceive heat pathology education that includes, but is not limited to, the following:
> (1) Increased consumption of liquids;
> (2) Avoidance of undue exposure to the sun;
> (3) Signs and symptoms of dehydration;
> (4) Signs and symptoms of dermatological conditions secondary to photosensitivity including sunburn and rashes;
> (5) Signs and symptoms of medication toxicity (any altered mental status); and
> (6) Avoidance of excessive exhausting activities in high temperatures.

(*Id.* at p. 6). Incarcerated persons who receive such education are to "document receipt" thereof on Form HC-45-A. (*Id.*). The Court has not been provided with any such documentation from Defendants.

In addition to the mandated offender training, Directive No. 13.067 requires all prison staff to attend an annual training on "the signs and symptoms and prevention of heat pathology as outlined in Heat Pathology Staff Training (Attachment B) and the provisions of this directive. Documentation of this training shall be maintained at the unit." (*Id.*). The Court has not been provided with any such training documentation from Defendants.

Finally, the policy provides that "[t]he DPS&C [(Department of Public Safety and Corrections)] Pharmacy and Therapeutics (P&T) Committee shall be responsible for annually reviewing and updating Heat Pathology Medications (Attachment A) as needed." (*Id.*). Plaintiffs contend that this policy, and those below, are not adhered to by Defendants. According to Plaintiffs, Defendants do not accurately record the heat index, do not issue heat alerts as they arise, do not allow incarcerated persons to take breaks every thirty minutes, and fail to identify and accommodate those who are issued a heat precaution duty status. (Doc. 37-1 at p. 15). As support for these assertions, Plaintiffs have provided the Court with documents that purport to show the daily high heat index values for May 1, 2023, through October 1, 2023, along with dates within this period when heat alerts were issued and breaks were given to those laboring on the Farm Line. (Docs. 37-5, 37-50). At least part of this data, specifically the information relating to whether breaks were taken, was pulled from Defendants'

own records and not the National Weather Service. (Doc. 37-1 at p. 25 (citing Doc. 37-62)). Defendants contest the accuracy of the materials provided by Plaintiffs, and contest Plaintiffs' conclusions as to the number of days on which breaks were given. (Doc. 49 at p. 16).

### B. Health Care Policy No. HCP8

HCP8, effective as of August 21, 2018, sets forth identical obligations to Directive No. 13.067. (Doc. 37-39). It lists as references a publication from the Occupational Safety and Health Administration (OSHA) and a publication from the Centers for Disease Control and Prevention (CDC). (*Id.* at p. 2). HCP8 applies to every DPS&C facility. (*Id.*).

Attachment A to HCP8 is the "Heat Pathology Medications" list, which contains twenty-two different medications. (Doc. 37-63 at p. 2). The Heat Pathology Medications list provides the same effective date as HCP8, August 21, 2018, yet the Court cannot, at this stage, confirm whether the list has been changed or updated since it became effective. (*Id.*). Attachment B to HCP8 provides educational material on the prevalence and dangers of heat-related conditions and heat death. (Doc. 51-11). It asserts that "around 618 people in the United States are killed by extreme heat every year," and lists ten factors that increase a person's risk of developing a heat-related illness, including high levels of humidity, obesity, fever, dehydration, prescription drug use, heart disease, mental illness, poor circulation, sunburn, and alcohol use. (*Id.*). The materials warn that older adults and people with mental illness and chronic disease are at the highest risk of succumbing to heat-related conditions.

(*Id.* at p. 3). Some of those conditions include heat cramps, predominately felt in the abdomen, arms, or legs, heat exhaustion, heat rash, and heat stroke. (*Id.* at pp. 3-4).

The materials suggest that to avoid such heat-related illnesses, persons should take "frequent drink breaks and 'wet down' or mist [themselves] with a spray bottle to avoid becoming overheated." (*Id.* at p. 4). Additionally, persons should "[d]ress in lightweight, light-colored, loose-fitting clothing on hot days. . . take rest periods in shady or cool areas. . . protect [themselves] from the sun by wearing a hat and sunglasses; [and] use a sunscreen that is at least SPF 15." (*Id.*). The materials also suggest that persons spend as much time indoors as possible on hot and humid days, and to monitor for extreme heat alerts. (*Id.*). Attachment B relies on OSHA and CDC guidelines for some of its conclusions. (*Id.*). Finally, various symptoms of heat stroke, heat exhaustion, heat rash, and other heat-related conditions are described, along with recommended mitigation tactics. (*Id.* at pp. 5-7). For each of the various heat-related conditions, it is recommended that those afflicted be moved to a cool location. (*Id.*). The Court assumes that Attachments A and B referred to in Directive No. 13.067 are the same as those HCP8 attachments outlined above.[13]

### C. Directive No. 19.004

Directive No. 19.004, effective June 7, 2023, establishes "procedures for the issuance of leather work gloves and plastic drinking cups to those inmates assigned

---

[13] The Court assumes that Attachments A and B are functionally the same in both HCP8 and Directive No. 13.067 because Directive No. 13.067 is substantively a verbatim copy of HCP8, and because both policies refer to these attachments in the same manner. (*Compare* Doc. 37-38 *and* Doc. 37-39). Defendants have not provided the Court with the attachments to Directive No. 13.067.

to field operations at Louisiana State Penitentiary." (Doc. 51-10 at p. 2). Incarcerated persons laboring on the Farm Line are to be issued leather work gloves once every six months. (*Id.*). As to the plastic drinking cups, the "inmate's farm line supervisor shall be responsible" for their issuance. (*Id.*). "When the inmate reports to his assigned line on the first day he shall be issued a plastic drinking cup." (*Id.* at p. 3). "The inmate is responsible for maintaining his drinking cup and only receive[s] one every six months, if needed." (*Id.*).

### D. Additional Policies at Angola

The classification procedures at Angola appear to be governed by Directive Nos. 13.063, 18.002, and 19.003. Directive No. 13.063 establishes that all incarcerated persons at Angola are assigned a permanent duty status on their arrival to the facility. (Doc. 49-6 at p. 1). A prisoner's work status may be changed based on "objective evidence of physical defects, limitations, injuries or illnesses," and may only be changed by Angola medical personnel. (*Id.* at pp. 1-2). Directive No. 18.002 provides procedures for the classification of offenders upon their arrival to Angola, and mandates that those decisions be made by "Classification Boards," which must include a staff member from the "Classification, Social Services, Medical/Mental Health" category and a staff member from the "Security" category. (Doc. 49-3 at p. 2). "Offenders who disagree with classification decisions may file a grievance through the Administrative Remedy Procedure." (*Id.*). Directive No. 19.0003 provides substantially similar guidance to the above policies, and indicates that incarcerated persons may apply for a reclassification of job status, but actual reclassification remains at the discretion of prison officials. (Doc. 49-4 at p. 1). It further states that

31

"[e]very offender will be assigned to some form of job assignment in the institution. . . . Offenders are assigned to job assignments based on [their] physical ability to perform the task. . . . Those offenders who are deemed mentally or physically disabled may be assigned to" less taxing job assignments. (*Id.* at p. 2).

The other operative equipment policy at Angola appears to be Department Regulation No. IS-A-3. (Doc. 37-51 at p. 25). This policy, effective as of January 2, 2022, provides that incarcerated persons shall be issued "standard" work boots, which shall not be "steel toe, military or fatigue type, army issue, or pointed toe," have a heel over 2 inches, or be insulated. (*Id.* at p. 28). The policy does not mandate the issuance of sunhats, and only provides for the provision of regular caps of the "baseball type" or "knit type." (*Id.* at pp. 28-29). Sunglasses are to be provided to incarcerated persons, but only by purchase at the canteen and not at the cost of the state. (*Id.* at p. 29).

### E. Practices at Angola

Defendants claim that the following practices are taken at Angola through the declarations of the following individuals.

### (i)   Maghen Gagnard

Maghen Gagnard is employed at Angola as an Executive Management Officer, and claims to have personal knowledge of operations at Angola. (Doc. 49-1 at ¶ 1, hereinafter "Gagnard Declaration"). Gagnard states that all inmates at Angola "are assigned a job, subject to that inmate's duty status as determined by a health care provider. When an inmate arrives at LSP, LSP will conduct an Initial Classification Board to determine the inmate's custody status, housing assignment and job

32

assignment." (*Id.* at ¶ 4). "Upon intake, inmates are issued the necessary clothing, footwear and/or supplies necessary to perform their assigned job duties. They are provided with tennis shoes, shower shoes, rubber boots, lace[-]up boots and gloves if their work assignment requires." (*Id.* at ¶ 5). As to labor performed outdoors, when ambient temperatures often exceed eighty-eight degrees Fahrenheit, "a heat alert is issued and recorded on the Station logs. . . . Officers are notified via radio and the field operation officers implement the organized breaks every 30 minutes." (*Id.* at ¶ 6). Gagnard also avers that all inmates who are prescribed medications on the Heat Pathology Medications list are given heat precaution duty statuses, and that other incarcerated persons may acquire a heat precaution duty status upon determination by a health care practitioner. (*Id.* at ¶ 7). Finally, Gagnard asserts that "[i]f operation of the Farm Line was shut down, LSP would suffer immediate harm," and estimates that "it would cost LSP $8,645,373 . . . a year to purchase meal compliments to substitute [the] fresh vegetables and fruit" harvested from the Farm Line for inmate consumption. (*Id.* at ¶ 8). She further states that "[t]he cost to maintain landscaping, hay fields, and cattle operations throughout the 18,000[-]acre facility is not capable of being enumerated at this time." (*Id.*).

The Court notes that this final assertion confirms that Gagnard is addressing the economic harm that Angola would suffer if *all* agricultural labor was enjoined, and not, specifically, Farm Line labor, which, as defined by Plaintiffs, encompasses at present four individual lines, and is staffed by no more than fifty incarcerated

persons at a time.[14] (Docs. 37-1 at p. 8 fn. 2, 49 at p.4 fn. 11). Further, Gagnard appears to not take into consideration that Plaintiffs request that only the Farm Line be enjoined when heat index values reach or exceed eighty-eight degrees Fahrenheit.

### (ii)    Ashli Oliveaux

Ashli Oliveaux is employed as a Deputy Warden of Quality Management and Assurance at Angola. (Doc. 49-12 at ¶ 1, hereinafter "Oliveaux Declaration"). She asserts that an inmate may declare a medical emergency at "any time" while laboring on the Farm Line, at which point a health care professional will be dispatched to assess the inmate and "call the ATU"[15] as necessary. (*Id.* at ¶ 3). Oliveaux avers that incarcerated persons working on the Farm Line routinely use the emergency sick-call procedures, "even for minor complaints." (*Id.* at ¶ 4). "Of all the sick calls [(from April 1, 2024, to May 15, 2024)], one inmate experienced chest pains and was immediately sent to the ATU," another "complained of dizziness and was allowed to rest in the shade and not work the remaining 45 minutes of his shift," and "[t]he remaining sick calls involved back pain, shoulder pain, abrasions, etc." (*Id.*). Oliveaux's implication on this final point appears to be that those sick calls involving "back pain, shoulder pain, abrasions, etc." are not related to heat conditions on the Farm Line. (*Id.*). As

---

[14] Were Gagnard to be referring to the Farm Line as presently defined by Plaintiffs, Gagnard would be stating that it is her belief that approximately fifty inmates, generally laboring for anywhere between four and five hours a day, will or have produced $8,645,373 in crops annually, primarily without the use of any sort of tool save for the inmate's own hands. The Court does not doubt that inmates sent to the Farm Line work diligently, but this would be a feat of Herculean proportions.

[15] The "ATU" refers to the "Acute Treatment Unit." *Lewis v. Cain*, No. CV 15-318-SDD-RLB, 2023 WL 7299130, at *5 (M.D. La. Nov. 6, 2023).

noted by Dr. Vassallo in Section IV(A) of this Ruling and Order, Oliveaux's implication is not necessarily correct.

An independent review of these sick calls by the Court reveals that on April 26, 2024, an inmate with a history of pre-diabetes and hypertension exhibited back pain while working his job assignment. (Doc. 49-13 at pp. 3-4). On May 7, 2024, a forty-one-year-old inmate lodged an emergency medical request after exhibiting flank pain. (*Id.* at p. 14). This inmate had a standing blood pressure reading of 163 over 98, values consistent with Stage 2 hypertension. (*Id.*). Despite this, his chart reflects that he was assigned a regular duty status with no restrictions. (*Id.* at p. 15). On May 15, 2024, a thirty-five-year-old inmate was sent to the ATU after exhibiting sharp chest pain while laboring in "the field." (*Id.* at p. 16). The man also reported dizziness. (*Id.*). The medical report details that he was working in the field in a sweatshirt. (*Id.*). Also on May 15, 2024, another inmate lodged an emergency medical request after displaying rashes on both arms. (Doc. 49-13 at p. 17). The medical report provides that this inmate exhibited a history of abdominal pain, rash, dysthymia, panic disorder, acquired immune deficiency syndrome (AIDS), vitamin D deficiency, and hyperlipidemia, among other ailments. (*Id.* at p. 18). Despite this, the medical record show that this man had a regular duty status with no restrictions. (*Id.*). In addition, a third emergency sick call was placed on May 15, 2024, regarding a fifty-three-year-old man who requested emergency medical attention from "the field" after experiencing dizziness for an hour. (*Id.* at pp. 20-21). This man has a history of pre-diabetes, fainting, knee pain, asthma, and osteoarthritis, among other ailments. (*Id.*

at p. 21). Prison officials assigned him a regular duty status with no restrictions. (*Id.*).

On the incident in question, he was instructed to "rest in the shade" for the remainder

of his shift. (*Id.*).

### (iii)   Gabriel Hebert

Gabriel Hebert is employed as a Field Operations Colonel at Angola. (Doc. 49-

23 at ¶ 1, hereinafter "Hebert Declaration"). He avers that he has personal knowledge

of Farm Line operations. (*Id.* at ¶ 2). Hebert claims that agricultural programs at

Angola are used to cultivate crops that then feed the inmate population. (*Id.* at ¶ 3).

He further states that "LSP utilizes modern day agricultural practices that are

common amongst all farmers." (*Id.*). It is not clear what materials or expertise Hebert

relies on to reach to this conclusion. Hebert asserts that the Farm Line laborers either

work in the morning, take a lunch break, and perform a second afternoon shift, or

work only a morning shift with approximate times of "about 8:00-11:40" A.M. (*Id.* at

p. 2). Hebert further states that "[a]ll inmates that work on the grass crews or in the

field work at their own pace. There are no quota requirements. LSP only asks that

the inmates keep up with their fellow workers. Inmates may take breaks and/or get

water at any point." (*Id.* at ¶ 9). As to conditions on the Farm Line, Hebert states that

"[a]ll lines are provided with large water coolers that are brought to the work site

every day. These water coolers have tops and remain closed in the field. They are

brought in every day and cleaned and sanitized." (*Id.* at ¶ 10). Hebert additionally

states that prisoners laboring on the Farm Line are "assigned a drinking cup and

gloves. Inmates can also request a sun hat. In my experience inmates do not use the

hats even when they request them." (*Id.* at ¶ 12). Further:

"[i]f a heat alert is issued, officers are notified via radio. Even though inmates may take breaks when they need them, once a heat alert is issued, organized 5-minute breaks are given every 30 minutes. LSP also provides Gatorade to the lines during the hot months. Further, officers ensure once a heat alert is issued, offenders with a heat precaution duty status are brought indoors in accordance with Directive 13.067."

(*Id.* at ¶ 13). Hebert further asserts that the "Daily Line Counts are internal documents that LSP officers fill out. These documents are not required by anyone, and LSP does not necessarily maintain these documents per any schedule." (*Id.* at ¶ 14). On the Daily Line Counts, "[o]fficers are not instructed to document all breaks that are given. Inmates can work at their own pace so documenting breaks would not be feasible." (*Id.* at ¶ 14). Hebert's understanding of Angola's policies appears to conflict with the language of Directive No. 13.067, which states that the heat prevention measures outlined therein, including allowing inmates to take breaks every thirty minutes upon the issuance of a heat alert, must be "documented and maintained at the facility." (Doc. 37-38 at p. 5). The Court was also unable to confirm that there is any explicit policy at Angola suggesting that incarcerated persons may take breaks while performing a job assignment whenever they wish.

### IV.    HEAT AND HEALTH

Put simply, "[i]t gets real hot down in Louisiana"[16] – and it is only getting hotter. The summer of 2023, according to Ben Schott, the lead meteorologist at the National Weather Service's New Orleans Station, was Louisiana's hottest one to date. (Doc. 37-54 at p. 2). As of August 23, 2023, there were 4,766 heat-related emergency

---

[16] The Oak Ridge Boys, *Leaving Louisiana in the Broad Daylight,* on The Oak Ridge Boys Have Arrived (ABC Records 1979).

visits in the state since April 1. (*Id.*). This was almost double the annual average and prompted former Governor John Bel Edwards to declare a state of emergency on August 11, 2023. (Doc. 37-53 at pp. 2-3). This heat wave caused, as of August 23, 2023, at least twenty-five heat-related deaths. (Doc. 37-36 at p. 3). Stephen Russo, then Secretary to the Louisiana Department of Health, was quoted as saying, "[h]eat-related illness and death are preventable, and I encourage Louisiana residents to know the signs of heat-related illness, stay indoors with air conditioning if possible, and remember to hydrate, rest and stay in the shade if they must be outdoors." (*Id.*). The U.S. National Oceanic and Atmospheric Administration (NOAA) predicted that there is a "one-in-three chance" that 2024 will be even hotter. (Doc. 37-37 at p. 2). NOAA further warned that there was a "99% chance [2024] [will] rank among the five warmest [years] on record." (*Id.* at p. 3). The Louisiana Department of Health has stated that "[h]eat exposure is intensifying as the frequency, severity, and duration of extreme heat events increases due to climate change. These changes are of concern in Louisiana because the state experiences some of the highest average summer temperatures in the nation." (Doc. 37-45 at p. 7). These high temperatures are "compounded by high humidity" which "worsens the impact of heat by impairing the body's ability to cool by evaporation." (*Id.*). The Louisiana Department of Health has further advised that those who work in outdoor settings are especially at risk of developing heat-related conditions, along with those suffer from chronic health conditions. (*Id.* at pp. 8, 18). The CDC notes that those who are exposed to extreme heat are at risk of suffering heat stroke, which requires immediate emergency

medical attention and can cause death or permanent disability if such treatment is not provided. (Doc. 37-59 at p. 2). In addition to heat stroke, the CDC provides that victims of other heat-related conditions should seek cool, shady areas and that generally persons should avoid the outdoors in high heat. (*Id.* at pp. 2-6). The National Weather Service (NWS) issues excessive heat warnings when the heat index reaches 113 degrees Fahrenheit, or the temperature reaches 105 degrees Fahrenheit. (Doc. 21 at p. 18 (citing *NWS LIX - Watch, Warning, Advisory Criteria*, National Weather Service, *available at*

https://www.weather.gov/lix/wwa_criteria#Heat%20Products)). The NWS issued a record-breaking number of excessive heat warnings across the state in 2023, with New Orleans alone suffering from seventeen excessive heat warnings as of August 6, 2023.[17] According to Defendants' temperature logs, conditions at Angola qualified for an excessive heat warning approximately twenty-four times over the summer months, and conditions qualified for a heat alert on roughly 145 days over the same period. (Doc. 49-10).

A. **Dr. Susi Vassallo**

According to Dr. Vassallo, an expert in thermoregulation and the effects of drugs and illnesses on thermoregulation, heat kills. (Doc. 37-3 at p. 20 (extreme heat is "the most common cause of weather-related death in the U[nited] S[tates], killing more people each year than hurricanes, lightning, tornados, floods and earthquakes

---

[17] *See* Excessive Heat Warnings Continue Through August, The City of New Orleans: NOLA Ready (Aug. 6, 2023, 11:45 AM), https://ready.nola.gov/incident/summer-heat-2023/august-heat-warning-(1)/..

combined")). Thermoregulation refers to the "process by which the human body maintains its temperature within a safe physiological range." (*Id.* at p. 7). Thermoregulation is an essential bodily process, and "[i]nability to thermoregulate properly impairs the function of multiple bodily systems, including but not limited to the nervous system, pulmonary system, cardiovascular system, gastrointestinal system, and kidney function." (*Id.*). The human body uses "two primary mechanisms to cool itself: perspiration (sweating) and cutaneous vasodilation (dilation of blood vessels close to the skin)." (*Id.* at p. 8). Both processes depend on neurotransmission and adequate cardiac function. (*Id.*). Similarly, in hotter environments the heart must pump "harder and faster in order to pump more blood through the body to maintain blood pressure and cooling." (*Id.*). Sweating depletes the body of water and salt, and leads to dehydration without adequate measures in response. (*Id.* at p. 9). Dehydration can cause "light-headedness or dizziness, a lack of energy, low blood pressure, weakness, and increased heart rate." (*Id.*). "If fluids are not replaced, core temperature will rise, and hyperthermia will result. Hyperthermia occurs when the body's natural thermoregulatory processes are insufficient and overwhelmed." (*Id.*). Dehydration and hyperthermia can "both be deadly." (*Id.*). Any medication that impacts cardiac function or limits sweat responses will have "profound" effects on the body's ability to thermoregulate. (*Id.*).

Dr. Vassallo reports that "[h]eat-related disorders occur when the body's temperature control system is overloaded, and the body is unable to adequately dissipate heat." (*Id.* at p. 10). Further, the "risk for heat stroke and heat-related

disorders increases sharply when the heat index exceeds 88 degrees Fahrenheit." (*Id.*). Some heat-related disorders include "heat syncope (fainting), heat cramps, heat exhaustion, and heat stroke." (*Id.*). Heat exhaustion and heat stroke can manifest in similar ways, including through light-headedness, thirst, nausea, weakness, fainting, irregular heartbeat, and abdominal cramps, because heat exhaustion can precede heat stroke. (*Id.* at p. 11). Heat strokes can occur rapidly and without warning. (*Id.* at p. 12). In fact, two-thirds of victims "experience symptoms for less than one day before being hospitalized or being found dead." (*Id.*). Victims may also be physically or mentally incapable of calling for help, as heat stroke can lead to feelings of confusion and alter the afflicted's mental status. (*Id.*). Heat stroke "carries a significant risk of death and permanent disability." (*Id.* at p. 13). Dr. Vassallo points out that "[s]tudies have shown heat stroke mortality rates ranging from 30-80%. Survivors of heat stroke may have significant heat-related morbidity, such as permanent inability to walk and talk." (*Id.*). Further, "[p]ermanent neurological damage occurs in up to 17% of survivors." (*Id.*).

Dr. Vassallo opines that "[a]ll people, including healthy people with no known medical problems, are at risk for heat related disorders during persistent exposure to a heat index above 88 degrees Fahrenheit." (*Id.* at pp. 19-20). "In addition to causing dehydration and heat stroke, extreme heat can 'affect otherwise healthy people's kidneys, liver, heart, brain, and lungs, which may cause renal failure, heat attack, and stroke.'" (*Id.* at p. 21 (citing Robert Pistone, <u>Violations of the Eighth Amendment: How Climate Change Is Creating Cruel and Unusual Punishment</u>, 28 Hastings Envt'l

41

L.J. 213, 224 (2022))). Further, "deaths due to heat alone, due to cardiovascular disease alone, and due to heat and cardiovascular disease combined, increase with the number of cumulative days of heat exposure." (*Id.* at p. 27). In other words, the risk of death from both heat-related diseases and facially unrelated diseases increases with the temperature.

While heat-related disorders are dangerous for everyone, "[c]ertain people are at greater risk" of developing them. (*Id.* at p. 15). Such people include "(a) people with chronic illnesses or medical conditions that impair thermoregulation; (b) people with psychiatric or mental health disorders; and/or (c) people taking drugs or medications that impair thermoregulation." (*Id.*). Based on her review of the medical records of named Plaintiffs, Dr. Vassallo concludes that Defendants have assigned numerous Plaintiffs who are especially susceptible to high heat to labor on the Farm Line. (Doc. 54-1). Those chronic illnesses or medical conditions that render the afflicted more at risk of heat stroke include hypertension, diabetes or pre-diabetes, "heart disease [and heart conditions], obesity, and respiratory diseases like asthma or chronic obstructive pulmonary disease." (Doc. 37-3 at pp. 15-16). Those psychiatric or mental health disorders that can impair thermoregulation include, most commonly, depression and anxiety. (*Id.* at p. 17). Those medications that impair thermoregulation include, but are not limited to, most medications used to treat mental illness, "including Synthroid, Benadryl, Zyprexa, Zyrtec, Losartan, [and] Elavil," "Vistaril," "Topiramate;" most medications that treat hypertension; "sympathomimetic drugs" commonly used to treat congestion and the cold; diuretics; and "anticholinergic drugs"

42

used to address insomnia, allergies, itching, and gastrointestinal disorders. (*Id.* at pp. 17-18, 29). A review of Angola's Heat Pathology Medications list shows that of these eight named medications, only one has been listed. (Doc. 37-63 at p. 2). In addition to these medicines, antipsychotic medications and selective serotonin reuptake inhibitors, commonly prescribed for persons suffering from depression, inhibit thermoregulation. (Doc. 37-3 at p. 19).

Dr. Vassallo has reviewed "the complaint and other case filings in this case, including the sworn declarations of named plaintiffs," as well as the "Department of Public Safety and Corrections' heat pathology policies, directives, and regulations," and opines that with a "reasonable degree of medical certainty" "[t]he incarcerated men who perform agricultural labor on Angola's Farm Line are at substantial risk of serious physical and psychological harm due to their extensive and continued exposure to high temperatures and heat index." (*Id.* at p. 6). Dr. Vassallo bases this opinion in part on the heat-related conditions experienced by named Plaintiffs. (*Id.* at p. 24).

According to her review of the materials provided, Dr. Vassallo does not believe that Defendants' heat-related policies are facially adequate or followed. (*Id.* at p. 28). She notes that HCP8-a, the education provided to incarcerated persons laboring on the Farm Line, provides that offenders "should avoid excessive exhausting activities in high temperatures" and that it is impossible for inmates to comply with this advice. (*Id.*). Further, Defendants' policies do not allow for inmates to take breaks in the

shade or otherwise cool areas, despite this being one of the "only way[s] to . . .avoid or effectively mitigate the detrimental impacts of extreme heat." (*Id.* at pp. 22, 29).

In short, Dr. Vassallo concludes that the Angola's "practice of forcing men to perform strenuous manual labor in the fields in conditions of extreme heat and humidity, without adequate rest and recovery periods, water intake, protective clothing, or modern tools or equipment" places all such men at "substantial risk of serious heat-related disorders" that can lead to "death or permanent physical injury." (*Id.* at p. 6).

B. **Dr. Randy Lavespere**

In response, Defendants offer a sworn statement from Dr. Randy Lavespere. (Doc. 49-24). Dr. Lavespere is the Chief Medical Officer of the Department of Corrections, and has served in this position for three years. (*Id.* at p. 1). Prior to this, he was the Medical Director at Angola for approximately seven years. (*Id.*). Dr. Lavespere is familiar with HCP8 and its various requirements. (*Id.* at p. 2). Further, the Heat Pathology Medications list was "created, evaluated and approved" by Dr. Lavespere, along with a Dr. Gamble and a Dr. Herman Soong. (*Id.* at p. 3). Dr. Lavespere avers that "[t]he medication list is annually reviewed by the DPS&C Pharmacy and Therapeutics Committee, which includes all institutional Medical Directors and the two Chief Pharmacists." (*Id.*). Dr. Lavespere disagrees with Dr. Vassallo's opinion that the Heat Pathology Medications list is underinclusive. (*Id.*). Dr. Lavespere also states, blankly and in part based on the legal ruling in *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015), that "the current policy of required 5-minute breaks every 30 minutes and access to water is sufficient to reduce heat

pathology among all offenders." (*Id.*). Dr. Lavespere concludes by asserting that, despite recent opinions by courts to the contrary, the "current emergency care at LSP is adequate." (*Id.* at pp. 3-4).[18]

There are numerous factors that significantly weigh against the persuasiveness of Dr. Lavespere's account. First, Defendants have failed to show that Dr. Lavespere has any sort of expertise in the field of thermoregulation. Second, Dr. Lavespere has failed to cite to any materials, facts, medical authorities, treatises, or processes that underly any of his conclusions. Third, specifically relating to Dr. Lavespere's contention that the Heat Pathology Medications list is sufficient because numerous medical personnel have been involved in creating it, receiving more input from potentially unqualified or uninformed sources does not necessarily imply that the list is medically sufficient. The Court has been offered no proof as to credentials and expertise of any of the medical personnel consulted for the list, and therefore has no basis to conclude that such review makes it substantially more likely that the Heat Pathology Medications list is adequate. Fourth, the conclusion that the present policies in place are sufficient to reduce heat stroke because of Angola has "required" breaks every thirty minutes after the issuance of a heat alert misstates the plain language of Directive No. 13.067, which provides that such breaks are optional, not mandatory.

---

[18] To the contrary, this Court recently examined "detailed and extensive findings of the callous and wanton disregard for the medical care of inmates at Angola." *See Lewis v. Cain*, 2023 WL 7299130, at *12 (M.D. La. Nov. 6, 2023); *see also Lewis* v. *Cain*, 2021 WL 1219988, at *6 (M.D. La. Mar. 31, 2021).

V.    AGRICULTURAL LABOR STANDARDS

The Court has conducted a review of operative federal and state requirements for heat safety in agricultural settings, and preliminarily concludes that Angola fails to meet the minimum standards set forth by such regulations.

For instance, according to the Louisiana Department of Health, and under OSHA regulations generally, "[a]t a minimum, employers should provide adequate cool water, rest breaks, and *shade or a cool rest area* for employees." *Working In Extreme Heat: What Employers and Workers Need To Know*, Louisiana Department of Health, https://ldh.la.gov/page/la-heat (emphasis added) ("Employers have a legal and moral duty to protect workers against heat."). Additionally, employers should "[g]ive new or returning employees the chance to gradually acclimatize (or become used to working in hot temperatures), to be trained and plan for emergencies, and to monitor for heat signs/symptoms." *Id.* The CDC further recommends that should persons working in hot environment become lightheaded, confused, weak, or faint, they "STOP all activity," "get into a cool area," and "rest." (Doc. 37-59 at p. 6) (emphasis in original).

The National Institute for Occupational Safety and Health (NIOSH) has also published criteria for a recommended standard for occupational heat stress, which includes advice to employers for how to prevent heat-related illnesses from developing in workers exposed to hot and humid environments. NIOSH suggests that:

> Employers should have an acclimatization plan for new and returning workers, because lack of acclimatization has been shown to be a major factor associated with worker heat-related illness and death. NIOSH recommends that employers provide the means for appropriate hydration and encourage their workers to hydrate themselves with

potable water <15°C (59°F) made accessible near the work area. Workers in heat <2 hours and involved in moderate work activities *should drink 1 cup (8 oz.) of water every 15–20 minutes*, but during prolonged sweating lasting several hours, they should drink sports drinks containing balanced electrolytes. In addition, *employers should implement a work/rest schedule and provide a cool area (e.g., air-conditioned or shaded) for workers to rest and recover*. These elements are intended to protect the health of workers from heat stress in a variety of hot environments.

BRENDA JACKLITSCH, ET AL., CRITERIA FOR A RECOMMENDED STANDARD: OCCUPATIONAL EXPOSURE TO HEAT AND HOT ENVIRONMENTS, NIOSH, viii (2016) (available at https://www.osha.gov/heat-exposure/standards) (emphasis added).

In addition to this publication, NIOSH has circulated a "Work/Rest Schedules Fact Sheet," which provides heat-dependent recommended rest times. *Heat Stress: Work/Rest Schedules*, NIOSH, available at https://www.cdc.gov/niosh/topics/heatstress/recommendations.html. According to NIOSH, for *light work* conducted in 84-degree weather, with no clouds and with humidity over 60%, employers should give employees 15 minutes rest per 45 minutes of work. *Id.* Should the temperature reach 85 degrees under like conditions, rest should be increased to 20 minutes. *Id.* At 88 degrees with no clouds and high humidity, 15 minutes work per 45 minutes work. *Id.* Any higher than that, NIOSH provides that employers must use "extreme caution" because the "risk for heat injury is high in this situation." *Id.* Those various tasks that Plaintiffs are alleged to have been ordered to complete on the Farm Line, such as picking crops and cutting grass, are not "light work." *See id.* (describing light work as activities such as "[o]perating equipment," "[i]nspection work," and "[w]alking on flat, level ground").

Other states have adopted their own labor regulations. For instance, Colorado's Agricultural Labor Conditions Rules require employers to provide shade when temperatures reach 80 degrees Fahrenheit. It is stated therein that:

> For employee use during rest, meal, cool-down, and other breaks, employers shall provide access to adequate shade located as close as practicable to the worksite, which may be artificial or natural, but does not qualify if:
> (A) any source yields additional heat in the shaded area, such as exhaust, running machinery, heat-radiating structures, or heat in a non-air-conditioned vehicle;
> (B) the shaded area is located further than 0.25 miles from the worksite for employees accessing the shade by foot, or otherwise too far to reasonably access during rest and meal periods;
> (C) the shaded area is too small for employees to sit fully shaded in normal posture, without touching one another;
> (D) the shaded area is neither ventilated nor open to the air; or
> (E) the area has unsafe, unhealthy, unsanitary, or other conditions (*e.g.*, noxious odor from rot or garbage) that deter or discourage accessing or using the shade.

Agricultural Labor Conditions Rules, 7 CCR 1103-15 §§ 3.1, 3.3. California, Oregon, and Washington have similar shade requirements. *See* T. 8 § 3395 Heat Illness Prevention In Outdoor Places of Employment; *see also* Oregon Occupational Safety and Health Division Rules 437-004-1131 (3); *see also* Safety Standards for Agriculture, 296-307-09735 WAC.

A. **Marguerite Green**

Plaintiffs offer a declaration from Marguerite Green, a farmer with "significant experience" operating specialty farms, that concludes that farming operations at Angola do not meet industry standards. (Doc. 37-7 at p. 1). Green received her Bachelor of Science in Agriculture and Plant and Soil Systems from Louisiana State University in 2011. (*Id.*). She has since obtained a horticulture license, which has expired, from the Louisiana Department of Agriculture and Forestry and a teaching

certificate from the Louisiana Department of Education. (*Id.* at p. 2). Green served as a farm instructor for a summer program at the LSU Agriculture Center's Burden Research Station for two years, and was a "farm manager and program director" of a farming operation in New Orleans between 2013 and 2020. (*Id.*). Green avers that she has "significant" experience with "prison garden programs," and earned a "Horticulture Therapy Certificate" from the "Chicago and New York Botanical Gardens" in 2019. (*Id.*). Currently, she serves as the executive director of SPROUT, "an organization based in New Orleans that provides technical assistance and training to specialty crop farmers throughout Louisiana." (*Id.*). In this role, Green advises and trains "private and institutional parties, including the United States Department of Agriculture (USDA), Feeding Louisiana,[19] and academic institutions like LSU." (*Id.* at pp. 2-3).

Plaintiffs assert that Green possesses "significant expertise" on the impact of the various seasons, and has trained hundreds of specialty crop farmers on the impact of changing climate on farm production. (*Id.* at p. 3). In this role, Green has provided training and technical assistance for workplace safety and management issues within agricultural organizations, and has taught farmers on "how to protect field workers from injuries, including those associated with chemical and sun exposure, by using personal protective equipment (PPE) and other best practices promulgated by [OSHA]." (*Id.* at pp. 3-4). During the course of Green's career, she has served on

---

[19] Feeding Louisiana is a non-profit organization that represents the state's various food banks and associated networks. Who We Are, Feeding Louisiana, https://www.feedinglouisiana.org/about (last visited on July 1, 2024).

"numerous boards and committees, including the Specialty Crop Subcommittee of the USDA National Agricultural Research, Extension, Education, and Economics Advisory Board (2021-2023)," among others. (*Id.* at p. 4).

Green reviewed the policies and practices in place at Angola, the Amended Complaint, Plaintiffs' various declarations, and "relevant literature, including a survey of agricultural workplace safety practices promulgated by several federal and state agencies" to arrive at her evaluation as to the adequacy of Angola's heat-related policies on the Farm Line. (*Id.* at p. 5). Green concludes that based on these materials and her experience and expertise, the "Farm Line operates in a manner inconsistent with industry customs and practices routinely observed on specialty farms in Louisiana." (*Id.*). She further opines that "the Farm Line does not meet basic work, health, or safety standards applicable to agricultural labor, particularly in conditions of excessive heat and humidity." (*Id.*).

Green bases her conclusions on the following observations. The use of incarcerated persons to hand-water crops, including by "dipping Styrofoam cups in a bucket," is "extremely inefficient and labor-intensive." (*Id.* at p. 7). Further, "[w]eeding by hand is inefficient, expensive, and highly labor intensive. Hand pulling may not extract all the roots, leaving a weed to grow back. This method is physically demanding and can cause injuries." (*Id.*). Hand weeding is "especially inefficient and dangerous in conditions of extreme heat and humidity." (*Id.*). In Green's opinion, "[b]asic PPE" such as "a [long-sleeved] shirt, long pants, lace-up work boots, socks, gloves, eye protection, and a sun hat" can prevent "some injuries." (*Id.* at p. 8).

50

However, such clothing, while presenting benefits through its "impermeab[ility]," will also "prevent heat exchange (i.e., sweat evaporation) from the body to the external environment." (*Id.*). This then requires supervisory persons to take "extra safety precautions" for workers wearing such equipment in hot environments. (*Id.* at p. 9).

It is further appropriate practice in the agricultural sector for employers to provide workers with sunscreen. (*Id.* at p. 12). Also, according to Green, "[r]ubber boots are not safe for daily fieldwork." (*Id.*). After reviewing the materials described above, Green concludes that inmates assigned to the Farm Line are not assigned the types of PPE that are "standard among agricultural workers in Louisiana." (*Id.*).

As to the adequacy of the heat-related policies at Angola, Green notes that they conflict with the various guidelines put forth by NIOSH and OSHA, as discussed above, and further stresses that NIOSH advises employers to suspend all "work that is not urgent" upon the issuance of a heat alert. (*Id.* at p. 11). This is not contrary to industry standards, as, according to Green, "[m]any private farms cease operations in the summer, in part to protect workers and in part because crop yield is generally low during the hottest months." (*Id.* at p. 12). Finally, "[t]o avoid dehydration and heat exhaustion/stroke, farm workers should be given frequent breaks. . . in a cool location. . . . The length and frequency of breaks should increase as heat intensifies." (*Id.* at p. 13). Green concludes that these practices are not followed at Angola. (*Id.* at p. 14).

B. **Tommy Guilino**

Defendants respond to Green's conclusion with the declaration of Tommy Guilino, an Angola employee with twenty-five years of farm experience. (Doc. 49-21 at p. 1). According to Guilino, the Farm Line is operated using industry standards and utilizes "modern day agricultural practices . . . that are common amongst all farmers." (*Id.* at pp. 2-3). Guilino appears to arrive at this conclusion solely on the basis of his own personal experience. He does not provide a description of what "modern day agricultural practices" he is referring to, or even how he would know what modern day agricultural practices are within the private sector, since he avers that he has been exclusively employed by Angola for the past twenty-two years. (*Id.* at pp. 1-3).

VI.   **STATEMENT OF LAW**

A. **Preliminary Injunctive Relief**

Federal Rule of Civil Procedure ("Rule") 65(b) sets forth the requirements that must be met before the Court may issue a TRO. It provides:

> *(1) Issuing Without Notice.* The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

*(2) Contents; Expiration.* Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record.

Fed. R. Civ. P. 65(b)(1)-(2). Additionally, the party requesting the TRO must provide "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

A TRO is simply a highly accelerated and temporary form of preliminary injunctive relief, requiring that the movant establish the same four elements for obtaining a preliminary injunction: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *See Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). In applying the four-factor analysis, a court must consider the factors on a "sliding scale"—a greater threat of irreparable injury may justify issuance of preliminary relief in a situation with a less certain likelihood of success, and vice versa. *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 635 (M.D. La. 2015).

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988). Irreparable injury is harm that "cannot be undone through monetary damages"—that is, harm for which money damages are inadequate or for

53

which money damages are "especially difficult" to compute. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).

## B. Eighth Amendment

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. To establish an Eighth Amendment violation for conditions of confinement, "an inmate must show that the alleged violation was sufficiently serious, i.e., that it deprived him of the most minimal level of life's necessities, and that prison officials acted with deliberate indifference to his health or safety." *Hewitt v. Henderson*, 271 F. App'x 426, 428 (5th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 847 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)). In other words:

> A prison official has violated the Eighth Amendment when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 833–34. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *Id.* at 842.

*Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). Further, "[c]onditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Id.* (citing *Wilson*, 501 U.S. at 304). "The standard against which a court measures prison conditions are 'the evolving standards of decency that mark the progress of a maturing society' and not the

54

standards in effect during the time of the drafting of the Eighth Amendment." *Gates*, 376 F.3d at 333 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

"'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley v. Albers,* 475 U.S. 312, 319 (1986) (some internal quotation marks omitted). The Supreme Court has held that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981). "In making this determination in the context of prison conditions, [the Court] must ascertain whether the officials involved acted with "deliberate indifference" to the inmates' health or safety." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)). Courts "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Id.* (citing *Farmer*, 511 U.S. at 842).

Subjecting incarcerated persons to high heat conditions for sustained periods of time, with inadequate procedures to mitigate the risks inherent in such high heat, is a violation of the Eighth Amendment when prison officials are "deliberately indifferent" to such risks. *See, e.g., Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015) ("inmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures"); *Ball*, 792 F.3d at 596 ("[W]e affirm the district court's conclusion that housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related

injury, violates the Eighth Amendment'); *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *39 (S.D. Tex. July 19, 2017) (finding that, due to continued occurrence of high heat and the inadequacy of efforts to mitigate such heat, "[t]he conditions of confinement at the Pack Unit," a prison operated by the Texas Department of Criminal Justice, "violate the Eighth Amendment").[20]

Further, "prison work requirements which compel inmates to perform physical labor, which is beyond their strength, endangers their lives, or causes undue pain constitutes cruel and unusual punishment." *Howard v. King*, 707 F.2d 215, 219 (5th Cir. 1983); *see also Mendoza v. Lynaugh*, 989 F.2d 191, 194 (5th Cir. 1993) ("To be sure, if prison officials assign an inmate to a work detail and they know that such an assignment could exacerbate a serious physical ailment, then such a decision could constitute deliberate indifference"); *Calhoun v. Hargrove*, 312 F.3d 730, 734-35 (5th Cir. 2002) (finding claim sufficient to survive a motion to dismiss where prison official purportedly knew about a four-hour medical work restriction but forced inmate to work long hours, which raised blood pressure to dangerously high levels).

---

[20] *See also Hope*, 536 U.S. at 738 (Eighth Amendment violation was "obvious" in part because plaintiff was subjected to "unnecessary exposure to the heat of the sun"); *Gates*, 376 F.3d at 340 (holding that the probability of heat-related illness based on the conditions of confinement in a certain cellblock and the open and obvious nature of the risk thereof amounted to an Eighth Amendment violation); *Valigura v. Mendoza*, 265 F. App'x 232, 235 (5th Cir. 2008) ("We have held that temperatures [within confinement] consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment"); *McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, at *18 (S.D. Tex. Feb. 3, 2017) (noting that Fifth Circuit precedent provides "that, in the face of extreme heat, prison officials must fashion adequate mitigating measures").

The adequacy of procedures is a fact-specific question that courts have routinely turned to experts for help answering. *See, e.g.*, *Gates*, 376 F.3d at 339 (upholding the issuance of injunctive relief that relied on Dr. Vassallo's testimony that the conditions of confinement were such that it was "very likely" that incarcerated persons in the relevant facility would die from heat stroke or some other heat-related condition); *Ball*, 792 F.3d at 593 (affirming the district court finding that, based mainly on Dr. Vassallo's testimony, the heat conditions and procedures in place within the relevant prison put incarcerated persons at substantial risk of serious harm); *Collier*, 2017 WL 3049540, at *30 (relying on Dr. Vassallo's testimony to find that a particular heat-related prison policy was ineffective).

Courts will issue preliminary or emergency injunctive relief to command that prisons modify their conditions of confinement so as to preserve human life. *See, e.g.*, *Collier*, 2017 WL 3049540, at *46; *Tiede v. Collier*, No. 1:23-CV-1004-RP, 2023 WL 6345966, at *1 (W.D. Tex. Sept. 28, 2023). That being said, in doing so courts remain "barred from enjoining the state to follow its own laws and procedures." *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020).

### C. Title II of the ADA and Section 504 of the Rehabilitation Act

Incarcerated persons may bring claims against their jailors for disability discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act. *Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 736 (M.D. La. 2016) (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998)). "[A] plaintiff proceeding under Title II must 'show that: (1) he or she is a qualified individual with a disability; (2) he or she

is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity which provides the service, program or activity is a public entity.'" *Id.* (quoting *Douglas v. Gusman*, 567 F. Supp. 2d 877, 889 (E.D. La. 2008)). Within the prison context, this equates to a requirement that prisons make "reasonable modifications" to its policies, practices, or procedures so that a disabled prisoner can have "meaningful access to existing public services or programs." *Id.* (quoting *Borum v. Swisher Cnty.*, No. 2:14–CV–127–J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015)).

Additionally, "in the context of the ADA, if not for purposes of the Eighth Amendment, 'international discrimination against the disabled does not require personal animosity or ill will'; 'it may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy . . . or custom.'" *Id.* (quoting *Bartlett v. N.Y. State Bd. of Law Examiners*, 156 F.3d 321, 331 (2d Cir. 1998)). "Where a claim is based on the failure to provide reasonable accommodations, the ADA and R[ehabilitation] A[ct] are identical in scope." *Godbey v. Iredell Mem'l Hosp., Inc.*, No. 5:12–cv–00004–RLV–DSC, 2013 WL 4494708, at *3 n. 7 (W.D.N.C. Aug. 19, 2013).

## VII.  ANALYSIS

After examining the factual record at length, and based on the analysis provided below, the Court concludes that Plaintiffs' request for injunctive relief must be granted, at least in part. The Court finds that Plaintiffs have satisfied each requisite element for such relief, and that injunctive relief is required to preserve and

protect human health and safety, especially as the summer heat arrives in full force. At this stage, the evidence shows that it is likely that Angola's present heat-related Farm Line policies do not adequately mitigate the risk of heat-related disorders among those laboring thereon, whether they be especially susceptible to suffering from such maladies or not. While the "sliding scale" on which the Court considers the various elements necessary for injunctive relief favors special emphasis on this point, because it is apparent that the immediate threat of irreparable harm amounts to death and permanent injury for incarcerated persons laboring on the Farm Line, *see Kliebert*, 141 F. Supp. 3d at 635, Plaintiffs have also shown a substantial likelihood of showing that Defendants have been deliberately indifferent to such risks.

Further, in response to Defendants' contention that injunctive relief at this juncture is premature because Plaintiffs have yet to move for class certification, such an argument is without merit. Defendants have cited to no case law for this proposition, and while the Court has yet to address the issue of class certification, this possibility does not preclude the Court from issuing a preliminary injunction that grants relief to any putative class member. *See Alex A.* v. *Edwards*, 2022 WL 3701169, at *3 (M.D. La. Aug. 26, 2022); *see also Gooch* v. *Life Invs. Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012); *Yang* v. *Kellner*, 458 F. Supp. 3d 199, 218 n.5 (S.D.N.Y. 2020), *aff'd*, 960 F.3d 119 (2d Cir. 2020). Put differently, [t]he lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directed generally against a class of persons."

*Alex A.*, 2022 WL 3701169, at *3. Defendants do not contest that their policies apply in equal measure to all putative class members.

## A. Substantial Likelihood of Prevailing on the Merits

To show a substantial likelihood of prevailing on the merits of their Eighth Amendment claims, Plaintiffs must first show that conditions on the Farm Line render incarcerated persons at substantial risk of suffering serious harm. Plaintiffs must then show that Defendants have likely been deliberately indifferent to such risks. For the following reasons, the Court finds that both tests have been satisfied, and that Plaintiffs have demonstrated a substantial likelihood of prevailing on the merits of their claims.

### i. Substantial Risk of Serious Harm

A substantial risk of harm may be found when prison conditions are such that they deprive an inmate of "the minimal civilized measure of life's necessities." *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 347). As noted above, subjecting incarcerated persons to high heat conditions without adequate mitigatory procedures satisfies the substantial risk of serious injury or death element of an Eighth Amendment claim. *Hinojosa*, 807 F.3d at 670 ("[I]nmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures").

According to experts like Dr. Vassallo, exposure to heat indexes in excess of eighty-eight degrees Fahrenheit leads to a sharp increase in risk for exposed persons to develop serious, and potentially fatal, injuries that can occur suddenly. (Doc. 37-3 at pp. 10-13). Strenuous labor exacerbates such risks, as do certain medical conditions

60

and the taking of specific medications. (*Id.* at p. 15). Those risks have been proven to be present in both prison settings and in civilian life.

Dr. Vassallo's Declaration, (Doc. 37-3), her Supplemental Declaration, (Doc. 54-1), and the Court's independent review of the medical records for each of the named Plaintiffs, shows that each Plaintiff has suffered from symptoms consistent with significant to severe heat-related illness, including fainting, cardiac events, heat chills, loss of bodily control, vomiting, dizziness, blurry vision, rashes, and dehydration. Named Plaintiffs further allege that they have seen other persons suffering from severe heat-related conditions while laboring on the Farm Line, (*see, e.g.,* Hicks Declaration at ¶ 6), and the emergency sick call records provided by Defendants for the period of April 2024 to May 15, 2024, show that numerous sick calls were placed wherein inmates suffered from symptoms consistent with heat-related illness, as identified by Dr. Vassallo, the CDC, OSHA, NIOSH, and Defendants' own educational materials, (Doc. 49-13). The additional declaration from Damion Thompson and the ARPs submitted by Dexter Vassar and Patrick Ramirez support such a conclusion. (Docs. 37-44, 37-46; Thompson Declaration).

Moreover, the medical records reviewed by the Court support Dr. Vassallo's conclusion that Angola does not maintain an adequate Heat Pathology Medications list or issue heat precaution duty statuses to those with qualifying pre-existing conditions. Of the named Plaintiffs, two have been provided with heat precaution duty statuses. (Doc. 49 at p. 10). Yet each named Plaintiff either possesses a chronic illness or takes a medication that inhibits their ability to thermoregulate. (Doc. 54-

1). Further, the Court's review of the emergency sick-call medical records provided by Defendants for the period of April 2024 to May 15, 2024, shows that multiple inmates with serious illnesses or pre-existing conditions were laboring in the field under no work restrictions. (Doc. 49-13). One of these men suffered from acquired immunodeficiency syndrome (AIDS), and another was a fifty-three-year-old man with a history of pre-diabetes, fainting, knee pain, asthma, and osteoarthritis. (*Id.* at pp. 18, 20-21). Defendants own educational materials, supposedly provided and reviewed by prison officials annually, state that such persons are at greater risk of developing heat-related conditions. (Doc. 51-11).

The wealth of evidence here shows that incarcerated persons laboring on the Farm Line are not provided with shade, sunscreen, or required rest breaks. Further, the declarations from named Plaintiffs uniformly provide that breaks are seldomly given, that the water provided is dirty, that they are required to work beyond their physical capacities, and that they are not provided with other necessary protective equipment, like lace-up boots or sunhats. Defendants contest these claims, but not persuasively. As to the rest breaks, Defendants admit that they do not record them, but nonetheless assert that they are regularly taken and that inmates may rest whenever they like. There is nothing in Angola's policies which indicates that breaks may be taken at will, and Plaintiffs again uniformly aver that the failure to continue working or failure to work efficiently on the Farm Line subjects them to discipline. Further, Defendants' assertion as to why breaks have not been diligently recorded is contradicted by those dates in their records when breaks have been sporadically

recorded, (*see, e.g.*, Doc. 37-62 at p. 143), and by the plain language of Directive No. 13.067, (Doc. 37-38).

Lastly, Defendants provided the declarations of Gagnard and Hebert in support of their assertion that breaks are given along the Farm Line. Yet while each declarant avers to have personal knowledge of the Farm Line, both serve in managerial roles within Angola, and do not appear to actually be responsible for personal and contemporaneous supervision of the taking of breaks on the Farm Line on a day-to-day basis. (*See* Gagnard Declaration; *see also* Hebert Declaration). As such, their statements carry less weight than those of Plaintiffs, who have been physically present and working the Farm Line at the relevant locations and times.

Regarding the protective equipment, there is nothing in Defendants' heat-related or general equipment policies that confirms the provision of such gear. Defendants' equipment policy does not appear to specifically provide for lace-up boots, only "work boots," which Plaintiffs have asserted refers to rubber boots that are allegedly unsafe for field labor. (Docs. 37-51 at p. 28, 37-7 at p. 12).

Dr. Vassallo has reviewed Angola's heat-related policies and concludes that they do not adequately reduce the serious risk of heat stroke and other heat-related conditions for those laboring on the Farm Line. (Doc. 37-3 at p. 6). Dr. Vassallo fears that, without significant changes, "a person forced to labor on the Farm Line will deteriorate or die." (*Id.*). Dr. Vassallo's fears are compounded by the sometimes "callous and wanton disregard" for the safety of those incarcerated at Angola by

63

medical personnel. *Lewis v. Cain*, No. CV 15-318-SDD-RLB, 2023 WL 7299130, at *1 (M.D. La. Nov. 6, 2023) (Dick, C.J.).

The Court's review of agricultural labor guideline materials from various national and state agencies supports the conclusions of Dr. Vassallo. OSHA, NIOSH, the CDC, Colorado, California, and Oregon all require that agricultural workers laboring in hot environments be provided with shade and adequate rest. The Louisiana Department of Health itself recommends that "[a]t a minimum, employers should provide adequate cool water, rest breaks, and shade or a cool rest area for employees." *Working In Extreme Heat: What Employers and Workers Need To Know*, Louisiana Department of Health, https://ldh.la.gov/page/la-heat. NIOSH recommends rest/break schedules that exceed those currently in place at Angola, and provides materials suggesting that the risk of heat injury on the Farm Line during the summer months is "high." *See Heat Stress: Work/Rest Schedules*, NIOSH, available at https://www.cdc.gov/niosh/topics/heatstress/recommendations.html.

Further, Marguerite Green opines that, based on her extensive experience in agricultural management and workplace safety, Angola's Farm Line policies do not meet "basic work, health, or safety standards applicable to agricultural labor, particularly in conditions of excess heat and humidity," because inmates are not provided with frequent breaks in cool locations. (Doc. 37-7 at p. 13). Curiously, Defendant's own educational materials also recommend, in contrast to actual practices at present, that persons take "frequent drink breaks and 'wet down' or mist [themselves] with a spray bottle to avoid becoming overheated." (Doc. 51-11 at p. 4).

Additionally, persons should, but allegedly are not able to, "[d]ress in lightweight, light-colored, loose-fitting clothing on hot days. . . take rest periods in shady or cool areas . . . protect [themselves] from the sun by wearing a hat and sunglasses; [and] use a sunscreen that is at least SPF 15." (*Id.*). The materials also suggest that persons spend as much time possible indoors on hot and humid days, that local news be monitored for extreme heat alerts and safety tips, and that those with a medical condition or that are taking medications consult with their doctor. (*Id.*).

Compounding these factors is the worsening climate situation in Louisiana generally and Angola specifically. As noted above, Defendants' own temperature logs for the period of May 2023 to October 2023 indicated that heat alerts were or should have been issued on approximately 145 days. (Doc. 49-10). Further, heat index values exceeded 113 degrees Fahrenheit on twenty-four of those days. (*Id.*). During this period, the heat caused numerous deaths throughout the state, and thousands of related emergency medical visits. (Doc. 37-36). State officials recommended that all persons remain indoors if possible. (*Id.*). Angola's own educational materials provide that "extreme heat kills 618 people in the United States every year." (Doc. 51-11). This summer could be hotter, and will almost certainly be one of the hottest ones in recorded history. (Doc. 37-37). Adequately dealing with the heat in Louisiana has become a matter of life and death, and, according to Dr. Vassallo, that death can arrive suddenly and without warning. (Doc. 37-3).

The only way to prevent heat stroke and heat-related conditions is to "effectively mitigate the detrimental impacts of extreme heat." (*Id.* at p. 29). Based

on the medical records and declarations provided thus far, which detail a consistent pattern of medically susceptible persons and non-medically susceptible persons developing severe heat-related conditions on the Farm Line, review of Angola's heat-related policies, the opinion of expert medical professional Dr. Susi Vassallo, general labor guidelines from around the country, including Louisiana, Defendants' own educational materials, the opinion of Marguerite Green, the increased occurrence of heat-related conditions statewide and the historic temperatures experienced throughout the South, the Court concludes that Defendants' policies do not appear to provide sufficient mitigation, and that Plaintiffs have shown a substantial likelihood of prevailing on the merits of the first element of their Eighth Amendment claims.

### ii. Deliberate Indifference

Plaintiffs must additionally show that Defendants acted with deliberate indifference to the substantial risk of serious harm addressed above. "Deliberate indifference is defined as a failure to act where prison officials have knowledge of a substantial risk of serious harm to inmate health or safety." *Collier*, 2017 WL 3049540, at *40 (citing *Farmer*, 511 U.S. at 837)). It is an "extremely high" standard to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Ball*, 792 F.3d at 594. On this point, "a prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Collier*, 2017 WL 3049540, at *40 (citing *Farmer*, 511 U.S. at 829)). Despite this high standard, Plaintiffs have provided enough evidence for the Court to determine that

they are likewise substantially likely to prevail on this element of their Eighth Amendment claims.

"In cases asserting deliberate indifference by prison officials where there is excessive heat, the Fifth Circuit has found deliberate indifference where prison officials ignored complaints 'of heat stroke or some other heat-related illness.'" *Ball*, 792 F.3d at 673 (quoting *Gates*, 376 F.3d at 339); *see also Blackmon v. Garza*, 484 F. App'x 866, 872-73 (5th Cir. 2012). Here, Plaintiffs submitted at least eleven separate ARPs to Defendants regarding heat-related working conditions on the Farm Line, essentially all of which were denied in summary fashion by Defendants with the same stated reasons, those being that the claims made in each ARP were "false" and held "no merit." (Docs. 37-40, 37-41, 37-42, 37-43, 37-44, 37-46, 37-48, 37-51, 37-60, 37-61, 37-64). This weighs in favor of a finding of deliberate indifference.

Courts have also found that "deliberate indifference may [] be 'demonstrated straightforwardly, through direct evidence that an administrator was aware of serious systemic deficiencies and failed to correct them.'" *Cain*, 2023 WL 7299130, at *48 (M.D. La. Nov. 6, 2023) (quoting *Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1129 (M.D. Ala. 2016)); *see also Collier*, 2017 WL 3049540, at *40 (finding that defendants knew that a risk of serious harm existed after nearly two dozen men died of heat-related illnesses, and when inmates and correctional officers regularly experienced heat-related illnesses). As noted in the Court's analysis in Section VII(A)(i), the medical records provided to the Court thus far are replete with inmates laboring on the Farm Line alleging symptoms of heat stroke or other heat-related illness. Also, as noted in

Section VII(A)(i), the vast majority of those afflicted prisoners had previously been diagnosed with pre-existing conditions or were taking medications that, according to Dr. Vassallo, inhibited their thermoregulation. The medical records examined spanned multiple years, and each emergency medical visit, or at least the sum total of all such visits, was direct evidence to Defendants of "serious systemic deficiencies" within their heat-related protocols. *Id*. Accordingly, this too weighs in favor of a finding of deliberate indifference.

Defendants' own policies can, and in this case do, help to establish Plaintiffs' case for deliberate indifference. *See Collier*, 2017 WL 3049540, at *40 ("[The prison's] own policies reflect the known danger of the heat in Texas"). As Defendants note, Directive No. 13.067 and HCP8 mandate certain heat-related mitigation efforts. (Doc. 49 at p. 21). Such policies make it clear that Defendants are cognizant of the threats that high heat imposes to human life and safety, both for the regular population of inmates and those exhibiting enhanced heat-susceptibility.

However, Defendants' policies are inadequate, and even conflict with their own educational materials. Attachment B to the HCP8 policy includes descriptions of the serious and sometimes fatal nature of heat-related conditions; notes that certain people that take medication and/or possess pre-existing conditions are more vulnerable to developing heat-related illness; and advises that persons laboring outdoors on hot days should be provided with adequate protective gear, including sunscreen, and be allowed to rest in shady or cool areas. (Doc. 51-11). Attachment B is reviewed by all prison officials annually according to HCP8, and therefore it

appears likely that Defendants have subjective knowledge of the necessity of, for example, shade and sunscreen, which mitigate the dangers of heat-related conditions. Additionally, Attachment B to HCP8 provides references to OSHA and CDC guidelines, which recommend and require similar heat-prevention measures. (*Id.*). The acknowledgement of the dangers that heat has to incarcerated persons working outdoors within Defendants' policies, coupled with the ignored advice contained in their own educational materials, further supports a finding of deliberate indifference.

Finally, Defendants' policies appear, to some degree, irrational. As noted by Plaintiffs, Directive No. 13.067 requires that for those indoors, in the absence of air conditioning, cool showers and cool wet towels be made available, and ventilation be increased as much as possible. (Doc. 37-38). Yet as to those laboring outdoors, who are more at risk of suffering from heat-related conditions insofar as they are performing various physical tasks, the only protections provided are water, ice, and an optional five-minute break every thirty minutes. (*Id.*).

Further, Angola's relatively static policies support Plaintiffs' case for deliberate indifference, as Plaintiffs suffered numerous heat-related injuries on the Farm Line, injuries which are described more thoroughly in Section VII(A)(i). *See Collier*, 2017 WL 3049540, at *42 ("What [defendant] did not do in the face of the substantial risk of harm is also relevant to the Court's [deliberate indifference] analysis"). The chief policies at issue here have been in place since at least 2019. (Docs. 37-38, 37-39). Even being limited to a relatively select sample size of medical records, the Court and Dr. Vassallo have noted numerous serious heat-related

69

injuries that have occurred over the past three years alone. (*See* Doc. 54-1). Each of these events placed Defendants on notice that their policies were potentially insufficient, yet Defendants appear to have taken no mitigating action. The Court therefore deems this inaction to weigh in favor of a finding of deliberate indifference.

Finally, and alternatively, the Court finds that based on the entirety of the evidence before it, including but not limited to the various statewide heat-related warnings, the historic temperatures recorded in Louisiana over the summer of 2023 and the likely reoccurrence of such temperatures in the summer of 2024, the various news articles attesting to the dangers of such temperatures, general agricultural labor guidelines from around the country, including Louisiana, Defendants' own educational materials, and the increased occurrence of heat-related conditions statewide, that the dangers for incarcerated persons working in high-heat environments on the Farm Line is open and obvious, and therefore it is substantially likely that Defendants were deliberately indifferent in refusing to adopt additional mitigatory policies that account for the documented heat increases. *See Hinojosa*, 807 F.3d at 665 (finding that "evidence showing that a substantial risk . . . was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to the information concerning the risk and thus 'must have known about it'" supports a finding of deliberate indifference). As in *Gates*, "the open and obvious nature of the dangerously hot conditions" here supports a finding that Plaintiffs have shown a substantial likelihood of prevailing on the deliberate indifference element of

70

their Eighth Amendment claims. 376 F.3d at 340. The Court, for this reason and those provided above, concludes that Plaintiffs have sufficiently carried their burden under the preliminary injunction standard as to both elements of their Eighth Amendment claims.

### B. Immediate Risk of Irreparable Harm

Based on the foregoing, the Court concludes that, at this stage, Plaintiffs have shown that conditions on the Farm Line "create a substantial risk of injury or death." *Collier*, 2017 WL 3049540, at *43. Irreparable harm is generally "one for which there is no adequate remedy at law." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (quoting *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 251 (5th Cir. 2023) (internal quotations omitted)). There is no adequate remedy at law for non-economic injuries like death or serious physical injury, and so Plaintiffs have satisfied this element. *See, e.g., Vazquez Barrera v. Wolf*, 455 F. Supp. 3d 330, 340 (S.D. Tex. 2020) (finding that allegations that plaintiffs "face[d] a heightened risk of dying or suffering from serious illness" constituted "imminent and irreparable" harm); *East v. Blue Cross & Blue Shield of Louisiana*, No. 3:14-CV-00115-BAJ, 2014 WL 8332136, at *2 (M.D. La. Feb. 24, 2014).

Additionally, and alternatively, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE, § 2948.1 (3d ed. 1998)). Plaintiffs have shown that they

are likely being denied their Eighth Amendment rights. Accordingly, Plaintiffs have shown an immediate risk of irreparable injury.

### C. Balance of Interests

In determining whether to grant injunctive relief, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987). In other words, plaintiffs must establish "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted." *Janvey*, 647 F.3d at 595. Plaintiffs must also establish "that the grant of an injunction will not disserve the public interest." *Id.* However, "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plainly, "the public interest supports the protection of Eighth Amendment rights." *Marlowe v. LeBlanc*, 2020 WL 1983915, at *2 (M.D. La. Apr. 27, 2020); *see also Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 fn. 9 (5th Cir. 2014). As noted, it is likely that Plaintiffs will succeed on their Eighth Amendment claims, and so the public interest favors an injunction.

Defendants' assertion that they would suffer economic injuries in excess of eight million dollars should work on the Farm Line be enjoined is based on an erroneous understanding of Plaintiffs' requested relief. Plaintiffs' definition of the Farm Line does not include all agricultural work conducted at Angola at all times, but rather, at this time, includes only Lines 15a, 15b, 24, and 25, which are staffed

by approximately fifty incarcerated persons at any given time. Plaintiffs also only seek injunctive relief for those times when heat alerts are issued. (Doc. 51 at p. 12).

Further, even were such a request for injunctive relief before the Court, "inadequate resources can never be an adequate justification for depriving any person of his constitutional rights." *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986)

Independent of the foregoing, the potential harms suffered by Plaintiffs far exceeds any harm suffered by Defendants by the issuance of injunctive relief, as the potential harms alleged by Plaintiffs are serious and potentially life-threatening. *See Collier*, 2017 WL 3049540, at *43 ("[I]f the Court were to fail to order remedies in this lawsuit, Plaintiffs' safety would be severely undermined, leading to a substantial risk of irreparable injury"); *Harding v. Edwards*, 487 F. Supp. 3d 498, 527 (M.D. La. 2020) (Dick, C.J.) ("Even though Plaintiffs' serious illness or death is not an *inevitable* result . . . the increased risk of such is still more detrimental than the abstract injury the state would suffer"). Accordingly, the balance of interests favors the issuance of injunctive relief.

### D. Bond Requirements

Courts may waive the bond requirement provided in Federal Rule of Civil Procedure 65(c) when appropriate. *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981); *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 303 (5th Cir. 1978); *Collier*, 2017 WL 3049540, at *44 (S.D. Tex. July 19, 2017). The Court will do so here, and no bond shall be imposed. The majority of Plaintiffs are incarcerated persons with limited resources, and "Plaintiffs have brought this suit to enforce constitutional rights," a factor which weighs in favor of

waiving the bond requirement. *See Collier*, 2017 WL 3049540, at *44 (S.D. Tex. July 19, 2017) (citing *City of Atlanta*, 636 F.2d at 1094).

### E. Remedies

Plaintiffs request that the Court enjoin Defendants' operation of the Farm Line whenever the heat index is at or above eighty-eight degrees Fahrenheit. For reasons provided below, the Court will issue preliminary injunctive relief that falls short of Plaintiffs' request.

The Prison Litigation Reform Act (PLRA) provides that:

[i]n any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be *narrowly drawn*, *extend no further than necessary to correct the harm* the court finds requires preliminary relief, and *be the least intrusive means necessary to correct that harm*. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C.A. § 3626(a)(2) (emphasis added). Paragraph (1)(B) of the PLRA provides that:

"The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless –
  (i)    Federal law requires such relief to be ordered in violation of State or local law;
  (ii)   the relief is necessary to correct the violation of a Federal right; and
  (iii)  no other relief will correct the violation of the Federal Right.

*Collier*, 2017 WL 3049540, at *44 (quoting 18 U.S.C.A. § 3626(a)(1)(B)). Within Eighth Amendment cases, "plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level." *Ball*, 792 F.3d at 599.

As Defendants note, agricultural labor does not cease across the South when heat index values reach eighty-eight degrees Fahrenheit. (Doc. 49 at p. 26). Further, while some of the guidelines and materials reviewed by the Court recommended that persons stay indoors and avoid outdoor labor in high heat, none offered a broad declaration that there were no remedies sufficient to reduce the risks of agricultural laborers developing heat-related maladies. The Court therefore concludes that at this juncture, Plaintiffs' requested relief is overbroad, and that granting such relief would be contrary to the mandate set forth under the PLRA.

Instead, the Court will order that Defendants take immediate measures to correct the glaring deficiencies in their heat-related policies. Such deficiencies include the failure to provide adequate shade, rest, sunscreen, and other protective equipment, as well as the failure to provide accommodations for those incarcerated persons suffering from an illness or ailment that significantly inhibits thermoregulation, and the failure to provide similar accommodations to those inmates who take prescribed medicine that likewise impairs their ability to regulate body temperature. Correcting these deficiencies will bring Angola into accord with consensus opinion on the necessary actions to take in response to high heat conditions. Such relief is well-within Defendants' ability to provide, and will not significantly alter operations on the Farm Line.

While "normally" for injunctive relief issued pursuant to Rule 65 of the Federal Rules of Civil Procedure, a court must "describe, in reasonable detail, the acts required by its injunction," in disputes involving state prisons, "a district court must give 'adequate consideration to the views of state prison authorities.'" *Collier*, 2017 WL 3049540, at *46 (quoting *Lewis v. Casey*, 518 U.S. 343, 362 (1996)). The Court therefore concludes that rather than "dictat[ing] precisely" what actions Defendants must follow, the appropriate next step is to require that Defendants provide the Court with proposed remedies that comply with the findings herein. *Lewis*, 518 U.S. at 362. Given the serious nature of interests at stake here, Defendants shall propose such remedies within seven (7) days of the entry of this Ruling and Order. Defendants' proposal shall contain estimated dates for the implementation of its terms and Defendants shall make every effort to provide for immediate implementation. Plaintiffs' response to Defendants' proposals shall be due seven (7) days thereafter. A hearing to address the proposed remedies may be required. The remainder of Plaintiffs' claims, and the entry of any permanent injunctive relief or declaratory judgment, shall be addressed in due course.

## VIII. CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiffs' **Application For A Preliminary Injunction And Temporary Restraining Order (Doc. 37)** be and is hereby **GRANTED IN PART**, and that a temporary restraining order be and is hereby **ENTERED**, **ORDERING** Defendants James LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections, Timothy

Hooper, in his official capacity as Warden of Louisiana State Penitentiary, Misty Stagg, in her official capacity as Director of Prison Enterprises, Inc., the Louisiana Department of Public Safety and Corrections, and Prison Enterprises, Inc. to immediately:

1. Correct the deficiencies of Directive No. 13.067 noted herein, including the lack of shade and adequate rest provided to incarcerated persons laboring on the Farm Line;

2. Correct the problems with Defendants' equipment policies noted herein, including the failure to provide sunscreen and other necessary protective clothing and equipment to those laboring on the Farm Line;

3. Submit a revised and expanded Heat Pathology Medications list;

4. Create a procedure to ensure that all incarcerated persons suffering from health conditions that significantly inhibit thermoregulation are assessed by medical personnel and are granted heat precaution duty status; and

5. Develop an additional heat-related policy to protect those laboring outdoors when heat index values reach or exceed 113 degrees Fahrenheit, the temperature at which the National Weather Service issues excessive heat warnings.

**IT IS FURTHER ORDERED** that Defendants shall submit a memorandum containing their proposed remedies within seven (7) days of the entry of this Ruling and Order. Plaintiffs' response to Defendants' proposed remedies shall be submitted

to the Court seven (7) days thereafter.

Baton Rouge, Louisiana, this 2nd day of July, 2024

JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

# EXHIBIT B

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **VOICE OF THE EXPERIENCED,** a membership organization on behalf of itself and its members; **and MYRON SMITH, DAMARIS JACKSON, NATE WALKER, DARRIUS WILLIAMS, KEVIAS HICKS, JOSEPH GUILLORY, KENDRICK STEVENSON,** and **ALVIN WILLIAMS,** on behalf of themselves and all others similarly situated, | * * * * * * * * * * * | **CIVIL ACTION** **NO.: 3:23-cv-1304** **JUDGE BRIAN A. JACKSON** |
| **VERSUS** | * * | |
| **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections**; TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary; **MISTY STAGG**, in her official capacity as Director of Prison Enterprises, Inc.; the **LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS;** and **PRISON ENTERPRISES, INC.** | * * * * * * * * * * * * | **MAGISTRATE JUDGE** **ERIN WILDER-DOOMES** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

# MEMORANDUM IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION AND TRO

**NOW INTO COURT,** through undersigned counsel, come Defendants herein, **JAMES LEBLANC,** in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections, **TIMOTHY HOOPER,** in his official capacity as Warden of Louisiana State Penitentiary, **MISTY STAGG,** in her official capacity as Director of Prison Enterprises, **LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS** and **PRISON ENTERPRISES** ("Defendants"), who file this opposition to Plaintiffs' Application for

Preliminary Injunction and TRO. R.Doc. 37. Plaintiffs fail to meet their heavy burden of proof for a preliminary mandatory injunction and their motion should be denied.

**I.    Introduction**

In this putative class action, plaintiffs seek overbroad and sweeping injunctive relief to cease all operations of the Farm Line when the heat index exceeds 88 degrees, a request that far exceeds the constitutional requirements, as well as any standard that may apply to any farmer across the United States.  The Farm Line, which is operated in accordance with constitutional and industry standards, is solely used to harvest fruits and vegetables for inmate consumption and is an integral part of the operation of LSP.  Plaintiffs admit that LSP currently has a Heat Pathology policy in place, which governs the very issue here: protection from heat related illnesses while working outdoors. Contrary to plaintiffs' unsupported allegations, the heat policy in effect is followed by LSP, which includes monitoring of temperatures every two hours, issuing heat alerts if the heat index exceeds 88 degrees, providing rest and water breaks every 30 minutes once a heat alert is issued. This policy, and the operation of the Farm Line, is constitutionally appropriate.

Nevertheless, plaintiffs seek a mandatory preliminary injunction to cease any an all operations of the Farm Line. Plaintiffs have failed to show entitlement to relief. Neither of plaintiffs' experts can or do opine that all work outdoors should cease when the heat index exceeds 88 degrees.  In fact, plaintiffs' experts admits that over 32 million people work outdoors across the United States. Yet, despite the current policies in place that provides adequate rest and water breaks for outdoor workers, plaintiffs attempt to impose standards on LSP that do not even apply to the farming industry as a whole.

Plaintiffs' application for a preliminary injunction should be denied for the following reasons:

- Plaintiffs fail to establish a substantial threat of irreparable injury if the injunction is denied because LSP's current Heat Pathology policies already address the issues raised by Plaintiffs.

- Plaintiffs are not likely to succeed on the merits because:
  - LSP implements a Heat Pathology policy for protection of inmates working outdoors once the heat index reaches 88 degrees, including access to ice, water and Gatorade, five-minute breaks every thirty minutes, and adjusted working schedules.

  - The operation of the Farm Line, which harvests vegetables solely for inmate consumption, is run in accordance with modern day industry standards, including the use of machines where appropriate and personal protective gear. Plaintiffs' claims of 8th amendment violations, including all opinions of their experts, are based on demonstrably untrue statements by the named plaintiffs.

  - Plaintiffs cannot demonstrate deliberate indifference where LSP created and implements its Heat Pathology policy, which specifically addresses the alleged constitutional violations.

- The certain and immediate harm to Defendants if the injunction is granted, which includes an enormous financial burden, outweighs plaintiffs' speculation of potential injury if the injunction is denied; and

- The public interest is served if the Motion is denied. A ruling prohibiting any inmate from working on the Farm Line if the heat index exceeds 88 degrees would effectively open the flood gates to cease any and all work in any institution across the South. Given that according to Dr. Vassallo, over 32 million people a year work outdoors, it is an absurd result to cease any and all outdoor operations.

- The requested relief, to cease operation of the Farm Line, far exceeds what is allowed under the PLRA, which requires relief that only remedies the alleged constitutional injury. Plaintiffs cite to no authority for the proposition that a complete stoppage of all outdoor work is constitutionally required.

As such, Defendants pray that plaintiffs' application for preliminary injunction be denied.

## II.    Factual Background
### A. Louisiana State Penitentiary

Louisiana State Penitentiary is a fully self-sufficient facility. LSP is responsible for all maintenance of the entire 18,000 acres including maintenance of all buildings, powerlines, plumbing, electrical, roadways and all of the grounds.[1]

---

[1] Exhibit A, Affidavit of Maghen Gagnard.

In accordance with state law and the constitution, every inmate at LSP is assigned a job, subject to the inmate's "duty status" as determined by a medical health care provider.[2] "It is the policy of LSP to provide as many offenders as possible the opportunity to be employed productively in internal maintenance, culinary, farm operations, and industrial assignments, consistent with their custody status and supervision requirements and the needs of the institution."[3] When an inmate arrives at LSP, LSP will conduct an Initial Classification Board to determine the inmate's custody status, housing assignment and job assignment.[4] The job assignments afford inmates the opportunity to learn job skills and develop good work habits and attitudes.[5] Offenders may be assigned to meaningful work assignments consistent with their ability, interest, medical status, and needs of the facility.[6] Contrary to the declarations of the plaintiffs in this case, new arrivals at Angola are not automatically assigned to the Farm Line.

### B.  The LSP Farm Line operations are constitutionally appropriate

LSP grows various fruits and vegetables that are harvested for inmate consumption. Because of the Farm Line, inmates enjoy fresh vegetables at least twice a day.[7] In 2023, over 200,000 pounds of fresh vegetables were issued to the LSP kitchens from the Farm Line to feed over 4,000 inmates.[8] These vegetables are not sold on the open market and LSP does not profit from its Farm Line.[9] Prison Enterprises does not run or operate the Farm Line at LSP.[10] LSP alone operate its Farm Line.[11]

---

[2] Exhibit A, Affidavit of Maghen Gagnard.
[3] Exhibit A-3, LSP Directive 19.003.
[4] *Id*.
[5] *Id*.
[6] *Id*. See also Exhibits A-2 and A-5,  Directive 18.002 and 13.063.
[7] Exhibit A, Affidavit of Maghen Gagnard.
[8] *Id*.; Exhibit A-1, Vegetable Yields.
[9] *Id*.
[10] Exhibit G, Affidavit of Misty Stagg.
[11] Plaintiffs define the Farm Line as Lines 15a, 15b, 24 and 25. However, plaintiffs attach documents regarding other lines at LSP. For clarity, Lines 24 and 25 go out to the fields. Lines 6A and 6B work in the

These vegetables are planted, cultivated and harvested using industry standards according to each vegetable.[12] For example, squash, cucumber, zucchini, snap beans, peas and okra are planted using a six-row planter that is pulled by a tractor.[13] These vegetables are planted after a rain, and generally no initial watering is required.[14] Before these vegetables are harvested, they are cultivated by a six-row cultivator (pulled by a tractor), which is performed as needed every few weeks.[15] Contrary to the declarations, inmates are rarely required to weed or cultivate every vegetable by hand.[16] Because these individual vegetables mature are different rates, they cannot be harvested with a machine and they are harvested by hand.[17] Another example is potatoes. These must be planted by hand, but are cultivated and harvested using machines.[18] The only manual labor that is required is to pick the potatoes up from the top of the ground and place in crates.[19] Similarly, vegetables such as carrots, beets, cabbage, collard greens, carrots, broccoli, beats and turnips are planted with six row planters and cultivated with tractors.[20] They are hand-picked because the vegetables cannot be harvested by a machine.

Inmates on the Farm Line are generally at the fields by 8:00 am. Generally, inmates are transported to the work area by bus.[21] Occasionally, if the work area is close to work crews' dorm (no more than 100 yards), inmates may walk to the work area.[22] They work until about 11:30, and

---

grading shed and processing plant, not outdoors. Lines 15a and 15b are grass cutting lines. Line 15a is a trustee line. Looking to the Lines 15a, 15b, 4 and 25, less than 50 inmates would be out on any given day. See R.Doc. 37-35.

[12] Exhibit C, Affidavit of Tommy Guilino.
[13] *Id*.
[14] *Id*.
[15] *Id*.
[16] *Id*.
[17] *Id*.
[18] *Id*.
[19] *Id*.
[20] *Id*.
[21] Exhibit D, Affidavit of Gabriel Hebert.
[22] *Id*.

will be back at the gates by 11:40. Contrary to the declarations, there are no quota requirements and inmates can work at their own pace.[23] They are able to take breaks and get water as needed.[24] Once a heat alert is issued, organized and scheduled breaks are given every 30 minutes.[25]

Inmates who are assigned to grass cutting crews will begin work around 8:00 am and work until around 10:15 am. Because of the needs of the facility and grass maintenance, the grass crew will sometimes work in the afternoon.[26] Like the field crew, the grass crew can work at their own pace and take rests and water breaks as needed.[27]

Plaintiffs mischaracterize the purpose of the "Daily Line Counts" when they assert that no breaks are given because breaks are not recorded in the Daily Line Counts. This is an internal document that officers fill out to document how many offenders are working.[28] The officers are not instructed to document breaks. If a break is not documented in the Daily Line Count, that does not mean a break did not occur. In fact, LSP does not document breaks because inmates can work at their own pace and take breaks as needed.[29]

In the field, inmates are provided water and Gatorade, which are contained in water jugs.[30] These jugs have tops, which remain closed while in the field.[31] The jugs are sanitized daily and brought back out in the field for each shift.[32]

---

[23] *Id*.
[24] *Id*.
[25] *Id*.
[26] Exhibit D, Affidavit of Gabriel Hebert.
[27] *Id*.
[28] *Id*.
[29] *Id*.
[30] *Id*.
[31] *Id*..
[32] *Id*..

All inmates are issued standard clothing, which includes both rubber and lace up boots.[33] Inmates are also issued gloves and a drinking cups.[34] At any time, an inmate can request a sun hat, which would remain with the inmate.[35] Inmates who are assigned to the grass cutting lines are issued vests and protective eyewear.[36]

### C. LSP's Heat Pathology Policies in place are constitutionally appropriate

LSP Directive 13.067 was enacted to "establish provisions for the reduction of heat pathology and to reduce the exposure to offenders identified as more vulnerable to heat."[37] The corresponding DOC Health Care Policy 8 was established using sound medical opinions and was created, evaluated and approved by multiple physicians and psychiatrists.[38] The policy is evaluated for necessary changes annually.[39]

Pertinent to this lawsuit, Directive 13.067 provides the following with regards to outdoor procedures:

1.  The Warden or designee shall ensure the following outdoor procedures are implemented for all offenders in all outdoor areas between 9:00 AM and 7:00 PM (May 1st- October 31st)
2.  Outside temperatures are monitored using the National Weather Center website https://www.weather.gov/, recorded every two hours, and reviewed and approved by the Warden or designee;
3.  When the apparent temperature (heat index) outdoors has exceeded 88 degrees Fahrenheit, a heat alert shall be announced;
4.  Upon the announcement of a heat alert, the following measures shall be provided while working outdoors:
      a. Water and ice is available at least every 30 minutes; and
      b. A rest break at least 5 minutes long is offered every 30 minutes.
    NOTE: Work hours may be adjusted to accommodate extreme temperatures.

---

[33] Exhibit A, Affidavit of Maghen Gagnard.
[34] Exhibit D, Affidavit of Gabriel Hebert
[35] *Id*.
[36] *Id*.
[37] Exhibit H, LSP Directive 13.067.
[38] Exhibit E, Affidavit of Dr. Lavespere; Exhibit E-1, HPC8.
[39] *Id*.

5.  The Warden or designee shall ensure the heat precautions implemented from May 1st through October 31st of each year as outlined in section 3. above are documented and maintained at the facility.

Note: Regardless of time of year or temperature, the above provisions in no way negate the standard requirements regarding the provision of adequate water and or ice for outdoor work crew and housing areas

LSP's records show that LSP does in fact check the temperature every two hours.[40] Heat alerts are issued as needed through the Station Logs.[41] Once a heat alert is issued, officers are notified via radio.

In relation to inmates who may be vulnerable to the heat, the Directive provides that offenders identified by a healthcare practitioner with a chronic illness that may be affected by heat or those prescribed medication that may impact sensitivity to heat shall be evaluated and educated for potential adverse reactions concerning heat or photosensitivity related pathology. Implementation of appropriate measures will be taken, if indicated, to reduce the risk of adverse outcomes."[42] If an inmate is on any medication listed in the Heat Pathology Medications, the inmate shall be issued a heat precautions duty status. Otherwise, the health care provider determines on a case-by-case basis whether a heat precaution duty status is necessary. A Heat Precautions Duty Status is as follows:

1.  The Warden or designee shall ensure that the heat precaution duty status includes, but is not limited to the following:

    a.  The offender must be brought indoors from May 1st through October 31st of each year; once the apparent temperature reaches 88 degrees;

    b.  The offender shall not participate in sports once the apparent temperature reaches 88 degrees; and

---

[40] Exhibit A, Affidavit of Maghen Gagnard; See also Exhibits A-8 and A-9, Temperature Logs.

[41] See Exhibit A-7, Station Logs. Defendants note that its initial production in April mistakenly contained gaps in the Station Logs. Plaintiffs did not notify Defendants of this mistake until after the Application for Preliminary Injunction was filed. Defendants immediately supplemented their production and attach all Station Logs to this opposition.

[42] Exhibit H, Directive 13.067.

     c.     The offender shall not be re-assigned to jobs in environments that are typically hotter than normal indoor temperatures, such as kitchen or warehouse environments.

2.     The Warden or designee shall ensure a list of all offenders with a heat precaution duty status as outlined above in section 1. of this directive is provided weekly, from May 1st through October 31st of each year, to the designated supervisor responsible for their care and custody.

Two of the named plaintiffs, Nate Walker and Kendrick Stevenson, have been issued Heat Related Duty Statuses.[43] These plaintiffs are not required to work outdoors between May and October when the heat index reaches 88 degrees. In fact, over 500 inmates currently have a heat-related duty status at LSP.[44]

The DPS&C and corresponding LSP Directive for Heat Pathology were prepared and implemented in accordance with medical opinions. DPS&C has a Pharmacy and Therapeutics Committee that annually reviews the medical list to update as necessary.

**D.  Medical care available to inmates working outdoors**

Any inmate may declare a medical emergency at any time. If an inmate is working outdoors and declares a medical emergency, the inmate will sit until the health care professional arrives.[45] A health care professional will assess the inmate, communicate with the ATU if necessary, and determine whether the inmate should be taken to ATU.[46]

Contrary to plaintiffs' allegations, inmates regularly use this emergency sick call procedure while working outdoors. However, these complaints rarely concern heat related issues. For example, LSP pulled all sick calls made from the field from April to May 15 of this year. The complaints included shoulder pain, back pain, foot abrasions, finger injury, toothache, hip pain,

---

[43] See Exhibit B-10, Nate Walker duty status; Exhibit B-9, Kendrick Stevenson duty status.
[44] Exhibit A, Affidavit of Maghen Gagnard.
[45] Exhibit B, Affidavit of Ashli Oliveaux; Exhibit D, Affidavit of Gabriel Hebert.
[46] Exhibit B, Affidavit of Ashli Oliveaux.

flank pain, and rash.[47] One inmate complained of chest pain and was brought to the ATU.[48] Another inmate complained of dizziness.[49] He was put in the shade to rest and was not required to work his remaining shift (less than 45 minutes remaining). Clearly, the current medical emergency care is adequate, and inmates working in the field frequently utilize such care, even for minor complaints or issues.

### E. Current job assignments for the named plaintiffs

Per the Court's request, the following is a summary of each named plaintiff's job assignment:

- Kendrick Stevenson – Heat related duty status issued after provided prescription for Zyprexa in March 2024.[50] He is currently located at the Sobriety Dorm Program. He does not currently have a job assignment.
- Nate Walker – Heat related duty status.[51] Walker is currently assigned to a line located at Raven dorms. Raven dorms have not been out to the field since December 2021.
- Myron Smith – Line 15b. From April 22, 2024, to present, Myron Smith has worked a total of 32 hours.[52]
- Alvin Williams – Line 25. From April 22, 2024, to present, Alvin Williams has worked a total of 12 hours.[53]
- Joseph Guillory is currently assigned to Line 10. LSP has not sent Line 10 to the fields since 2021.
- Kevias Hicks is currently a Grounds Keeper on Falcon Yard. Grounds Keepers are not considered a part of the Farm Line (even under Plaintiffs' definition) and they keep the outside area of Falcon Unit neat and clean.
- Damarius Jackson is currently located at the Sobriety Dorm Program. He does not currently have a job assignment.[54]
- Darrius Williams is currently in Preventative Segregation. He does not currently have a job assignment.[55]

---

[47] Exhibit B, Affidavit of Ashli Oliveaux.
[48] Exhibit B, Affidavit of Ashli Oliveaux; See also Exhibit B-1, Self-Declared Emergencies.
[49] *Id*.
[50] Exhibit B-9, Stevenson Heat Related Duty Status.
[51] Exhibit B-10, Walker Heat Related Duty Status.
[52] See Exhibit B-11, Line 15b Incentive Pay Roster.
[53] See Exhibit B-12,  Line 25 Incentive Pay Roster.
[54] Exhibit B, Affidavit of Ashli Oliveaux.
[55] *Id*.

Defendants attach the named plaintiffs' medical records,[56] as well as all emergency sick calls made from the field from April 2024 to present.[57]

## III.    Law and Argument

### A.  The heightened burden for preliminary mandatory injunction

A preliminary injunction is an "extraordinary and drastic remedy" that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.[58] A preliminary injunction is the exception, not the rule.[59] A plaintiff seeking a preliminary injunction must establish (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that their substantial injury outweighs the threatened harm to the party whom they seek to enjoin; and (4) that granting the preliminary injunction will not disserve the public interest.[60] If the movant fails to carry the "heavy burden" to show each of these prerequisites, a preliminary injunction is not warranted.[61]

The decision to grant or deny a preliminary injunction is discretionary with the district court.[62] However, because a preliminary injunction is an extraordinary remedy, it "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements."[63]

In addition, mandatory preliminary relief "which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and

---

[56] Exhibit F.
[57] Exhibit B-1.
[58] *Munaf v. Geren*, 553 U.S. 674, 689, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008).
[59] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).
[60] *Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012); accord *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).
[61] See *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985).
[62] *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).
[63] *Suehs*, 692 F.3d at 348.

law clearly favor the moving party."[64] Because "[a]n indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury, [o]nly in rare instances is the issuance of a mandatory preliminary injunction proper."[65]

In the context of injunctions against correctional facilities, based on the PLRA, "preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm."[66] Public policy, and the Supreme Court, counsels federal courts to "eschew toward minimum intrusion into the affairs of state prison administration."[67] The Supreme Court warned against federal courts making decisions regarding "the day-to-day functioning of state prisons and involv[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges."[68] Stated differently, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison administration into their own hands and out of the hands of the people entrusted with such tasks by the state."[69]

**B. Plaintiffs seek overbroad class wide relief prior to class certification**

In this putative class action, plaintiffs seek class wide relief before any certification order has been issued. While courts may issue conditional class relief prior to class certification, plaintiffs fail to even address or show that such conditional relief, on a class wide basis, is warranted. Only two of the named plaintiffs are currently working in the fields.

---

[64] *Three Expo Events, L.L.C. v. City of Dallas, Texas*, 182 F.Supp.3d 614, 622 (N.D. Tex. 2016)(quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).

[65] *Tate v. American Tugs, Inc*., 634 F.2d 869, 870 (5th Cir. 1981) (internal quotation marks omitted).

[66] *Ball v. Sanders*, No. CIV.A. 13-282-JWD, 2015 WL 58872, at *1 (M.D. La. Jan. 5, 2015).

[67] *Alex A. by & through Smith v. Edwards*, No. CV 22-573-SDD-RLB, 2022 WL 4445499, at *18 (M.D. La. Sept. 23, 2022)

[68] *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976).

[69] *Alex A. by & through Smith v. Edwards*, No. CV 22-573-SDD-RLB, 2022 WL 4445499, at *18 (M.D. La. Sept. 23, 2022). See also *Creel v. City of Baton Rouge/Par. of E. Baton Rouge*, No. CV 20-880-SDD-EWD, 2021 WL 856710, at *1 (M.D. La. Mar. 8, 2021).

While Dr. Vassallo makes broad sweeping statements that all persons are at risk for heat related illnesses, she admits that "some healthy people with no known medical problems will tolerate heat more easily."[70] Yet, plaintiffs seek a mandatory injunction to cease all operations of the Farm Line for all inmates, whether they are allegedly "medically vulnerable" or healthy.

Dr. Vassallo's opinions demonstrate that the broad sweeping injunctive Plaintiffs seek for all inmates that may be assigned to the Farm Line is inappropriate. Dr. Vassallo asserts that the current policies in place are inadequate because: (1) the heat pathology medications are under inclusive; (2) it fails to indicate that heat worsens underlying medical conditions; (3) it fails to mandate that medically vulnerable inmates receive a duty status from field labor work; and (4) it fails to allow individuals to take breaks in an air-conditioned facility.[71]

At the outset, Defendants dispute these opinions, see Section C(1)(a), *infra*. Regardless, Dr. Vassallo's first three opinions solely concern "medically vulnerable" inmates, and not the broad class for which plaintiffs seek injunctive relief.  As such, her only opinion as to the alleged inadequacy of the Directive that would apply to all inmates assigned to the Farm Line is that inmates are not brought in an air-conditioned facilities for rest breaks. Aside from the fact that Plaintiffs cite to no case law[72] or even industry standards that require rest breaks in an air-conditioned facility, this one opinion does not support an injunction to cease all operations of the Farm Line when the heat index exceeds 88 degrees. As such, this injunctive relief plaintiffs seek on a class wide basis, prior to certification, should be denied.

---

[70] R.Doc. 37-3, p. 20.

[71] R.Doc. 37-3, p. 29.

[72] In facts, the Fifth Circuit has held that LSP was not required to install air conditioning on Death Row because this relief exceeds what is required under the Constitution. *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015).

**C. Plaintiffs fail to meet their burden for a preliminary mandatory injunction**

**1. Plaintiffs fail to demonstrate a substantial likelihood of success on the merits**

Plaintiffs seek a mandatory preliminary injunction prohibiting the entire operation of the Farm Line for all inmates once the heat index reaches 88 degrees. Plaintiffs cannot show that the law clearly favors this relief where: (1) the heat pathology policies in place are directly on point to plaintiffs' claims and are constitutionally sufficient; (2) Plaintiffs' unsupported allegations cannot support a finding that the current operating conditions of the Farm Line violate the 8th Amendment; and (3) Plaintiffs cannot show deliberate indifference.

**a. LSP's Heat Pathology policy is constitutionally appropriate**

Plaintiffs admit that there are specific heat pathology policies in place to govern the very crux of Plaintiffs' claims. Plaintiffs argue that the policy is inadequate and that the policy is not followed. Both arguments are without merit.

Dr. Vassallo states that the Heat Pathology as written is "inadequate to protect incarcerated people at Angola from the risk of heat-related illness." She opines that the Heat Pathology medications that require a heat related duty status is under inclusive. While Defendants dispute this statement, it is irrelevant to plaintiff's request for a preliminary injunction to cease all farm Line Operations for all inmates, even those who are not prescribed any medication. Further, DPS&C created this Heat Pathology medication list with the assistance of Dr. Lavespere (DPS&C Chief of Medical Operations), Dr. Gamble (LSP Medical Director) and Dr. Herman Soong (Psychiatrist).[73] DPS&C's Pharmacy and Therapeutics Committee, which is comprised of all institution's Medical Directors and the Chief Pharmacists, review the medical list yearly to update

---

[73] Exhibit E, Affidavit of Dr. Lavespere.

if required.[74] Based on the Committee's current recommendations, the medication list is adequate.[75]

Dr. Vassallo next states that the policy is inadequate because "It fails to indicate that heat exacerbates or worsens underlying medical conditions and disorders." To the contrary, the policy states that "Offenders identified by a healthcare practitioner with a chronic illness that may be affected by heat … shall be evaluated and educated for potential adverse reactions concerning heat or photosensitivity related pathology" and that the "health care practitioner/provider determines on a case-by-case basis if a heat precaution duty status is to be ordered based on the offender's chronic disease."[76]

Dr. Vassallo further states that the "protocol fails to recognize that to avoid dehydration and heat exhaustion/stroke, individuals should be permitted to take breaks and recover from the heat in a cool, air-conditioned location." She cites to no authority whatsoever for this proposition. Further, as the Fifth Circuit found in *Ball*, in Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level.[77] Requiring LSP to install AC units on death row was held to be outside of the constitutional requirements. Likewise, requiring rest breaks in air conditioned facilities is outside of the constitutional requirements. It is the Chief Medical Director of DPS&C's opinion that the current policy of required 5-minute breaks every 30 minutes and access to water is sufficient to reduce heat pathology among all offenders working outdoors.[78]

---

[74] *Id*.
[75] *Id*.
[76] Exhibit H, Directive 13.067.
[77] *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015).
[78] Exhibit E, Affidavit of Dr. Lavespere.

In addition, plaintiffs' arguments that the current policies are not being followed are without merit. Plaintiffs created a Heat Index Tracker and attached to their motion for the proposition that the Heat Pathology Policies are not followed. R.Doc. 37-50. This Comparative Heat Index Tracker is based on flawed information and misinterpretations of LSP's internal documents. At the outset, plaintiffs rely on a "NWS (Temp/Heat Index)."[79] This heat index chart was purportedly created by Plaintiffs' counsel. See R.Doc. 37-3, p. 25, para 89. Dr. Vassallo attempts to authenticate this chart by stating that she reviewed the chart created by Plaintiffs' counsel.[80] However, Dr. Vassallo is not a meteorologist and neither Dr. Vassallo nor Plaintiffs' counsel cite to any authority for the creation of this heat index chart. As such, the entire basis of the chart, which purportedly compares whether LSP issued a heat alert when the heat index exceeds 88 degrees, is flawed. Regardless, even based on Plaintiffs' flawed chart which is not supported by the documents they attach,[81] a heat alert was documented: 17 of the 22 days in June;19 of the 20 days in July; 21 of the 23 days in August; 9 of the 10 days in September.  Based on Plaintiffs' unsupported temperature data and its misinterpretation of LSP's documents, LSP issues heat alerts nearly every day. Any instance that plaintiffs allegedly show where a heat alert was not issued, at best, evidences negligence, which is not the standard to prove deliberate indifference.[82]

---

[79] See R.Doc. 37-50, footnote 1. Plaintiffs cite to the Heat Index Chart attached to Dr. Vassallo's Affidavit. R.Doc. 37-5. However, Dr. Vassallo merely states that she looked at the Heat Index Chart that was prepared by Plaintiffs' counsel. R.Doc. 37-3, p. 25, para 89.

[80] Id.

[81] The Comparative Chart also includes incorrect data. For example, chart alleges that no heat alert was issued on 6/7/2023. However, R.Doc. 37-52 p. 2 shows a heat alert was issued at 12:18 pm. Plaintiffs further assert that no heat alert was issued on 6/26/2023. R.Doc. 37-52, p. 39 shows that a heat alert was issued at 8:58 am on that date. Due to the time constraints on filing this opposition, Defendants have not been able to check each of plaintiffs' entries with the LSP station logs.

Another example of flawed data is that plaintiffs assert that the heat index exceeded 88 degrees on 6/5/2023. However, LSP's temperature logs show that the heat index was only at 86 degrees. Exhibit A-8.

[82] *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020).

Further, the Comparative Heat Index Tracker makes conclusory statements that rest and water breaks were not provided because the Daily Line Counts did not indicate such breaks were provided. As discussed above, the Daily Line Counts do not indicate when rest and water breaks are provided. Contrary to plaintiffs' allegations, inmates can take rest and water breaks whenever they need because inmates may work at their own pace, and can stop and get water at any time. LSP does not document the rest breaks provided since breaks are allowed at any time. However, LSP Field Operations Colonel attests that the required rest breaks once a heat alert is issued are given every 30 minutes.[83]

Further, inmates working in the fields will generally only work in the morning hours. Line 15b, which is a grass cutting crew, will occasionally work some afternoons due to the needs of the facility. However, these inmates are provided with the required rest breaks per the policy, and can take breaks at any time.

As the Fifth Circuit has made clear, federal courts cannot issue injunctions to state entities that require the entities to follow their own policies. *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020)(finding that an injunction that would promote compliance with a prison's own COVID-19 policies was prohibited under *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). As such, any showing that LSP may not issue a heat alert on discreet days cannot form the basis for a preliminary injunction.

**b. The operation of the Farm Line is constitutional**

The entire crux of the motion, and plaintiffs' expert opinions, are based on the allegations of the named Plaintiffs. These allegations are simply false. The current operation of the Farm Line

---

[83] Exhibit D, Affidavit of Gabriel Hebert.

complies with industry standards and therefore goes above and beyond what is required under the constitution.

The fact that inmates are required to work does not raise a constitutional claim for deliberate indifference.[84] In determining whether to uphold an eighth amendment challenge to prison conditions, the court must consider whether the totality of the circumstances violates "contemporary standards of decency."[85]

In *Clarke v. Collins*, 5 F.3d 1494 (5th Cir. 1993), an inmate sought declaratory and injunctive relief arising from his claims that his work on the agricultural lines violated his constitutional rights. The Fifth Circuit held:

> A prison inmate has no constitutional right to a job of his choice and cannot base a civil rights action on general dissatisfaction with a job assignment. *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir.1984). The Constitution does not mandate comfortable prisons, and to the extent that conditions of confinement may be restrictive and even harsh, they are ordinarily considered part of the penalty that criminal offenders pay for their offenses against society. See *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). An inmate's feeling that he is being treated harshly, without more, does not qualify him for relief under section 1983. Rather, the Eighth Amendment's prohibition against cruel and unusual punishment requires a demonstration of "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Though Clarke has convinced this court that he is no Thoreau, he has not demonstrated that his work on the agricultural line meets the threshold requirements for an Eighth Amendment claim.
>
> The uncomfortable conditions Clarke painstakingly describes, including the episodes with fire ants, poison ivy, cold weather, and cotton picking, do not raise questions of constitutional magnitude. They are simply part of working the agricultural line. As such, they represent "a de minimis level of imposition with which the Constitution is not concerned." *Simons v. Clemons*, 752 F.2d 1053, 1056 (5th Cir.1985).

---

[84] *Winston v. Stacks*, 243 F. App'x 805, 807 (5th Cir. 2007).
[85] *Rhodes v. Chapman*, 452 U.S. 337, 345–50, 101 S.Ct. 2392, 2398–2400, 69 L.Ed.2d 59 (1981).

In *Sampson v. King*, 693 F.2d 566, 568 (5th Cir. 1982), an inmate housed at LSP brought a 1983 action against DPS&C and LSP alleging that his exposure to a pesticide while working in the fields at LSP constituted cruel and unusual punishment. The court ruled:

> In general, the state has a responsibility to protect the safety of its prisoners. *Streeter v. Hopper*, 618 F.2d 1178, 1182 (5th Cir.1980); *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir.1977). In operating a prison, however, the state is not constitutionally required to observe all the safety and health standards applicable to private industry. *Ruiz*, at 1159. Nor is it bound by the standards set by the safety codes of private organizations. *Bell v. Wolfish*, 441 U.S. 520, 543 n. 27, 99 S.Ct. 1861, 1876 n. 27, 60 L.Ed.2d 447 (1979). Standards suggested by experts are merely advisory. *Bell*, at 543 n. 27, 99 S.Ct. at 1876 n. 27; Ruiz, at 1149–50. A federal court required to gauge the conduct of state officials must use minimum constitutional standards as the measure.
>
> The magistrate erred in concluding that Sampson's work with Parathion constituted cruel and unusual punishment. No showing was made that Parathion is not regularly used by private farmers engaged in the sort of agriculture practiced by the prison. Prison officials should not be held to a higher standard of care than that practiced by responsible farmers in the surrounding agricultural community. A prison farm which adheres to the reasonable customs and usages of the surrounding area cannot be said to be imposing cruel and unusual punishment.

Here, Plaintiffs argue that the LSP Farm Line is inconsistent with industry practices. Plaintiffs' expert opinion is solely based on the named Plaintiffs' declarations. At the outset, these declarations are inconsistent with the current operation of the Farm Line, as discussed above. Further, the Farm Line does in fact comply with the "industry standards" cited by Green.

In her affidavit, Green cites to NIOSHI recommendations that commercial farmers should implement to mitigate heat-related illness among farm workers.[86] First, Green cites to case studies and recommendations given to farmers after a heat related incident takes place. Green cites to no current standards from OSHA or NIOSHI that apply to farmers across the nation. Further, while

---

[86] R.Doc. 37-7, p. 11.

the state is not constitutionally required to observe all the safety and health standards applicable to private industry,[87] the "recommendations" cited by Green are in fact implemented at LSP. LSP has implemented its Heat pathology Directive, which includes training of officers and inmates on heat illnesses; LSP provides potable water and Gatorade during the summer months and allows and encourages inmates to drink at regular intervals; LSP monitors the heat index and will adjust work schedules accordingly; and any inmate at any time may declare himself a medical emergency and receive medical attention in the field.

As such, plaintiffs failed to show that the conditions on the Farm Line fail to meet constitutional requirements.

### c. Plaintiffs fail to establish the likelihood of success on the deliberate indifference standard

"Deliberate indifference is an extremely high standard to meet."[88] In a constitutional claim alleging deliberate indifference to the conditions of a prisoner's confinement, the plaintiff must satisfy both the "subjective and objective requirements" of the Eighth Amendment inquiry.[89] To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm."[90] To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk."[91] In *Farmer*, the Supreme Court held that deliberate indifference requires the defendant to have a subjective "state of mind more blameworthy than negligence,"[92] akin to criminal recklessness.[93]

---

[87] *Sampson v. King*, 693 F.2d 566, 568 (5th Cir. 1982).
[88] *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020).
[89] *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).
[90] *Id.*
[91] *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019).
[92] *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970
[93] I*d*. at 839–40, 114 S.Ct. 1970.

Although a court may disagree with a defendant's actions, "mere disagreement" "does not establish deliberate indifference."[94]

Here, plaintiffs cannot show that Defendants have a subjective state of mind. LSP and DPS&C have implemented policies that govern outdoor work when the heat index exceeds 88 degrees. Defendants are not disregarding a substantial risk, but instead are implementing policies to protect inmates from the very risk they complain of.

In *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020), an inmate sought a preliminary injunction regarding COVID-19 precautions. It was undisputed that the prison has a COVID-19 policy in place. With regards to the deliberate indifference standard, the Fifth Circuit held that the district court collapsed the objective and subjective component. The Fifth Circuit held that the district court treated alleged inadequate measures as dispositive of Defendants' mental state, which resembled the standard of civil negligence that has been rejected by the Supreme Court. The question was not how the prison's policies were being administered, but whether Defendants subjectively believed the measures they were taking were inadequate.

The same reasoning applies here. Plaintiffs do not dispute that a Heat Pathology policy, which specifically governs outdoor work when the heat index exceeds 88 degrees, is in place. The policy itself is the antithesis of deliberate indifference. The policy was created by various doctors based on medical opinions. Based on Defendants' subjective state of mind, the policies are sufficient to protect against heat-related risks. Further, the operation of the Farm Line exceeds constitutional requirements. There is no evidence that given the current policies in place, coupled with the safe operation of the Farm Line, Defendants subjectively believe that the measures they are taking are inadequate.

---

[94] *Valentine v. Collier*, 956 F.3d 803.

Further, there is no evidence that the current policies in place are inadequate. There are no heat related illnesses indicated in the named plaintiffs' medical records. The medical records from recent sick calls made from the field demonstrate that most sick calls are not for heat related instances.[95] One inmate complained of dizziness, was immediately treated and allowed to forgo his remaining shift and rest in the shade.[96]

Plaintiffs solely rely on Dr. Vassallo, who cites to one case of an alleged heat related instance stemming from outdoor work from five years ago. While Dr. Vassallo indicates the EMT mistakenly interpreted symptoms of a heat stroke with a drug overdose, that inmate tested positive for opioids.[97] Regardless, this one allegation from 2019 does not show that the current policies in place are inadequate.

Plaintiffs fail to show a likelihood of success on the merits on their extremely high burden to show deliberate indifference. Like in *Valentine*, allegations that the current policies in place are inadequate are insufficient to meet the subjective component for deliberate indifference.

### 2. Plaintiffs fail to show irreparable harm

The Supreme Court has held that for a preliminary injunction, the standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.[98] The Fifth Circuit has explained the heavy burden to establish irreparable harm or injury where adequate relief is available under the plaintiff's asserted cause of action: Federal courts have long recognized that, when 'the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'"[99]

---

[95] Exhibit B, Affidavit of Ashli Oliveaux.
[96] *Id*.
[97] See redacted medical records from *Lewis* case for patient #51, Exhibit I.
[98] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 375, 172 L. Ed. 2d 249 (2008).
[99] *Enter. Int'l, Inc.  v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th  Cir.1985) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir.1974)).

"The possibility that adequate compensatory  or other corrective relief will be available at a later date, in the ordinary  course of litigation, [weighs] heavily against a claim of irreparable  harm."[100]

At the outset, LSP has a policy in place to address the very issues they complain of. As such, they fail to prove irreparable harm. Further, Of the eight named plaintiffs, only two are currently assigned to the Farm Line. The most recent records indicate that Myron Smith has only worked 32 hours over the past month, and Alvin William has only worked 12 hours. Plaintiffs have failed to show that the current policies in place are insufficient to cause likely irreparable harm for the two named plaintiffs, much less an un-certified class.

Further, plaintiffs are seeking a permanent injunction in this litigation. As such, there is a possibility of "other corrective relief." As such, Plaintiffs' motion should be denied.

### 3.  Defendants will suffer certain and immediate harm if the injunction is granted that outweighs plaintiffs' speculation of potential injury if the injunction is denied

Contrary to plaintiffs' allegations, the operation of the Farm Line is productive farming and is essential to the operation of LSP, which incudes maintenance of the grass on the facility, as well as feeding inmates fresh fruits and vegetables. If the injunction is granted, LSP will suffer immediate harm. This includes an estimated cost of over $8 million to provide the necessary vegetables to inmates. The cost to maintain landscaping, hay fields, and cattle operations throughout the 18,000 acre facility is not capable of being enumerated at this time. In addition, the current crops that have already been planted will rot and ruin.

Further, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."[101] Here, as in *Valentine*, the State of Louisiana has "assigned the prerogatives" of administration of prison policy to

---

[100] (emphasis added) *Morgan v. Fletcher*, <u>518 F.2d 236, 240</u> (5th Cir.1975) (quoting *Va.  Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, <u>259 F.2d 921, 925</u>  (D.C.Cir.1958)).
[101] *Valentine*, <u>956 F.3d at 803</u>.

Defendants, and the Court's injunction would "prevent the State from effectuating the Legislature's choice and hence imposes irreparable injury."[102] As the *Valentine* court explained, the Supreme Court "has repeatedly warned that it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."[103] As such, like the *Valentine* defendants, Defendants will be irreparably harmed if the injunction is granted.

Given that Defendants have shown a policy in place that governs the very harm plaintiffs seek to enjoin, and that Defendants will suffer enormous immediate financial harm, plaintiffs' request for an injunction should be denied.

### 4.  Public interest is served if the motion is denied

While Plaintiff's Motion asserts it is "always" in the public interest to prevent the violation of constitutional rights, there are limits to this sweeping statement. Indeed, "when a state statute vests state officials with broad discretionary authority  concerning [prison operations], the Constitution affords the prisoners no constitutionally protected interests that might outweigh defendants' or the public interests in prison administration."[104]

Louisiana courts have held it is "against the public interest to issue an injunction based solely on plaintiff's disagreement with the health care being provided" by "corrections officials who are presently charged with that obligation."[105] Again, the Supreme Court "has continuously

---

[102] *Id*.

[103] *Id*. (quotations omitted).

[104] *Patterson v. Daniels*, No. 12-1674, 2010 WL 2100546, at *21 (E.D. La. March 22, 2013).

[105] *Hawkins v. Hawkins*, No. 3:11–cv–1325, 2012  WL 601426, at *9 (W.D. La. Jan. 2, 2012) (where plaintiff inmate complained of denial of prompt  and appropriate medical care and requested injunctive relief for same).

cautioned federal courts from assuming a greater role in decisions affecting prison administration."[106]

Further, the issuance of an injunction in this case will open the flood gates across the South regarding inmate labor outdoors. Public interest is not served where constitutional requirements for laboring outdoors exceeds that of what is required in the farming industry. Therefore, plaintiffs have failed to establish that the public interest will be served if the injunction is granted. The Court should deny the plaintiffs' Motion.

### 5. The requested injunctive relief far exceeds the PLRA and FRCP 65

Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury.[107] In Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level.[108] Some risk is permissible and perhaps unavoidable.[109]

In *Ball*, the Fifth Circuit found that an injunction to install air conditioning on Death Row violated the PLRA.[110] The Fifth Circuit based this ruling on the fact that Dr. Vassallo opined that there were other remedies short of facility wide air conditioning.[111]

Here, plaintiffs seek an injunction to prohibit any outdoor work on the Farm Lines if the heat index exceeds 88 degrees. However, as Dr Vassallo indicates, over 32 million people in the United States work outdoors. Neither Dr. Vassallo nor Green cite to any sources that all outdoor

---

[106] *Id*. (collecting cases); see also *Zantiz v. Seal,* No. 12-1580, 2013 WL  357069, at *4 (E.D. La. Jan. 29, 2013) ("To issue an injunction against this facility would limit  those best equipped to make decisions about the proper procedures to maintain safety, and would  therefore disserve the public interest in maintaining the safety of the prisoners and officers at the  facility.").

[107] See *Westefer v. Neal*, 682 F.3d 679, 683–84 (7th Cir.2012) (vacating an injunction under the PLRA because it exceeded what was required under the Due Process Clause).

[108] *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015).

[109] *Id*.

[110] *Id*.

[111] *Id*.

work should cease if the heat index exceeds 88 degrees. In fact, when discussing the millions of people who work outdoors in the United States, Dr. Vassallo states that workers and staff should receive heat stress training, staff should monitor heat advisories and encourage adequate fluid and rest breaks.[112] Green cites to recommendations that include development of health programs for prevention of heat related illnesses, training staff on heat related illnesses, establish a hydration program, monitor weather conditions, and provide prompt medical conditions.[113] None of these recommendations cited by Dr. Vassallo or Green include complete stoppage of outdoor work. Further, Defendants demonstrate that they already implement these recommendations by implementing the Heat Pathology policies, which includes training,  outline of required rest and hydration, and monitoring of weather conditions.

Plaintiffs seek to apply standards to LSP that do not even apply to farmers across the country. This requested injunction far exceeds the requirements of the constitution.

Further, even if plaintiffs proved entitlement to injunctive relief, which in denied, the requested injunction fails to comply with FRCP 65.  Federal Rule Civil Procedure 65 requires that an injunction "state its terms specifically; and describe in reasonable detail ... the act or acts restrained or required." FRCP 65(d)(1); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Plaintiffs seek an injunction to cease operation of the "Farm Line" but fail to identify what activities they consider would be subjected to the requested injunction. Plaintiffs assert that the requested injunction would only affect operation of the Farm Line during periods of high heat and "all other agricultural programs at Angola would remain untouched."[114] However, plaintiffs have failed to adequately define what they contend are included on the Farm Line. They assert that the

---

[112] R.Doc. 37.3, p. 22.
[113] R.Doc. 37-7, p. 11.
[114] R.Doc. 37-1, p. 31.

Farm Line includes, <u>but is not limited to</u>, Lines 15a, 15b, 24 and 25, and that it does not include all agricultural programs.[115] In discovery requests, plaintiffs defined the Farm Line to include agricultural work not performed by trustees. Yet, they now include trustee lines in their definition. Further, they submit evidence regarding Lines 6a and 6b, which are lines that only work in the processing plant, and this work is not done outdoors. As such, the requested injunction fails to comply with <u>FRCP 65</u> and should be denied.

## IV.    CONCLUSION

As demonstrated herein, plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order is unwarranted and should be denied.[116]

Respectfully submitted,

**KEOGH, COX & WILSON, LTD.**

By:    s/Andrew Blanchfield
Andrew Blanchfield, T.A. (#16812)
Email: ablanchfield@keoghcox.com
C. Reynolds LeBlanc (#33937)
Email: rleblanc@keoghcox.com
Chelsea A. Payne (#35952)
Email: cpayne@keoghcox.com
Post Office Box 1151
Baton Rouge, Louisiana 70821
Telephone:  (225) 383-3796
Facsimile:  (225) 343-9612

---

[115] R. <u>Doc. 37-1, p. 9</u>, fn. 2.
[116] In the event this Court orders that a hearing is necessary, Defendants reserve the right to call additional or different witnesses, given the time constraints of this filing, along with witness availability.

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 23rd day of May, 2024.


_____s/Andrew Blanchfield_____
Andrew Blanchfield

# EXHIBIT C

<pre>
 1              UNITED STATES DISTRICT COURT

 2               MIDDLE DISTRICT OF LOUISIANA

 3

 4  VOICE OF THE EXPERIENCED, ET AL  : CIVIL ACTION

 5  VERSUS                           : NO. 23-1304-BAJ-EWD

 6  LEBLANC, ET AL                   : JUNE 18, 2024

 7  ========================================================
              MOTION FOR PRELIMINARY INJUNCTION
 8             AND TEMPORARY RESTRAINING ORDER
            BEFORE THE HONORABLE BRIAN A. JACKSON
 9               UNITED STATES DISTRICT JUDGE

10

                   A P P E A R A N C E S
11

12  FOR THE PLAINTIFFS:

13       PROMISE OF JUSTICE INITIATIVE
         BY: LYDIA WRIGHT, ESQUIRE
14       BY: CLAUDE-MICHAEL COMEAU, ESQUIRE
         1024 ELYSIAN FIELDS
15       NEW ORLEANS, LOUISIANA 70117

16
    FOR THE DEFENDANTS:
17
         KEOGH COX & WILSON
18       BY: ANDREW BLANCHFIELD, ESQUIRE
         BY: CHELSEA ACOSTA PAYNE, ESQUIRE
19       701 MAIN STREET
         BATON ROUGE, LOUISIANA 70802
20

21
            REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
22               UNITED STATES COURTHOUSE
                     777 FLORIDA STREET
23              BATON ROUGE, LOUISIANA 70801
                      (225) 389-3565
24            NATALIE_BREAUX@LAMD.USCOURTS.GOV
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
25           COMPUTER-AIDED TRANSCRIPTION SOFTWARE
</pre>

(JUNE 18, 2024)

PROCEEDINGS

THE LAW CLERK:  ALL RISE.

(CALL TO THE ORDER OF COURT.)

THE COURT:  GOOD AFTERNOON, EVERYONE.  BE SEATED.

ANDREW, LET ME SEE YOU.

(OFF THE RECORD)

THE COURT:  GOOD AFTERNOON, EVERYONE.

I HOPE YOU-ALL ENJOYED THE ENTERTAINMENT THERE.  THIS IS NOT MY COURTROOM.  THIS IS MY DEAR FRIEND AND COLLEAGUE JUDGE JOHN DEGRAVELLES' COURTROOM.  MY COURTROOM IS UNDERGOING SOME UPGRADES RIGHT ABOUT NOW, SO HE WAS KIND ENOUGH TO ALLOW ME TO USE HIS, AND I'M INDEED VERY GRATEFUL FOR THAT.

TO BEGIN, LET ME ASK COUNSEL FOR BOTH SIDES TO ENTER THEIR APPEARANCES.  I WILL ASK YOU TO DO SO FROM THE FORWARD PODIUM.

BEFORE WE DO SO, PLEASE CALL THE CASE.

THE COURTROOM DEPUTY:  CIVIL CASE NO. 23-1304, *VOICE OF THE EXPERIENCED, ET AL, VS LEBLANC, ET AL.*

THE COURT:  ALL RIGHT.  COUNSEL FOR THE PLAINTIFFS, PLEASE, AGAIN, ENTER YOUR APPEARANCES

1 FROM THE FORWARD PODIUM.

2       **MS. WRIGHT:**  GOOD AFTERNOON, YOUR HONOR.

3       LYDIA WRIGHT FROM THE PROMISE OF

4 JUSTICE INITIATIVE FOR THE PLAINTIFFS.

5       **THE COURT:**  MS. WRIGHT.

6       **MR. COMEAU:**  CLAUDE-MICHAEL COMEAU FOR THE

7 PLAINTIFFS, YOUR HONOR, FROM THE PROMISE OF JUSTICE

8 INITIATIVE.

9       **THE COURT:**  MR. COMEAU.

10       ALL RIGHT.  AND FOR THE DEFENDANTS?

11       **MR. BLANCHFIELD:**  GOOD AFTERNOON, YOUR

12 HONOR.

13       ANDREW BLANCHFIELD ON BEHALF OF THE

14 DEFENDANTS.

15       **THE COURT:**  GOOD TO SEE YOU AGAIN, MR.

16 BLANCHFIELD.

17       **MR. BLANCHFIELD:**  JUDGE.

18       **MS. PAYNE:**  CHELSEA PAYNE ON BEHALF OF

19 DEFENDANTS.

20       **THE COURT:**  THANK YOU, MS. PAYNE.

21       ALL RIGHT.  SO WE HAVE QUITE A BIT TO

22 COVER TODAY.  AS I PREVIOUSLY INDICATED TO COUNSEL,

23 THE PURPOSE OF TODAY'S HEARING IS NOT TO RECEIVE

24 EVIDENCE BUT SIMPLY TO TAKE UP SOME OF THE ISSUES

25 THAT ARE MOST PROMINENT IN THIS LAWSUIT, SHOULD IT

1  BECOME NECESSARY -- AND INDEED IT WILL BECOME

2  NECESSARY -- FOR THE COURT TO RECEIVE EVIDENCE

3  CERTAINLY ON THE APPLICATION FOR INJUNCTIVE RELIEF

4  AND LATER, OF COURSE, IN THE TRIAL ON THE MERITS.

5  AND SO WE'LL TALK ABOUT DEADLINES AND -- FOR THOSE IN

6  JUST A MOMENT AS WELL.  BUT THERE ARE, AGAIN, A FEW

7  THINGS THAT I WOULD CONSIDER TO BE PRELIMINARY

8  MATTERS TO BE TAKEN UP AT THIS TIME.

9            FIRST, READING THROUGH THE -- I WILL

10  TELL YOU NOW, LET ME JUST TELL YOU, I THINK WE

11  BOTH -- BOTH SIDES HAVE AGREED UPON AN ACCURATE

12  DEFINITION OF "HEAT INDEX."  AM I CORRECT?

13            AND I WILL ALLOW EITHER SIDE TO COME TO

14  THE PODIUM TO ANSWER THE QUESTIONS.

15        **MS. WRIGHT:**  I BELIEVE WE DO AGREE ON --

16        **THE COURT:**  THERE IS NO DISPUTE ABOUT WHAT

17  CONSTITUTES --

18        **MS. WRIGHT:**  THERE IS NO DISPUTE.

19        **THE COURT:**  -- SCIENTIFICALLY WHAT THE HEAT

20  INDEX IS.

21            IS THAT CORRECT, COUNSEL?

22        **MR. BLANCHFIELD:**  THAT'S CORRECT, YOUR

23  HONOR.

24        **THE COURT:**  ALL RIGHT.  VERY WELL.

25            NOW, I UNDERSTAND THAT YOU BOTH MOVE

1  FOR AN EXTENSION OF CERTAIN DEADLINES, INCLUDING

2  DISCOVERY DEADLINES.  THAT MOTION WAS GRANTED BY THE

3  MAGISTRATE JUDGE.  BUT I WILL TELL YOU NOW THAT I

4  WILL VACATE THAT ORDER.

5  AND THE REASON FOR THAT IS BECAUSE IT

6  SEEMS TO ME THAT THIS IS NOT A MATTER THAT SHOULD BE

7  TRIED IN 2025.  GIVEN THE NATURE OF THE CLAIMS, I

8  BELIEVE THERE -- WE SHOULD ATTACH, AS ALWAYS IN

9  MATTERS LIKE THIS, SOME DEGREE OF URGENCY AND

10  ALACRITY AND DISPATCH TO THOSE.  SO WE'RE GOING TO GO

11  ON AND I'M GOING TO SET A NEW SCHEDULING ORDER.  SO

12  BEFORE DOING SO, HOWEVER -- I DON'T WANT TO DO SO

13  ARBITRARILY, SO LET'S FIRST TAKE UP THE ISSUE OF

14  DISCOVERY.

15  NOW, IT SEEMS TO ME THAT THE PROPOSED

16  CLASS MEMBERS ARE FAIRLY WELL-DEFINED.  INITIALLY

17  THERE WAS A GENERAL CLASS OF PLAINTIFFS AND TWO

18  SUBCLASSES.  I HAVE ALREADY DISMISSED CLAIMS BY ONE

19  OF THE PROPOSED SUBCLASSES, SO WE'RE LEFT WITH THOSE

20  PLAINTIFFS WHO HAVE A DOCUMENTED HISTORY OF

21  ADA-RELATED MEDICAL ISSUES.

22  BUT THE POINT IS, IS THAT IT SEEMS TO

23  ME THAT WE KNOW WHAT THOSE MEDICAL ISSUES ARE.  THOSE

24  ISSUES ARE VERY WELL-DOCUMENTED IN THE MEDICAL

25  RECORDS AT ANGOLA.

1        AND SO LET ME ASK FIRST, BEGINNING WITH

2   THE PLAINTIFFS, HOW MUCH TIME DO YOU BELIEVE YOU NEED

3   TO PROPOUND DISCOVERY IN THIS CASE FOR A TRIAL ON THE

4   MERITS?

5        **MS. WRIGHT:**  YOUR HONOR, THE -- WE HAVE

6   OUTSTANDING DISCOVERY REQUESTS THAT WE'VE PROPOUNDED

7   TO THE DEFENDANTS RIGHT NOW THAT WE'RE AWAITING

8   DOCUMENTS AND INTERROGATORIES.  WE HAVE --

9        **THE COURT:**  WHAT'S THE NATURE OF YOUR

10  DISCOVERY REQUESTS?

11       **MS. WRIGHT:**  WE'VE REQUESTED DISCOVERY ABOUT

12  THE AGRICULTURAL OPERATIONS AT ANGOLA, THE

13  DISCIPLINARY RECORDS, THE MEDICAL RECORDS.  WE HAVE A

14  REQUEST FOR INSPECTION THAT WE'VE SERVED ON THE

15  DEFENDANTS.  WE'LL BE INSPECTING THE ENTIRE

16  AGRICULTURAL FACILITY WITH OUR EXPERTS ON AUGUST

17  12TH.

18       **THE COURT:**  AUGUST 12TH?

19       **MS. WRIGHT:**  AUGUST 12TH.

20       **THE COURT:**  WE'RE GOING TO HAVE TO MOVE THAT

21  UP.  WHY AUGUST 12TH?  IS THAT THE EARLIEST TIME THAT

22  YOUR EXPERTS ARE AVAILABLE?

23       **MS. WRIGHT:**  WE HAVE -- YES, YOUR HONOR.  WE

24  HAVE AT LEAST FOUR EXPERTS, INCLUDING SOME WHO ARE

25  OUT OF STATE.

1      DR. SUSI VASSALLO, WHO I THINK IS

2 FAMILIAR TO THIS COURT, IS OUR EXPERT IN

3 THERMOREGULATION, AND SHE'S IN NEW YORK AND HAS A

4 BUSY SCHEDULE.

5      THE COURT:  OKAY.  SHE MAY HAVE TO MOVE THAT

6 UP.

7      MS. WRIGHT:  YES, YOUR HONOR.

8      THE COURT:  WHO ARE YOUR -- I KNOW YOU'VE

9 IDENTIFIED MS. GREEN.  BUT WHO ELSE HAVE YOU

10 IDENTIFIED AS A POSSIBLE EXPERT IN THE CASE?

11      MS. WRIGHT:  MR. TERRANCE WINN WILL BE AN

12 EXPERT IN OUR CASE.

13      THE COURT:  AND WHAT IS HIS FIELD OF

14 EXPERTISE?

15      MS. WRIGHT:  HE SERVED NEARLY 30 YEARS AT

16 ANGOLA AND HE CAME HOME A FEW YEARS AGO.  HE WORKED

17 THE FARM LINE.  AND HE MADE THE IMPOSSIBLE CHOICE TO

18 GO TO SOLITARY CONFINEMENT AS OPPOSED TO WORK THE

19 FARM LINE BECAUSE OF PSYCHOLOGICAL HARMS THAT ARE

20 ATTENDANT TO IT.

21      THE COURT:  SO HE'LL BE A FACT WITNESS?

22      MS. WRIGHT:  HE'LL BE A FACT -- HE'LL BE --

23 WE WILL ATTEMPT TO CERTIFY HIM AS AN EXPERT WITNESS,

24 YOUR HONOR.

25      THE COURT:  AGAIN, IN WHAT FIELD OF

1  EXPERTISE?

2       **MS. WRIGHT:**  THE DISCIPLINARY SYSTEM AT

3  ANGOLA AND THE PSYCHOLOGICAL HARM --

4       **THE COURT:**  BUT DOES THAT --

5       **MS. WRIGHT:**  -- OF FIELD WORK.

6       **THE COURT:**  -- REQUIRE AN EXPERT TO TESTIFY

7  ABOUT -- IT SEEMS WHAT YOU'VE DESCRIBED SUGGESTS TO

8  ME THAT HE WILL DESCRIBE THE FACTS AT ANGOLA.  THERE

9  WON'T BE AN ANALYSIS OF THOSE FACTS.  HE'LL SIMPLY

10  DISCUSS OR TESTIFY ABOUT THE FACT, HIS EXPERIENCE.

11       AND SO, AGAIN, I DON'T SEE -- AND I'LL

12  GIVE YOU TIME -- I'M NOT ASKING YOU AT THIS TIME TO

13  MAKE YOUR CASE FOR THE FACT THAT HE IS OR MAY BE AN

14  EXPERT.  BUT I JUST WANT TO, IN FAIRNESS TO YOU,

15  RAISE THESE ISSUES.  I MEAN, IF YOU CALL HIM AS A

16  FACT WITNESS, THAT'S FINE.  BUT I'M HARD-PRESSED TO

17  SEE HOW HE WOULD BE AN EXPERT ON THE CONDITIONS AT

18  ANGOLA.

19       NOW, AGAIN, HE CAN TESTIFY HIS OWN

20  PERSONAL KNOWLEDGE OF THAT, SO -- AND WHO IS YOUR

21  LAST -- ARE WE TALKING BOTH -- WELL, LET'S CONFINE IT

22  NOW TO PROPOSED EXPERTS.

23       WHO WOULD BE YOUR FINAL EXPERT OR

24  PROPOSED EXPERT?

25       **MS. WRIGHT:**  OUR FINAL EXPERT WILL BE AN

1  EXPERT IN THE HISTORY OF FORCED LABOR AT ANGOLA IN

2  PARTICULAR AND ON PRISON ECONOMIES.  JOSH SBICCA IS A

3  PROFESSOR FROM THE UNIVERSITY OF COLORADO AT BOULDER

4  WHO WILL BE OUR EXPERT IN THAT FIELD.

5       THE COURT:  ALL RIGHT.  AND I ASSUME THEN

6  THAT IT'S IMPORTANT TO GATHER, AS IN VIRTUALLY EVERY

7  CASE, INCLUDING CASES OF THIS SORT, FACTS TO PROVIDE

8  TO THE EXPERT WITNESSES TO CONDUCT ANALYSIS?

9       MS. WRIGHT:  THAT'S RIGHT.

10       THE COURT:  ALL RIGHT.

11          MR. BLANCHFIELD OR MS. PAYNE, LET ME

12  ASK YOU:  DO YOU INTEND TO PRESENT EXPERT WITNESSES

13  IN EITHER THE INJUNCTIVE -- HEARING ON THE INJUNCTION

14  OR THE TRIAL ON THE MERITS?

15       MR. BLANCHFIELD:  VERY UNLIKELY, YOUR HONOR.

16  WE HAVEN'T SEEN WHAT WE HAVE FROM THE OTHER SIDE.  IT

17  DOES -- I THINK THE TIMING THAT THE FOUR -- THREE OR

18  FOUR EXPERTS, HOWEVER MANY, THAT'S PROBABLY

19  DIFFICULTY IN THE TIMING.

20       THE COURT:  SURE.  I UNDERSTAND.

21       MR. BLANCHFIELD:  THE ONLY OTHER THING IS

22  SOMETIMES WE GET BOGGED DOWN IN ELECTRONIC -- YOU

23  KNOW, WE AGREE TO -- OR TRYING TO AGREE TO SEARCH

24  TERMS, SEARCHING MAILBOXES, PRODUCING DOCUMENTS WHICH

25  HAVE TO BE REVIEWED FOR PRIVILEGE AND THINGS LIKE

1  THAT, AND THAT -- SOMETIMES WE GET A LITTLE BOGGED

2  DOWN IN THAT.

3       THE COURT:  NO, I UNDERSTAND.  I DON'T SEE

4  THIS, HOWEVER, AS A CORPORATE COMMERCIAL LITIGATION,

5  OF COURSE.  THIS IS NOT THE KIND OF CASE WHERE YOU

6  WANT TO KNOW FROM CHASE BANK HOW MANY APPLICATIONS

7  FOR CREDIT CARDS DID YOU SEND IN A CERTAIN PERIOD OF

8  TIME.  I MEAN, IT SEEMS TO ME THAT, AT LEAST AT THIS

9  JUNCTURE, THE UNIVERSE OF DOCUMENTS AND EVIDENCE AND

10 DATA IS PRETTY CONFINED.  RIGHT?

11      MR. BLANCHFIELD:  I WOULD AGREE.

12      THE COURT:  IT'S PRETTY LIMITED.

13      MR. BLANCHFIELD:  I WOULD AGREE, JUDGE.

14      THE COURT:  AND SO I WOULD IMAGINE THAT -- I

15 MEAN, WE'RE TALKING ABOUT HEALTH RECORDS, WE'RE

16 TALKING ABOUT POLICIES OF LOUISIANA STATE

17 PENITENTIARY.  THOSE POLICIES ARE READILY AVAILABLE

18 WITH THE PRESS OF A BUTTON TODAY.  IT SEEMS LIKE THE

19 MEDICAL RECORDS -- WHO IS THE MEDICAL -- WHO IS

20 CURRENTLY SERVING AS THE MEDICAL DIRECTOR?

21      MR. BLANCHFIELD:  THE ENTIRE DOC IS

22 DR. LAVESPERE.

23      THE COURT:  DR. LAVESPERE IS STILL AT THE

24 HELM.  SO HE'S -- I'M FAMILIAR WITH HIM, HE'S

25 FAMILIAR WITH ME.  AND I THINK HE'S DONE A VERY FINE

1  JOB IN THE PAST OF PROVIDING THOSE RECORDS PRETTY

2  QUICKLY, SO I WOULD HOPE THAT HE WOULD AGREE TO DO

3  SO.  AND I'M SURE HE WILL AGREE TO DO SO.

4  SO, COUNSEL, I GUESS MY POINT TO YOU IS

5  THAT I DON'T SEE WHERE -- WITH THE EXCEPTION OF THE

6  POSSIBLE AVAILABILITY OF THE EXPERTS, I JUST DON'T

7  SEE WHY WE HAVE TO WAIT TWO MONTHS, GIVEN THE NATURE

8  OF THIS CLAIM.

9  THE HEAT INDEX OF 88 DEGREES, I MEAN,

10  YOU NEED ONLY -- AND JUST SO YOU KNOW, WE HAVE

11  REVIEWED THE RECORDS OF THE NATIONAL WEATHER SERVICE

12  ON THIS POINT.  AND SUFFICE IT TO SAY THAT IT'S GOING

13  TO BE 88 DEGREES -- THE HEAT INDEX WILL EXCEED 88

14  DEGREES FAIRLY EARLY IN THE MORNING THROUGH AT LEAST

15  AUGUST, IF NOT EARLY SEPTEMBER OR BEYOND.  AND AGAIN,

16  THAT'S JUST BASED UPON DATA THAT WE HAVE REVIEWED

17  FROM THE NATIONAL WEATHER SERVICE.

18  SO AGAIN, GIVEN THE FACT THAT THE

19  ALLEGATIONS ARE THAT HUMAN HEALTH IS IN JEOPARDY, I

20  WOULD SUGGEST THAT WE HAVE TO TREAT THIS WITH SOME

21  DEGREE OF URGENCY.  RIGHT?

22  AND IT'S NOT UNLIKE -- MR. BLANCHFIELD,

23  I DON'T THINK YOU WERE COUNSEL OF RECORD FOR THE

24  STATE IN THE *BALL* CASE, *BALL VS LEBLANC.*  BUT THE

25  STATE WAS VERY COOPERATIVE IN THAT CASE; THE QUICK

1   TURNAROUND ON ALL THE DISCOVERY, WHICH, OF COURSE, I

2   APPRECIATED.  AND I WOULD APPRECIATE, OF COURSE, THE

3   SAME LEVEL OF ATTENTION IN THIS CASE, SO --

4           **MR. BLANCHFIELD:**  YEAH.

5           **THE COURT:**  ALL RIGHT.  SO --

6           **MR. BLANCHFIELD:**  AND, YOUR HONOR, THE

7   AUGUST 12TH DATE WAS SUGGESTED TO US.  THAT WAS NOT

8   --

9           **THE COURT:**  I'M SURE.  YES, I UNDERSTAND

10  THAT.  AND AGAIN, MR. BLANCHFIELD, YOUR CLIENT IN

11  THESE TYPES OF CASES HAS ALWAYS BEEN VERY

12  FORTHCOMING, AND WE APPRECIATE THAT.

13          **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

14          **THE COURT:**  SO AGAIN, WHAT I WILL DO --

15  THANK YOU, MR. BLANCHFIELD.

16          SO, MS. WRIGHT, AGAIN, I DON'T WANT TO

17  ARBITRARILY ISSUE A SCHEDULING ORDER WITHOUT TAKING

18  INTO ACCOUNT THE CHALLENGES AND AVAILABILITY OF YOUR

19  EXPERT WITNESSES.  WHAT I WILL ASK YOU TO DO,

20  HOWEVER, IS TO CONFER WITH YOUR EXPERTS, IMPRESS UPON

21  THEM -- AND, OF COURSE, THEY ALREADY KNOW, YOU KNOW,

22  THAT, AGAIN, WE'VE GOT TO GET THIS CASE MOVING.

23          AND SO I WOULD ASK YOU, BEFORE CLOSE OF

24  BUSINESS ON FRIDAY, THE 21ST OF JUNE, TO REPLY TO THE

25  COURT WITH DATES WHERE YOUR CLIENTS -- OR YOUR

PROPOSED EXPERTS WILL BE AVAILABLE. I WON'T SET A

DEADLINE FOR THAT, BUT AGAIN, I WILL TELL YOU THAT I

DON'T SEE -- WELL, I INTEND TO -- LET ME SEE. I

INTEND TO SET A TRIAL IN THIS CASE ON THE MERITS NO

LATER THAN MID-SEPTEMBER. OKAY?

**MS. WRIGHT:** THANK YOU.

**THE COURT:** ALL RIGHT. NOW, LET ME ASK --

AND I DON'T KNOW WHO'S BEST TO -- JUST SO THAT I HAVE

AN UNDERSTANDING OF SOME OF THE FACTS ALLEGED HERE,

WE'RE TALKING ABOUT -- LET'S SEE -- WE'RE TALKING

ABOUT VARIOUS FARM LINES AT THE PENITENTIARY;

SPECIFICALLY LINES 15A, 15B, 24 AND 25.

SO WHAT I WOULD ASK IS THAT SOMEONE

EXPLAIN TO ME THE SIGNIFICANCE OF THOSE FARM LINES

VERSUS OTHER FARM LINES.

**MS. WRIGHT:** YES, YOUR HONOR.

THE FARM LINE REFERS TO COMPULSORY

AGRICULTURAL LABOR THAT OCCURS AT ANGOLA AS A FORM OF

DISCIPLINE WHERE THE INDIVIDUALS ARE PAID TWO CENTS

AN HOUR IN INCENTIVE PAY OR NOTHING AT ALL.

THERE IS OTHER AGRICULTURAL OPERATIONS

AT ANGOLA. THOSE ARE APPARENTLY OPERATED BY PRISON

ENTERPRISES. THOSE ARE THE OPERATIONS THAT USE

COMBINES AND TRACTORS, MILLION-DOLLAR AIR-CONDITIONED

TRACTORS. THAT'S NOT THE FARM LINE. WHAT WE KNOW IS

THAT LINES 24 AND 25, LINES 15B, THOSE RUN OUT OF

CAMP C AND CAMP D, AND THOSE ARE THE DISCIPLINARY

FARM LINES.  THERE MAY BE OTHERS.

DURING A MEET-AND-CONFER ON JUNE 4TH,

OPPOSING COUNSEL, OUR FRIENDS ON THE OTHER SIDE,

AGREED TO GIVE US A LIST OF THE LINES THAT LSP

CONSIDERS THE FARM LINES, AND WE HAVEN'T RECEIVED

THAT YET.  BUT I DO THINK THAT WE ARE -- THERE IS

ACCORD ABOUT WHAT THE FARM LINE IS AND WHAT IT'S NOT.

**THE COURT:**  VERY WELL.  I'LL LAY ADDITIONAL

INFORMATION ABOUT THAT.

AND LET ME JUST MENTION THAT I

APPRECIATE COUNSEL FOR BOTH SIDES MEETING AND

CONFERRING PRIOR TO THIS HEARING AND TRYING TO REACH

AGREEMENT AT LEAST ON THE EVIDENCE, THE DATA THAT

WILL BE IMPORTANT AND THAT WILL, OF COURSE, INFORM

THE COURT HERE.  SO THANK YOU-ALL FOR DOING SO.

ALL RIGHT.  NOW, THE COURT HAS BEEN

PRESENTED WITH, BY MY CALCULATION, SOMETHING ON THE

ORDER OF 11 DECLARATIONS -- NINE FROM THE PLAINTIFF,

THREE FROM THE DEFENSE -- ATTESTING TO THE

CONDITIONS; EQUIPMENT THAT IS PROVIDED TO INMATES WHO

ARE REQUIRED TO WORK THESE VARIOUS FARM LINES.  THERE

SEEMS TO BE SOME -- A BIT OF INCONSISTENCY BETWEEN

THE TWO.  SO I WILL TELL YOU THE COURT WILL CERTAINLY

1  HAVE TO HEAR TESTIMONY ON THAT.

2          BUT LET ME TURN NOW -- SPECIFICALLY

3  WITH RESPECT TO THE CONDITIONS, THERE ARE ALLEGATIONS

4  IN THE COMPLAINT, MR. BLANCHFIELD OR MS. PAYNE, THAT

5  THE WATER IS NOT CLEAN; THAT EVEN SOME OF THE

6  GATORADE I GUESS THAT'S PROVIDED TO INMATES IS NOT

7  CLEAN; THE WATER ISN'T COLD AND THAT SORT OF THING.

8          I ASSUME YOU'VE HAD A CHANCE, AT LEAST

9  PRELIMINARILY, TO TAKE A LOOK AT THE CONDITIONS OR TO

10  CONFER WITH YOUR CLIENTS.  WHAT'S THE STATE'S

11  RESPONSE TO THAT ALLEGATION AT LEAST AT THIS

12  JUNCTURE?  I KNOW WE'VE NOT HAD THE BENEFIT OF

13  DISCOVERY.  BUT WHAT IS YOUR RESPONSE TO THAT?

14      **MR. BLANCHFIELD:**  YOUR HONOR, THE VESSELS

15  THAT HOLD THE WATER ARE CHANGED OUT DAILY.  WE HAVE

16  AN AFFIDAVIT FROM SOMEONE WHO HAS FIRSTHAND KNOWLEDGE

17  OF THAT:  WE TAKE THEM IN EVERY DAY; WE CLEAN THEM;

18  WE BRING THEM BACK OUT; COLD WATER; UNLIMITED ACCESS

19  TO THE COLD WATER AND GATORADE.

20      **THE COURT:**  OKAY.  NOW, WHEN YOU SAY

21  "UNLIMITED ACCESS," DOES THAT MEAN -- ARE YOU

22  SUGGESTING OR ASSERTING THAT THE INMATE AT ANY TIME

23  CAN REQUEST WATER?

24      **MR. BLANCHFIELD:**  THAT'S CORRECT.  EXACTLY.

25      **THE COURT:**  ALL RIGHT.

1    AND, MS. WRIGHT, WHAT'S YOUR RESPONSE

2  TO THE DEFENSE POSITION ON THAT POINT?

3    **MS. WRIGHT:**  OUR CLIENTS REPORT THAT WATER

4  IS NOT READILY AVAILABLE, THAT IT RARELY -- THAT ICE

5  IS RARELY AVAILABLE AND THAT THE IGLOO® COOLERS THAT

6  DO -- THAT HOLD WATER IN THE FIELDS ARE OFTEN MOLDY,

7  MILDEWY AND HAVE INSECTS FLOATING IN THEM.  OUR

8  CLIENTS HAVE ALSO REPORTED THAT THEY'VE NEVER

9  RECEIVED GATORADE IN THE FIELD.

10    **THE COURT:**  HAVE YOU HAD -- YOU'VE NOT HAD

11  AN OPPORTUNITY TO VISIT ANGOLA TO OBSERVE THE

12  CONDITIONS, I TAKE IT?

13    **MS. WRIGHT:**  I VISITED ANGOLA MANY TIMES.

14  I'VE NEVER OBSERVED THE FARM LINE IN THIS WAY.

15    **THE COURT:**  THE FARM LINE SPECIFICALLY, YES.

16    **MS. WRIGHT:**  YES.

17    **THE COURT:**  OKAY.  AND HAVE YOU-ALL REACHED

18  AGREEMENT ON THE REQUEST TO INSPECT THE RELEVANT

19  PORTIONS OF THE FACILITY?

20    **MR. BLANCHFIELD:**  WE HAVE AGREED -- WE HAVE

21  NOT AGREED SPECIFICALLY AS TO WHAT AREAS WILL BE

22  INSPECTED, YOUR HONOR, BUT I DON'T THINK THAT'S GOING

23  TO BE A PROBLEM.

24    **THE COURT:**  GOOD.  IF THERE IS A DISPUTE

25  ABOUT THAT, PLEASE LET ME KNOW AS SOON AS POSSIBLE.

1      I WILL ALSO TELL YOU IT IS LIKELY THAT

2  THE COURT WILL VISIT TO -- ANGOLA TO INSPECT THE

3  CONDITIONS.

4      NOW, HAVING SAID THAT, MR. BLANCHFIELD,

5  I DON'T WANT TO ISSUE AN ORDER PROHIBITING ANGOLA

6  FROM SWITCHING OUT ANYTHING -- NO EQUIPMENT, NO NEW

7  BUCKETS, NO NEW ANYTHING -- WITHOUT MY PERMISSION.

8  NOW, LET ME BE CLEAR:  THESE PERSONS, LIKE ALL

9  PERSONS, LIKE ALL HUMAN BEINGS, ARE ENTITLED TO CLEAN

10 WATER.  AND IF THE STATE BELIEVES THAT WE NEED TO GO

11 ON AND CHANGE THESE OUT -- CHANGE OUT THESE

12 CONTAINERS PRIOR TO A VISIT OF THE COURT OR BY

13 COUNSEL, I NEED TO KNOW THAT.

14      I'VE HAD A CASE BEFORE WHERE THERE WERE

15 CERTAIN -- AND I WILL HASTEN TO ADD THAT IT WAS THE

16 PRIOR LEADERSHIP OF THE PRISON -- I'LL PUT IT THAT

17 WAY -- THAT TOOK STEPS TO CHANGE THE RELEVANT

18 CONDITIONS BEFORE THE COURT HAD AN OPPORTUNITY TO

19 CONDUCT AN INSPECTION.  I DON'T EXPECT THAT TO HAPPEN

20 HERE, AND I KNOW THAT YOU WILL ASSURE ME THAT THAT

21 WILL NOT HAPPEN HERE.

22      HOWEVER, IF UPON INSPECTION, AFTER

23 HEARING FROM MS. WRIGHT, YOUR CLIENT DISCOVERS "YEAH,

24 YOU KNOW, THERE IS PROBABLY SOME MILDEW HERE.  WE

25 NEED TO CHANGE IT OUT IMMEDIATELY OBVIOUSLY" -- I

1 MEAN, THAT'S THE MOST IMPORTANT THING, IS THE

2 PROTECTION OF HUMAN HEALTH.  RIGHT? -- I NEED TO KNOW

3 ABOUT THAT FIRST.  AND I'M GOING TO ASSURE YOU THAT

4 IF YOU CONTACT ME, MY CHAMBERS, YOU FILE A MOTION,

5 THIS IS PRIORITY ONE.  I DON'T CARE IF IT'S DAY,

6 MIDDLE OF THE NIGHT OR WHATEVER, I'M GOING TO MAKE

7 MYSELF AVAILABLE TO TAKE THE MATTER UP.  OKAY?

8      **MR. BLANCHFIELD:**  YES, YOUR HONOR.  AND I

9 CAN TELL YOU THERE ARE NO PLANS TO CHANGE ANYTHING.

10 AND IF THAT CHANGES, WE WILL NOTIFY YOU IMMEDIATELY.

11      **THE COURT:**  THANK YOU, MR. BLANCHFIELD.

12      ALL RIGHT.  NOW, LET'S TALK ABOUT -- I

13 THINK WE TALKED A LITTLE BIT ABOUT THE DATA

14 COLLECTION.  THERE IS ALSO A DISPUTE WITH RESPECT TO

15 THE HEAT CONDITIONS, IT APPEARS TO ME.

16      MR. BLANCHFIELD OR MS. PAYNE,

17 WHOEVER -- MS. PAYNE, I DON'T WANT TO LEAVE YOU OUT

18 OF THIS.  I WANT YOU TO GET IN ON THE FUN WHENEVER

19 YOU'D LIKE.  OKAY?

20      SO THE QUESTION BECOMES -- TELL ME, MR.

21 BLANCHFIELD:  HOW IS -- HOW ARE THE TEMPERATURES

22 RECORDED IN THE FIELDS?  I MEAN, I'M VERY MUCH AWARE

23 FROM THE *BALL* CASE, OF COURSE, OF HOW -- IN FACT, I

24 REQUIRED THAT THE TEMPERATURES BE TAKEN BY SPECIFIC

25 INSTRUMENTS AND BY SPECIFIC CONSULTANTS IN THE DEATH

1  ROW TIER.  THIS IS A LITTLE DIFFERENT, OF COURSE.

2            SO YOU HAVE REPORTED, OR YOUR CLIENT

3  HAS REPORTED, CERTAIN HEAT DATA -- HEAT INDEX DATA

4  FOR AT LEAST FOUR DAYS.  I NEED TO KNOW A LITTLE BIT

5  MORE ABOUT, YOU KNOW, HOW THAT INFORMATION IS

6  CAPTURED, WHO IS RESPONSIBLE FOR COLLECTING THAT

7  DATA, AND WHAT YOU-ALL DO WITH IT -- WHAT YOUR CLIENT

8  DOES WITH IT.

9            **MR. BLANCHFIELD:**  YOUR HONOR, SO IN

10  ACCORDANCE WITH OUR HEAT POLICY, THE TEMPERATURES AND

11  HEAT INDEX ARE BASED ON THE NATIONAL WEATHER CENTER.

12  THERE IS A WEBSITE THAT IS CITED IN OUR HEALTH CARE

13  POLICY.  THE HEAT IS RECORDED EVERY TWO HOURS, AS PER

14  THE NATIONAL WEATHER CENTER.  IT'S REVIEWED AND

15  APPROVED BY THE WARDEN OR A DESIGNEE.  I DON'T HAVE A

16  PARTICULAR NAME OF WHO DOES THAT, BUT THEY ARE

17  RECORDED EVERY TWO HOURS.  IN THE EVENT THE INDEX

18  HITS 88, A HEAT ALERT IS ISSUED AND WE FOLLOW THE

19  POLICIES.

20            **THE COURT:**  OKAY.  ALL RIGHT.  THANK YOU,

21  MR. BLANCHFIELD.

22            MS. WRIGHT, MR. COMEAU, DO YOU-ALL

23  BELIEVE THAT TO BE A SUFFICIENT METHOD OF CAPTURING

24  THE RELEVANT DATA?

25            **MS. WRIGHT:**  WE AGREE THAT THE NATIONAL

WEATHER SERVICE IS THE SOURCE TO USE TO CAPTURE THE

HEAT INDEX.  BUT WE DO NOT SEE EVIDENCE IN THE RECORD

THAT THE POLICY IS ACTUALLY FOLLOWED; THAT THE HEAT

IS RECORDED -- THE HEAT INDEX IS RECORDED EVERY TWO

HOURS OR THAT THE WARDEN OR HIS DESIGNEE VERIFIES

THAT RECORD.

        **THE COURT:**  AND WHAT WOULD YOU HAVE THE

WARDEN OR HIS DESIGNEE DO TO VERIFY THAT DATA?

        **MS. WRIGHT:**  I DON'T KNOW THE ANSWER TO

THAT, YOUR HONOR.  WHAT I KNOW IS THAT THE POLICY,

HEAT-PRECAUTION POLICY -- NO. 8, I BELIEVE -- STATES

THAT THE WARDEN OR HIS DESIGNEE SHOULD VERIFY THE

RECORDING EVERY TWO HOURS.

        **THE COURT:**  SO WHAT I'M GOING TO DO IS ASK

THE TWO OF YOU TO MEET AND CONFER AND TO AT LEAST

AGREE UPON A PROTOCOL FOR THE COLLECTION OF THAT

DATA.  NOW, IN INTERIOR SPACES, OF COURSE, IT'S -- WE

CAN AFFIX VERY SENSITIVE, PRETTY HIGH-TECH DEVICES

THAT WOULD RECORD TEMPERATURE AND HUMIDITY FOR AN

ACCURATE CALCULATION OF THE HEAT INDEX.  WE'RE NOT

TALKING ABOUT INDOORS, OF COURSE, NOW.  NOW WE'RE

OUTDOORS.

        SO I'M GOING TO HAVE TO ASK YOU-ALL IF

-- I'M GOING TO GIVE YOU-ALL THE FIRST OPPORTUNITY TO

MEET AND CONFER AND REACH AGREEMENT ON THAT.  IF YOU

1    CAN'T, I'LL GO ON AND COME UP WITH MY OWN METHOD,

2    EVEN IF I HAVE TO BRING IN A SPECIAL MASTER.  OF

3    COURSE, THAT COST WILL BE BORNE BY THE STATE, SO

4    HOPEFULLY THAT YOU-ALL CAN AGREE TO -- AT LEAST TO A

5    PROTOCOL FOR THE ACCURATE COLLECTION OF TEMPERATURES.

6             AND, MR. BLANCHFIELD, THE REASON I

7    MENTION THAT IS BECAUSE BEFORE ME IN THE PLEADINGS IT

8    -- I BELIEVE THE STATE ALLEGED THAT THERE WERE A HEAT

9    INDEX EXCEEDING 88 DEGREES BY 11 A.M. ON FOUR DATES

10   BETWEEN -- ONLY FOUR DATES -- BETWEEN MAY 8TH AND MAY

11   20TH.  AND THE DATA THAT WE HAVE COLLECTED FROM THE

12   NATIONAL WEATHER SERVICE INDEPENDENTLY SUGGEST THAT

13   IT'S -- ONE, TWO, THREE, FOUR, FIVE -- EITHER FIVE OR

14   SIX, NOT FOUR.

15            SO I'M REALLY GOING TO HAVE TO ASK YOU

16   TO SPEAK TO YOUR CLIENT ABOUT ACCURATELY REPORTING

17   THIS DATA.  THAT'S ONE OF THE REASONS WHY I'M GOING

18   TO HAVE TO ORDER A SPECIAL MASTER TO DO IT FOR ME.

19   OKAY?  I'VE GOT TO RELY ON THIS DATA.  AND IF I -- I

20   DON'T WANT TO SUGGEST THAT THE DATA COMING OUT OF

21   ANGOLA IS NOT TRUSTWORTHY.  TO THE CONTRARY.  IN THIS

22   AND IN ANOTHER CASES OFFICIALS HAVE WORKED WITH THE

23   COURT.  THEY HAVE BEEN VERY GOOD ABOUT SUPPLYING THE

24   DATA.

25            BUT I JUST NEED YOU-ALL TO -- YOUR

CLIENT TO BE A LITTLE BIT MORE DILIGENT ABOUT

CAPTURING THAT DATA, BECAUSE WHAT I HAVE SO FAR IS

THAT SELF-REPORTING ON THE -- ON MAY 8TH, 9TH, 19TH

AND 20TH; WHERE OUR REVIEW OF NATIONAL WEATHER

SERVICE DATA SUGGEST THAT IT WAS THE 8TH, THE 9TH,

THE 10TH, THE 16TH, THE 19TH, THE 20TH AND ON THROUGH

THE 22ND.  AND THAT'S WHERE WE STOPPED THE ANALYSIS,

AT THE 22ND.

SO I MENTION THIS ONLY TO SUGGEST THAT

YOU-ALL COME UP WITH AN ACCURATE WAY.  I MEAN, IF

YOU-ALL AGREE TO RELY ON THE NATIONAL WEATHER

SERVICE, I WILL TAKE THAT INTO ACCOUNT.  BUT WE'VE

GOT TO AT LEAST AGREE ON A PROTOCOL FOR THE ACCURATE

COLLECTION OF HEAT INDEX DATA.  OKAY?

NOW, MR. BLANCHFIELD, IF YOU KNOW --

AND YOU CAN COME BACK TO THE FORWARD PODIUM, SIR --

DO YOUR CLIENTS PROVIDE ANY SHADE, ANY COVER, FOR THE

WORKERS?

**MR. BLANCHFIELD:**  I DON'T BELIEVE, YOUR

HONOR.  YOU KNOW, I'VE BEEN OUT THERE, I'VE SEEN THEM

IN ACTION.  THERE IS NO CREATED SHADE.

**THE COURT:**  OKAY.  BUT YOUR CLIENT,

ACCORDING TO YOU, DOES PROVIDE WATER BREAKS OR THEY

PROVIDE ELECTROLYTE ENHANCED DRINKS, GATORADE AND

THAT SORT OF THING.  RIGHT?

1    **MR. BLANCHFIELD:**  CORRECT.

2          **THE COURT:**  AND THEY DO THAT HOW OFTEN, IF

3  YOU KNOW, AT THIS JUNCTURE?

4          **MR. BLANCHFIELD:**  WELL, THE -- YOU KNOW,

5  THERE IS A VERY LARGE VESSEL OF WATER THAT IS THERE.

6  AND IF SOMEONE WANTS SOME WATER, IT'S NOT A -- YOU'RE

7  NOT ENTITLED TO WATER EVERY HOUR OR TWO.  YOU CAN GO

8  GET WATER IF YOU WANT.

9          **THE COURT:**  UPON REQUEST?

10          **MR. BLANCHFIELD:**  EXACTLY.

11          **THE COURT:**  OKAY.  VERY GOOD.

12                NOW, LET'S TALK ABOUT BREAKS.  I'M

13  GIVEN TO BELIEVE THAT THERE ARE BREAKS PROVIDED EVERY

14  30 MINUTES?

15          **MR. BLANCHFIELD:**  IN THE EVENT THE HEAT

16  INDEX REACHES 88, THE BREAKS ARE MANDATED EVERY 30

17  MINUTES.

18          **THE COURT:**  ALL RIGHT.  AND LET'S TALK ABOUT

19  ATTIRE AND EQUIPMENT.  ARE HATS PROVIDED?

20          **MR. BLANCHFIELD:**  YES, YOUR HONOR.  WE

21  PROVIDED A PICTURE OF SUN HATS.  I WILL TELL YOU THAT

22  MOST DON'T CHOOSE TO WEAR THEM.  THEY -- THEY'LL TIE

23  A SHIRT ON THEIR HEAD OR SOMETHING LIKE THAT.

24          **THE COURT:**  OKAY.  NOW, I DON'T THINK -- I

25  DON'T THINK, MS. WRIGHT, YOU MENTIONED ANYTHING ABOUT

SUNSCREEN OR ANYTHING LIKE THAT.  HAVE YOU MENTIONED

THAT IN YOUR PLEADINGS?  HAVE YOU?

        **MS. WRIGHT:**  YES, YOUR HONOR.

        **THE COURT:**  OKAY, GOOD.

        **MS. WRIGHT:**  I BELIEVE THAT'S IN OUR

COMPLAINT.  WE -- OUR CLIENTS DO NOT RECEIVE

SUNSCREEN.

        **THE COURT:**  MR. BLANCHFIELD, ARE YOU AWARE

IF -- WHETHER THEY RECEIVE SUNSCREEN OR NOT?

        **MR. BLANCHFIELD:**  MY UNDERSTANDING, YOUR

HONOR, IS THAT SUNSCREEN IS AVAILABLE THROUGH THE

COMMISSARY.  THEY CAN PURCHASE SUNSCREEN.  I DON'T

BELIEVE SUNSCREEN IS ONE OF THE ITEMS THAT ARE

PROVIDED BY THE -- BY THE STATE.

        **THE COURT:**  EVERY DERMATOLOGIST IN AMERICA

SAYS YOU'VE GOT TO WEAR SUNSCREEN IF YOU'RE GOING TO

BE OUT IN THE SUN.  THAT'S GOT TO BE MANDATORY.  IT'S

THE NO. 1 FORM OF CANCER, I'M TOLD, IN THE UNITED

STATES; MELANOMA.  AND IT CUTS ACROSS ALL RACES.

        SO ONE OF THE THINGS, MR. BLANCHFIELD,

I'M GOING TO ASK YOU TO DO IS SPEAK TO YOUR CLIENT

ABOUT THAT.  I MEAN, IT SEEMS TO ME THAT'S AN ISSUE

THAT CERTAINLY AFFECTS HUMAN HEALTH.  IN THIS DAY AND

AGE, AGAIN, EVERYBODY KNOWS THAT YOU'VE GOT TO HAVE

SUNSCREEN IF YOU'RE GOING TO BE OUT IN THE SUN IN ANY

1 MEASURABLE AMOUNT OF TIME.

2         LET'S SEE.  ARE THERE ANY OTHER THINGS,

3 MR. BLANCHFIELD, THAT YOU'RE AWARE OF THAT HAVE NOT

4 BEEN INCLUDED IN YOUR PLEADINGS THAT SHOW THAT YOUR

5 CLIENT HAS MITIGATED THE RISK OF HARM AND

6 SPECIFICALLY HEAT STROKE AND OTHER HEAT-RELATED

7 ILLNESSES TO THE WORKERS?

8      **MR. BLANCHFIELD:**  I THINK IT'S ALL CONTAINED

9 IN THE PLEADINGS, YOUR HONOR.  WE -- YOU KNOW, WE --

10 THERE IS ALLEGATIONS THAT THERE IS NO PERSONAL

11 PROTECTIVE EQUIPMENT GIVEN.  WE -- I THINK WE

12 INCLUDED SOME PICTURES OF GLOVES THAT ARE ISSUED AND

13 THINGS LIKE THAT.  BUT THAT'S ABOUT IT.

14      **THE COURT:**  OKAY.  THANK YOU.

15         MS. WRIGHT, WHAT'S YOUR RESPONSE TO MR.

16 BLANCHFIELD'S REPRESENTATIONS THAT ALL THOSE ITEMS

17 ARE OFFERED AT LEAST TO THE INMATES?

18      **MS. WRIGHT:**  THE DEFENDANTS DID INDEED FILE

19 INTO THE RECORD PICTURES OF WHAT APPEARED TO BE

20 BRAND-NEW CLOTHING ITEMS.  OUR PLAINTIFFS HAVE NOT

21 RECEIVED SUCH ITEMS.  THEY RECEIVE RUBBER BOOTS.

22 THEY'VE NEVER RECEIVED LACE-UP BOOTS.  AND THOSE ARE

23 IN THE SUPPLEMENTAL DECLARATIONS.

24      **THE COURT:**  WHAT'S THE SIGNIFICANCE OF

25 RUBBER BOOTS VERSUS LACE-UP BOOTS?

1    **MS. WRIGHT:**  THE DECLARATION OF MARGUERITE

2  GREEN GOES INTO THIS A BIT MORE.  LACE-UP BOOTS ARE

3  MORE STRUCTURED AND THEY'RE SAFER FOR PEOPLE WHO ARE

4  WORKING -- DOING PHYSICAL MANUAL LABOR; DIGGING

5  DITCHES, PULLING WEEDS, WALKING ON UNEVEN TERRITORY.

6              IT'S ALSO SAFER TO BE WEARING RUBBER

7  BOOTS -- EXCUSE ME.  IT'S SAFER TO BE WEARING LACE-UP

8  BOOTS THAT HAVE A HARDER TOE STRUCTURE.  IN THE HEAT

9  AND THE HUMIDITY WE HAVE MANY PLAINTIFFS WHO HAVE

10  SUFFERED INJURIES FROM WEARING RUBBER BOOTS IN

11  130-DEGREE HEAT INDEXES BECAUSE OF THE SWEATING AND

12  THE HEAT.

13      **THE COURT:**  OKAY.  ANY OTHER -- ANY OTHER

14  PROVISIONS THAT YOU BELIEVE ARE REQUIRED?

15      **MS. WRIGHT:**  I WOULD ALSO --

16      **THE COURT:**  OTHER THAN THE THINGS WE'VE

17  ALREADY TALKED ABOUT, OF COURSE.

18      **MS. WRIGHT:**  I WOULD JUST NOTE THAT THE

19  PROVISION OF HEAT-PRECAUTION DUTY STATUSES CONTINUES

20  TO BE A BIG PROBLEM AT ANGOLA.  AND WE CAN SEE THAT

21  FROM THE EMERGENCY SICK CALLS THAT WERE ATTACHED TO

22  THE AFFIDAVIT OF ASHLI OLIVEAUX IN DEFENDANTS'

23  FILING.

24              ON MAY 15TH ALONE, IN 2024, THERE WERE

25  THREE MEN WHO REPORTED SICK CALLS FROM THE FIELD.

THERE WAS A 37-YEAR-OLD WHO HAD SYMPTOMS OF HEAT
RASH.  THAT INDIVIDUAL HAD UNSPECIFIED PERSONALITY
DISORDER, PANIC DISORDER, AND AIDS.  HE HAD NO
HEAT-PRECAUTION DUTY STATUS, EVEN THOUGH MEDICATION
USED TO TREAT HIV INCREASES PHOTOSENSITIVITY AND CAN
CAUSE HEAT RASH.

THE DEFENDANTS HAVE NOT PRODUCED THE
MEDICAL RECORDS OR MEDICATION RECORDS FOR THESE
PEOPLE, SO I'LL JUST ADD THAT.

THERE WAS ALSO ON THAT SAME DAY --

**THE COURT:**  SO YOU BELIEVE THAT THAT -- THAT
OFFENDER SHOULD BE INCLUDED IN THE SUBCATEGORY OF --
THE SUBCLASS, I SHOULD SAY?

**MS. WRIGHT:**  YES.

AND THESE ARE EXAMPLES OF INDIVIDUALS
WHO SHOULD HAVE HEAT-PRECAUTION DUTY STATUSES BUT WHO
DON'T.

ON THAT SAME DAY, MAY 15TH -- WHICH,
ACCORDING TO THE NATIONAL WEATHER SERVICE, IT WAS A
93-DEGREE HEAT INDEX DAY -- THERE WAS A 53-YEAR-OLD
WHO PRESENTED WITH HIS HEAD SPINNING FOR ABOUT AN
HOUR.  ACCORDING TO DEFENDANTS' RECORDS, THAT
INDIVIDUAL HAS PREDIABETES, A HISTORY OF SYNCOPE OR
FAINTING, ASTHMA, OSTEOARTHRITIS, HERNIAS.

THE EMTs WHO REPORTED TO THE FIELD TO

1 TREAT THAT PERSON NOTIFIED FIELD FOREMAN TO LET

2 OFFENDER REST, WHICH SUGGEST TWO THINGS TO ME.  THE

3 FIRST IS THAT THIS INDIVIDUAL SHOULD HAVE A

4 HEAT-PRECAUTION DUTY STATUS.  AND THE SECOND THING IS

5 THAT IT'S EVIDENCE OF EXACTLY WHAT THE PLAINTIFFS

6 HAVE REPORTED IN THEIR AFFIDAVITS, WHICH IS THAT

7 ANGOLA OFFICIALS DO NOT, IN FACT, LET INCARCERATED

8 MEN REST WHEN THEY NEED TO IN THE FIELD.  THEY DON'T

9 PROVIDE REST BREAKS OR WATER BREAKS AT WILL.

10             THE THIRD INDIVIDUAL IN DEFENDANTS'

11 RECORDS THAT PRESENTED WITH AN INJURY ON MAY 15TH IS

12 A 35-YEAR-OLD WHO HAD SHARP CHEST PAINS WHILE WORKING

13 IN THE FIELD.  AGAIN, THERE IS NO MEDICAL RECORDS,

14 THERE IS NO MEDICATION RECORDS THAT DEFENDANTS HAVE

15 PROVIDED.  SO THIS APPEARS TO BE WHAT DR. VASSALLO

16 TALKS ABOUT, WHAT LSP'S OWN POLICIES TALK ABOUT:

17 THAT EVEN YOUNGER AND RELATIVELY HEALTHIER PEOPLE CAN

18 BE AFFECTED WHEN THEY PARTICIPATE IN STRENUOUS

19 PHYSICAL ACTIVITIES DURING HOT WEATHER.

20             I WILL JUST RUN THROUGH.  ALSO IN THOSE

21 RECORDS THERE WAS A 61-YEAR-OLD WITH A BMI OF 40 IN A

22 WHEELCHAIR WHO APPARENTLY WAS WORKING IN THE FARM

23 LINE.  THERE IS A 31-YEAR-OLD WITH PREDIABETES AND

24 HYPERTENSION; A 31-YEAR-OLD WITH ANXIETY DISORDER; A

25 25-YEAR-OLD WITH A HISTORY OF MENTAL ILLNESS; A

1 41-YEAR-OLD WITH HYPERTENSION.  NONE OF THESE PEOPLE

2 HAVE HEAT-PRECAUTION DUTY STATUSES.

3      **THE COURT:**  LET'S TALK FOR A MOMENT ABOUT

4 THE POLICY.  YOU ASSERT IN YOUR PLEADINGS THAT THE

5 POLICY IS INADEQUATE, BUT YOU ACKNOWLEDGE THAT ANGOLA

6 DOES HAVE A HEAT POLICY.  I THINK THE MOST RECENT

7 HEAT POLICY -- AND MR. BLANCHFIELD WILL CORRECT ME IF

8 I'M WRONG -- GOES BACK TO 2019.  CORRECT?  I BELIEVE

9 IT WAS REVISED FROM THE 2012 EDITION.  IS THAT

10 CORRECT?

11      **MS. WRIGHT:**  I BELIEVE THAT'S RIGHT.

12      **THE COURT:**  WHY DO YOU THINK THE CURRENT

13 POLICY IS -- WELL, FIRST OF ALL, DO YOU BELIEVE IT'S

14 INADEQUATE?  ACCORDING TO YOUR PLEADINGS, OBVIOUSLY

15 YOU DO.  BUT WHY?

16      **MS. WRIGHT:**  THERE IS TWO PROBLEMS WITH THE

17 POLICY.  THERE IS ACTUALLY TWO POLICIES.  THERE IS

18 HEALTH CARE POLICY 8 AND THEN THERE IS LSP DIRECTIVE

19 13.067.  THE POLICIES ARE DEFICIENT AND THEN THEY'RE

20 ALSO NOT EVEN ENFORCED.

21      THE MOST GLARING DEFICIENCY I THINK IS

22 THE HEAT PATHOLOGY, THE HEAT-PRECAUTION PROTOCOL.

23 DR. VASSALLO DISCUSSES THIS AT LENGTH IN HER

24 DECLARATION AND HER SUPPLEMENTAL DECLARATION; THAT

25 THE LIST OMITS MEDICATIONS LIKE SSRIs, LIKE

1  ANTIHISTAMINES THAT ARE ROUTINELY PRESCRIBED BY

2  DEFENDANTS TO PLAINTIFFS AND PEOPLE LIKE THEM TO

3  MANAGE THEIR CHRONIC CONDITIONS.  AND THOSE

4  MEDICATIONS ARE WELL-KNOWN TO IMPAIR A BODY'S ABILITY

5  TO THERMOREGULATE.

6          AS TO THE ACTUAL IMPLEMENTATION OF THE

7  POLICIES, THE POLICIES ARE FACIALLY DEFICIENT.  BUT

8  EVEN IF THEY WERE NOT, THEY ARE IGNORED.  AND WE CAN

9  SEE THAT WITH THE HEAT PATHOLOGY -- EXCUSE ME -- WITH

10 THE HEAT-PRECAUTION DUTY STATUS THAT WE JUST

11 DISCUSSED.  THAT'S ONE EXAMPLE.  DEFENDANTS ROUTINELY

12 FAIL TO GIVE QUALIFYING INDIVIDUALS HEAT-PRECAUTION

13 DUTY STATUSES, EVEN THOUGH THE POLICY SETS OUT A

14 PROCEDURE FOR DOING THAT.

15         AND AS A RESULT, NOT ONLY ARE PEOPLE AT

16 SUBSTANTIAL RISK OF SERIOUS HARM FROM HEAT-RELATED

17 ILLNESS, BUT THEY ARE ACTUALLY BEING INJURED.  THEY

18 ARE ACTUALLY BEING HURT.  AND WE CAN SEE THAT FROM

19 DEFENDANTS' OWN RECORDS, WHICH, I WILL ADD, ARE FROM

20 APRIL 1ST TO MAY 15TH, SO BEFORE EVEN THE HEIGHT OF

21 THE SUMMER.

22         **THE COURT:**  OKAY.  THANK YOU.

23         MR. BLANCHFIELD?

24         **MR. BLANCHFIELD:**  SO, YOUR HONOR, THIS MAY

25 15TH ISSUE, WE REALLY TAKE ISSUE WITH THIS.  THEY

REPORT A HEAT INDEX OF 93 ON MAY 15TH.  HOW DO THEY

DO THAT?  THEY TAKE THE HIGHEST TEMPERATURE OF THE

DAY AND THE HUMIDITY AND THEY MAKE THE CALCULATION.

     **THE COURT:**  RATHER THAN DURING THE RELEVANT

HOURS THAT --

     **MR. BLANCHFIELD:**  EXACTLY.

     AND IN THE RECORD, WHICH WE FILED --

49-11 AT PAGE 5 -- THE HEAT INDEX THAT MORNING OF THE

15TH OF MAY AT 9:00 WAS 72.  SO I GOT ONE FELLOW

WHO'S GOT A RASH ON HIS ARM NOW.  DR. VASSALLO SAYS

THAT'S HEAT RELATED.  I DON'T KNOW HOW -- YOU KNOW,

MAYBE IT'S JUST SOME BASIC RASH THAT WE HAVE.  IT'S

CERTAINLY NOT A SERIOUS HARM.

     THE OTHER -- THE ONE -- THERE WAS ONE

AT 10:00 A.M. AND THEN ANOTHER AT 10:11 ON THE SAME

DAY.  THE ONE AT 8:41 WAS WORKING IN THE FIELD WITH A

SWEATSHIRT WHEN HE HAD THIS -- WHEN HE HAD NAUSEA.

     SO, YOU KNOW, WE REALLY -- YOU KNOW, WE

NEED TO LOOK AT THE TEMPERATURES.  THESE GUYS,

THEY'RE ONLY OUT THERE IN THE MORNING.  BY 11:30

THEY'RE IN.  WE ALL LIVE HERE IN SOUTH LOUISIANA.  WE

KNOW.  IT GET -- MORNINGS CAN BE FAIRLY PLEASANT

AROUND HERE.  THE HEAT REALLY COMES IN THE AFTERNOON.

     **THE COURT:**  SO YOU WOULD AGREE WITH ME,

THOUGH, MR. BLANCHFIELD, THAT YOUR CLIENT CAN AT

1 LEAST PROHIBIT FIELD WORKERS FROM WEARING

2 SWEATSHIRTS?

3     **MR. BLANCHFIELD:**  YEAH.  I MEAN, I DON'T

4 KNOW HOW THAT CAME TO BE WHERE SOMEONE WOULD --

5     **THE COURT:**  RIGHT, I UNDERSTAND.  BUT --

6 OKAY.

7         SO THIS IS PRECISELY WHY I BELIEVE IT'S

8 SO CRITICAL THAT YOU AGREE UPON PROTOCOLS TO CAPTURE

9 THE HEAT, HUMIDITY FOR CALCULATION OF THE HEAT INDEX

10 AT THE RELEVANT TIME AND EVEN UNDER THE RELEVANT, OF

11 COURSE, CONDITIONS, SO IF YOU WOULD MAKE THAT A

12 PRIORITY.  AND I'M GOING TO GIVE YOU A DEADLINE TO

13 MEET AND CONFER AND REPORT BACK TO THE COURT.  OKAY?

14     **MR. BLANCHFIELD:**  YES.

15         AND THEN THE SECOND ON THE POLICIES,

16 YOUR HONOR, THERE IS NO SECRET -- EVERYONE IS AWARE

17 OF THE *BALL* CASE.  AND THAT IS WHAT GOT A LOT OF

18 THESE THINGS, YOU KNOW, MODIFYING THE POLICIES AND

19 ADDRESSING THESE ISSUES.

20         DR. VASSALLO SAYS WE'RE UNDER-INCLUSIVE

21 WITH RESPECT TO WHAT MEDICATIONS RENDER SOMEONE

22 VULNERABLE TO HEAT.  WE DISAGREE.  IT'S NOT THAT WE

23 DON'T -- IT'S NOT THAT WE DON'T RECOGNIZE THAT

24 PRINCIPLE.  WE DO.  WE HAVE THREE PHYSICIANS:

25 DR. LAVESPERE, DR. GAMBLE, WHO'S A PSYCHIATRIST, AND

DR. HERMAN SOONG, WHO IS A REPUTABLE -- HE'S A

PROFESSOR AT TULANE.  HE'S A NEUROPSYCHIATRIST.

THESE THREE GET TOGETHER, THEY FORM THE

MEDICATION LIST, THEY REVISIT IT ANNUALLY AND PUBLISH

IT.  AND ANYONE THAT'S ON THERE GETS A HEAT-RELATED

DUTY STATUS.  THERE IS OVER 500 INMATES WHO HAVE THAT

STATUS.  THEY'RE EVALUATED, YOU KNOW, ON A

CASE-BY-CASE BASIS.

THE COURT:  AND I APPRECIATE YOU SHARING

THAT WITH ME, BECAUSE THAT WAS GOING TO BE MY

QUESTION TO YOU:  HOW ARE THEY EVALUATED?  HOW OFTEN

ARE THEY EVALUATED?  DO YOU KNOW AT THIS POINT?

AGAIN, I KNOW WE HAVEN'T PROPOUNDED DISCOVERY YET,

BUT --

MR. BLANCHFIELD:  I DON'T KNOW THE ANSWER TO

THE QUESTION HOW OFTEN ARE THEY EVALUATED.  I KNOW

THAT IF THEY HAVE ANY PROBLEMS, THEY CAN CALL FOR

MEDICAL TREATMENT.

THE COURT:  ARE THE -- THE ISSUE OF THE

BREAKS, ARE THERE ANY -- IS THERE -- DOES YOUR CLIENT

DOCUMENT HOW OFTEN THE WORKERS TAKE BREAKS?

MR. BLANCHFIELD:  NO, YOUR HONOR.  IT'S NOT

WRITTEN DOWN.

THE COURT:  AND SO THAT WILL BE ONE OF THE

THINGS THAT WE TAKE UP AT -- SO AGAIN, IN FAIRNESS TO

1 BOTH SIDES, I THINK THESE ARE, FRANKLY, JUST

2 COMMON-SENSE ISSUES WE'RE GOING TO HAVE TO TALK

3 ABOUT.  BECAUSE OBVIOUSLY IF THEY'RE PERMITTED TO

4 TAKE A BREAK, YOU KNOW, AND HAVE WATER -- ACCESS TO

5 WATER AT WILL, IT'S GOING TO BE IMPORTANT.  I MEAN,

6 THE TESTIMONY, OF COURSE, FROM THE CREDIBLE -- THE

7 CREDIBLE TESTIMONY WILL GO A LONG WAY.  BUT IF THERE

8 IS ANY DOCUMENTATION OR VERIFICATION OF THAT

9 TESTIMONY, THAT TOO WOULD BE HELPFUL TO THE COURT.

10 OKAY?

11        **MR. BLANCHFIELD:**  YES, YOUR HONOR.

12        **THE COURT:**  ALL RIGHT.  LET'S SEE NOW.

13        ALL RIGHT.  MS. WRIGHT, SO AGAIN, YOU

14 BELIEVE THAT THERE IS -- THE POLICY IS INADEQUATE.

15 CORRECT?

16        **MS. WRIGHT:**  YES.

17        **THE COURT:**  AND IT'S ALSO YOUR POSITION THAT

18 THE POLICY IS NOT BEING FAITHFULLY FOLLOWED AT

19 ANGOLA.  CORRECT?

20        **MS. WRIGHT:**  YES.

21        **THE COURT:**  AND SO WHAT WOULD YOU HAVE THE

22 COURT DO?

23        **MS. WRIGHT:**  WE WOULD ASK THE COURT TO

24 ENJOIN OPERATION OF THE FARM LINE WHEN THE HEAT INDEX

25 REACHES OR EXCEEDS 88 DEGREES FAHRENHEIT.  AND THE

1  REASON IS BECAUSE THE DEFENDANTS ARE UNABLE OR

2  UNWILLING TO TAKE ANY MITIGATING MEASURES TO ACTUALLY

3  REDUCE THE HARM TO HUMAN HEALTH THAT'S CAUSED BY THE

4  FARM LINE AND BECAUSE CONSTITUTIONALLY ADEQUATE

5  HEALTH CARE IS NOT AVAILABLE AT ANGOLA.

6       MY FRIEND REFERENCED THE ABILITY OF

7  INCARCERATED PEOPLE TO CALL FOR SICK CALLS WHENEVER

8  THEY'RE INJURED.  WELL, A SICK CALL COSTS THREE

9  DOLLARS.  AT TWO CENTS AN HOUR ON THE FARM LINE,

10 THAT'S THREE HUNDRED -- THAT'S A HUNDRED AND FIFTY

11 HOURS OF WORK.  AN EMERGENCY SICK CALL IS SIX

12 DOLLARS, SO THAT'S 300 HOURS OF WORK.  EMERGENCY CARE

13 IS JUST SIMPLY NOT AVAILABLE.

14       AND WE KNOW FROM THE *LEWIS* CASE WITH

15 CHIEF JUDGE DICK, HELD IN NOVEMBER OF 2023, JUST TWO

16 MONTHS AFTER WE FILED THIS CASE, THAT RATHER THAN

17 RECEIVING MEDICAL CARE, MEN INCARCERATED AT ANGOLA

18 ARE SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT BY

19 MEDICAL MISTREATMENT AT UNSPEAKABLE HUMAN COSTS.

20       SO THERE IS SIMPLY -- CONSTITUTIONALLY

21 ADEQUATE MEDICAL CARE SIMPLY IS NOT AVAILABLE AT

22 ANGOLA.  THE WAY TO SOLVE THIS PROBLEM IS TO ENJOIN

23 OPERATION OF THE FARM LINE UNDER THESE VERY NARROW

24 CIRCUMSTANCES.

25       **THE COURT:**  YOU WOULD AGREE THAT UNTIL AND

1  UNLESS WE CAN -- WELL, AT LEAST I AM SATISFIED THAT

2  THE HEAT INDEX DATA IS ACCURATE, IT'S GOING TO BE

3  DIFFICULT FOR THE COURT TO DO THAT.  RIGHT?

4         **MS. WRIGHT:**  AND THE PLAN TO EXPEDITE THE

5  TRIAL SETTING AND THE SCHEDULING ORDER, YOUR HONOR,

6  WE WELCOME THAT.

7         **THE COURT:**  WELL, YES.  AND I APPRECIATE

8  THAT.  AND I'M SURE MR. BLANCHFIELD AND HIS CLIENTS

9  AS WELL.  I MEAN, I THINK WE ALL HAVE AN INTEREST IN

10 ENSURING THAT THE POLICY IS ADEQUATE AND IT'S BEING

11 FOLLOWED.

12        THE COST OF MEDICAL CARE -- LET ME ASK

13 MR. BLANCHFIELD.  MR. BLANCHFIELD, YOU'VE HEARD MS.

14 WRIGHT.  IS IT -- CAN YOU AFFIRM THAT IF AN OFFENDER

15 WORKING THE FARM LINE SUDDENLY FEELS LIGHTHEADED OR

16 FEELS LIKE THEY ARE UNDER HEAT-RELATED MEDICAL

17 STRESS, THAT THEY HAVE TO ACTUALLY PAY TO RECEIVE

18 TREATMENT?

19        **MR. BLANCHFIELD:**  WE HAVE A DISAGREEMENT ON

20 THAT, YOUR HONOR.  MY UNDERSTANDING IS THAT IN THAT

21 INSTANCE, THAT THERE IS NOT A PAYMENT ON THAT.  I

22 MEAN, THERE ARE SOME PAYMENTS FOR SOME REQUESTED.

23 BUT IF SOMEONE IS UNDER STRESS IN THE FIELD, I DO NOT

24 BELIEVE THEY ARE CHARGED ANYTHING.

25        **THE COURT:**  DID YOU HANDLE THE MATTER THAT

1 CHALLENGED THE ADEQUACY OF THE MEDICAL TREATMENT

2 PROVIDED AT ANGOLA IN THE CASE BEFORE CHIEF JUDGE

3 DICK?

4       **MR. BLANCHFIELD:**  YOUR HONOR, I WAS NOT -- I

5 DID NOT HANDLE THAT.  I'M VERY FAMILIAR WITH IT.  I

6 DID MONITOR IT AT SOME LEVEL.

7           AND I WILL SAY THAT THE MEDICAL CARE

8 THAT JUDGE DICK WAS LOOKING AT IS MEDICAL CARE FROM

9 OVER FIVE YEARS AGO.

10       **THE COURT:**  AND THAT WAS MY QUESTION TO YOU,

11 IF THIS SCENARIO WAS CONTEMPLATED IN THAT CASE; THAT

12 IS, HEAT-RELATED MEDICAL ISSUES THAT MIGHT ARISE IN

13 THE CONTEXT OF WORKING IN THE -- ON THE FARM LINE.

14           BUT YOU DON'T BELIEVE THAT CAME UP.

15 CORRECT?

16       **MR. BLANCHFIELD:**  I DON'T BELIEVE IT CAME

17 UP, YOUR HONOR.

18       **THE COURT:**  DO YOU HAVE ANYTHING SUGGESTING

19 OTHERWISE, MS. WRIGHT?

20       **MS. WRIGHT:**  I DON'T BELIEVE THAT THE *LEWIS*

21 CASE CONCERNED THE FARM LINE SPECIFICALLY.  BUT IT

22 DID CONCERN THE SICK CALL POLICY, IT CONCERNED THE

23 MISDIAGNOSIS, FAILURE TO -- DELAYED DIAGNOSIS, WHAT

24 JUDGE DICK CALLED THE ABHORRENT MEDICAL TREATMENTS OF

25 DETAINED PEOPLE.  IT CONCERNED CONSTITUTIONAL

1  DEFICIENCIES IN EMERGENCY CARE.  AND SPECIFICALLY THE

2  POLICY RELATED TO THAT, WHICH WAS CREATED BY ASHLI

3  OLIVEAUX, REQUIRES EMTs TO MAKE DIAGNOSES.  AND

4  THAT'S BEYOND THE SCOPE OF THEIR PRACTICE, ACCORDING

5  TO JUDGE DICK.

6         THE DECISION CONCERNED DEFICIENT

7  MEDICAL LEADERSHIP AND ADMINISTRATION AND

8  ORGANIZATIONAL STRUCTURE THAT, ACCORDING TO JUDGE

9  DICK, UNDERPINS THE CONSTITUTIONALLY DEFICIENT SYSTEM

10 OF HEALTH CARE.  SO IT'S ONE FULL SYSTEM.

11         AND I WOULD ADD THAT IF AN INDIVIDUAL

12 IS INJURED ON THE FARM LINE BECAUSE OF A HEAT-RELATED

13 ILLNESS, THAT'S ONE THING.  BUT MY UNDERSTANDING FROM

14 DR. VASSALLO'S DECLARATION IS THAT HEAT STRESS

15 ILLNESS CAN MANIFEST ITSELF LATER ON AS WELL.  SO ONE

16 POSSIBLE OUTCOME IN THIS MIGHT BE TO PAUSE THE COPAYS

17 THAT LSP CHARGES TO INDIVIDUALS.

18         **THE COURT:**  ALL RIGHT.  SO ONE OF THE

19 THINGS, MR. BLANCHFIELD, I WILL REQUIRE THAT YOU --

20 YOUR CLIENT THROUGH YOU, OF COURSE, SUBMIT

21 INFORMATION OF ALL MEDICAL CARE -- THE INSTANCES

22 WHERE INMATES WERE CHARGED FOR MEDICAL CARE AS A

23 RESULT OF HEAT-RELATED COMPLAINTS WHILE WORKING THE

24 FARM LINE.  AND I'D LIKE THAT DATA FOR THE LAST 24

25 MONTHS.  OKAY?

1    **MR. BLANCHFIELD:** YES, YOUR HONOR.

2          AND IF I COULD, YOUR HONOR, YOU KNOW,

3    THE ANGOLA -- YOU KNOW, TAKING THAT *LEWIS* CASE VERY

4    SERIOUSLY, THE EMTs DON'T DO THAT ANYMORE.  THERE

5    HAVE BEEN SUBSTANTIAL MODIFICATIONS.  WE HAVE RNs IN

6    THERE DOING THINGS NOW.

7          SO TO TAKE A SHOT AT ANGOLA IN 2024 FOR

8    WHAT HAPPENED BEFORE 2020 IS NOT FAIR.

9    **THE COURT:** SURE.  I UNDERSTAND YOUR

10   CONCERN.  AND THAT'S WHY I THINK IT IMPORTANT FOR THE

11   COURT TO CONSIDER AT LEAST BOTH CONTEMPORARY AS WELL

12   AS HISTORICAL DATA ON THAT ISSUE.  OKAY?

13   **MR. BLANCHFIELD:** YES, YOUR HONOR.

14   **THE COURT:** ALL RIGHT.

15         OKAY.  MS. WRIGHT, LET ME NEXT ASK

16   YOU -- LET'S COVER THE ELEMENTS REQUIRED TO PROVE FOR

17   THE ISSUANCE OF A TRO.  WHY DO YOU BELIEVE THAT THE

18   COURT, AT LEAST AT THIS JUNCTURE, SHOULD ISSUE THE

19   ORDER?

20         TAKING EACH OF THE ELEMENTS ONE AT A

21   TIME, THE LIKELIHOOD OF SUCCESS ON THE MERITS, WOULD

22   YOU LIKE TO SPEAK TO THAT?

23   **MS. WRIGHT:** YES, YOUR HONOR.

24         I BELIEVE THAT OUR BRIEFING ALSO LAYS

25   THIS OUT QUITE CLEARLY.  WE'VE DEMONSTRATED A

 1  LIKELIHOOD THAT PEOPLE SUCCEED AS TO THE EIGHTH

 2  AMENDMENT CLAIM, WHICH IS WHAT THIS INJUNCTION IS

 3  ASKING FOR AND THIS TRO IS ASKING FOR.  THE BRIEFING

 4  SETS OUT THE DELIBERATE INDIFFERENCE STANDARD AND THE

 5  PROOF THAT WE HAVE SET FORTH.  THE STATE IS

 6  OBJECTIVELY DELIBERATE INDIFFERENCE AND ALSO

 7  SUBJECTIVELY DELIBERATE INDIFFERENCE -- DELIBERATELY

 8  INDIFFERENCE.  AND WE KNOW THAT KNOWINGLY PLACING AN

 9  INCARCERATED PERSON ON A WORK DETAIL WHERE THE PRISON

10  KNOWS THAT IT COULD SIGNIFICANTLY AGGRAVATE HIS

11  PHYSICAL CONDITION CAN CONSTITUTE DELIBERATE

12  INDIFFERENCE.  WE BELIEVE THAT WE HAVE PROVED A

13  SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS AS TO

14  THAT CLAIM.

15          THERE IS ALSO VERY CLEARLY IRREPARABLE

16  INJURY WILL RESULT TO OUR PLAINTIFFS.  I HAVE GONE

17  THROUGH THE LIST OF INDIVIDUALS WHO WERE HARMED ON

18  THE FARM LINE JUST IN THE MONTH AND A HALF PRECEDING

19  THE STATUS CONFERENCE IN THIS CASE.  WE HAVE, YOU

20  KNOW, CURRENT PLAINTIFFS -- MYRON SMITH, ONE OF OUR

21  CURRENT PLAINTIFFS, HE WAS ASSIGNED TO FARM LINE 15B.

22          FOLLOWING THE STATUS CONFERENCE IN THIS

23  CASE ON MAY 16TH, PRISON OFFICIALS TOOK HIM OFF THE

24  FARM LINE.  THEY TOLD HIM HE DIDN'T HAVE TO REPORT TO

25  DUTY ANYMORE; HE COULD DO ANYTHING HE WANTED.  EXCUSE

ME.  HE DOESN'T HAVE A NEW JOB ASSIGNMENT.  THAT
MEANS IF HE DOESN'T SHOW UP TO THE FARM LINE DURING A
CALL-OUT, HE COULD RECEIVE A DISCIPLINARY VIOLATION.

      **THE COURT:**  BUT HE HASN'T RECEIVED A
DISCIPLINARY WRITE-UP YET?

      **MS. WRIGHT:**  HE HAS NOT RECEIVED ONE YET.

      **THE COURT:**  SO THAT'S MY QUESTION TO YOU.
ACCORDING TO MR. BLANCHFIELD, HIS CLIENT IS AT LEAST
ATTEMPTING TO BE RESPONSIVE TO COMPLAINTS OF
HEAT-RELATED ILLNESSES BY THE WORKERS, THE OFFENDERS.

      DO YOU HAVE ANY REASON TO DISPROVE THAT
OR TO DOUBT THAT, AT LEAST WITH RESPECT TO THE LAST
MONTH AND A HALF?

      **MS. WRIGHT:**  I DO.  WE SPOKE YESTERDAY TO
ALL EIGHT INDIVIDUAL PLAINTIFFS WHO ARE CURRENTLY
INCARCERATED AT ANGOLA.  AND ONE OF THEM, MR.
GUILLORY, HE IS -- HE HASN'T HAD TO WORK THE FARM
LINE IN SEVERAL YEARS.  HE'S ENROLLED IN THE NEW MAN
PROGRAM, WHICH IS A SOBRIETY-BASED EDUCATIONAL
PROGRAM.

      HE REPORTED THAT ANGOLA OFFICIALS HAVE
IN THE LAST TWO WEEKS OR SO STARTED COMING TO THE NEW
MAN EDUCATIONAL PROGRAM AND ASKING FOR VOLUNTEERS TO
PICK POTATOES IN THE FIELD, TO MOW THE LAWN, AND TO
USE WEED EATERS.  NOW, IN A COERCIVE ENVIRONMENT LIKE

A PRISON, THERE IS NO SUCH THING AS VOLUNTEERING.
AND HE HAS GONE OUT AND MOWED THE LAWN AND PICKED
WEEDS BECAUSE AN OFFICER HAS TOLD HIM TO.

      **THE COURT:**  IS HE BEING PAID FOR THAT LABOR?

      **MS. WRIGHT:**  HE'S NOT BEING PAID FOR THAT
LABOR.

      RETURNING TO THE ELEMENTS OF A TRO, THE
THREATENED INJURIES TO -- INJURY TO THE PLAINTIFFS
OUTWEIGHS ANY INJURY TO THE DEFENDANTS.  WE'RE
TALKING ABOUT CRUEL AND UNUSUAL PUNISHMENT HERE AND
SERIOUS RISK TO EVEN THE YOUNGER AND HEALTHIER
PEOPLE.

      BUT AS WE SEE AND AS WE KNOW FROM
*LEWIS,* FROM *BALL,* FROM *ALEX A*, FROM *GATES,* FROM THIS
LITANY OF CASES, INDIVIDUALS WHO ARE INCARCERATED ARE
LIKELY TO SUFFER FROM CHRONIC ILLNESS; THEY'RE LIKELY
TO TAKE MEDICATIONS LIKE ANTI-ANXIETY MEDICATIONS OR
ANTIDEPRESSANTS OR MEDICATIONS TO TREAT MENTAL
ILLNESS THAT IMPAIR THEIR BODY'S ABILITY TO
THERMOREGULATE.

      WE KNOW THAT THOSE INDIVIDUALS, ANYBODY
AT ANGOLA -- ACTUALLY NEARLY ANYBODY AT ANGOLA --
COULD BE REASSIGNED TO THE FARM LINE AT ANY POINT.
INDIVIDUALS ON DEATH ROW, THEY'RE NOT GOING TO WORK
THE FARM LINE.  BUT NEARLY EVERYBODY ELSE AS A

1  DISCIPLINARY MEASURE COULD BE REASSIGNED TO THE FARM

2  LINE.  THEY'RE AT RISK OF ASSIGNMENT AT ANY POINT.

3         THE COURT:  BUT THERE IS NOTHING

4  UNCONSTITUTIONAL ABOUT BEING SENTENCED TO HARD LABOR.

5  CORRECT?

6         MS. WRIGHT:  THAT'S CORRECT.  AND THAT'S NOT

7  WHAT WE'RE ARGUING HERE.  IT'S THE FORM OF HARD LABOR

8  THAT IS THE FARM LINE.  AND AGAIN --

9         THE COURT:  THE FORM OF HARD LABOR THAT'S

10 INJURIOUS TO THE HEALTH OF THE OFFENDER?

11        MS. WRIGHT:  THAT'S RIGHT.  THAT'S EXACTLY

12 RIGHT.

13        THE COURT:  I UNDERSTAND.

14        MS. WRIGHT:  THAT'S EXACTLY RIGHT.

15        THE COURT:  AND THE FOURTH ELEMENT, WOULD

16 YOU LIKE TO ADDRESS THAT?

17        MS. WRIGHT:  THE INJUNCTION WILL NOT

18 DISSERVE THE PUBLIC INTEREST HERE.  THERE IS A LITANY

19 OF OTHER OPPORTUNITIES, JOB ASSIGNMENTS THAT ARE

20 AVAILABLE AT ANGOLA FOR INCARCERATED PEOPLE LIKE THE

21 NEW MAN GROUP.  AGAIN, ON THAT DAY OF OUR STATUS

22 CONFERENCE -- MAY 16TH, I BELIEVE IT WAS -- BOTH

23 MYRON SMITH AND ALVIN WILLIAMS WERE SUDDENLY -- FOUND

24 THEMSELVES TO BE PULLED OFF THE FARM LINE AND

25 ENROLLED IN THE NEW MAN GROUP.  THERE IS MANY OTHER

1  JOBS THAT INDIVIDUALS COULD DO.

2      **THE COURT:**  SO LET'S GO BACK TO THE SECOND

3  ELEMENT; THAT IS, THE THREAT OF IRREPARABLE INJURY.

4  HOW WOULD YOU SUGGEST THE COURT CONSIDER THAT

5  ELEMENT?

6      ARE YOU SUGGESTING THAT ALL AN OFFENDER

7  NEED DO IS TO SAY "I'M REALLY HOT.  I'M -- EVEN

8  THOUGH I'VE HAD WATER, I'VE HAD ATTIRE, I'VE HAD THE

9  PROTECTIVE GEAR AND I'VE BEEN ALLOWED," LET'S SAY,

10  SHOULD THE PRISON CREATE, SAY, A COOLING ZONE; THAT

11  ALL AN OFFENDER NEED DO IS COMPLAIN THAT THEY'RE HOT,

12  THEY'RE OVERHEATED AND THAT OFFICIALS WILL BE

13  REQUIRED TO THEN PULL THEM OFF THE LINE?

14      **MS. WRIGHT:**  WE'RE NOT ASKING THE PRISON TO

15  TAKE ANY AFFIRMATIVE STEPS TO MITIGATE THE HEAT

16  INDEX.  THIS IS NOT A CASE ABOUT A HEAT CEILING.

17  THIS IS A CASE ABOUT A HEAT TRIGGER.

18      **THE COURT:**  NO, I UNDERSTAND THAT.  BUT THE

19  ISSUE IS -- BUT HOW -- LET'S SAY IT'S 88, MAYBE

20  EVEN -- NOT EVEN 88 DEGREES INDEX.  LET'S SAY 82

21  DEGREES, AS MR. BLANCHFIELD INFORMED US AT SOME

22  RELEVANT PERIOD DURING THIS.  82-DEGREE HEAT INDEX,

23  LET'S SAY -- OR 72, I BELIEVE HE SAID.  BUT 82-,

24  LET'S SAY, DEGREE HEAT INDEX.  ARE YOU SUGGESTING

25  THAT ALL AN OFFENDER NEED DO IS SAY "I'M HOT.  I'M

SWEATING.  I THINK -- I DON'T FEEL WELL.  I'M

LIGHTHEADED," AND THAT SHOULD TRIGGER A REACTION OR

AN OBLIGATION OF PRISON OFFICIALS TO PULL THE

OFFENDER OFF THE LINE?

     **MS. WRIGHT:**  I DO BELIEVE THAT THERE IS A

WAY TO COME UP WITH A PRINCIPLED POLICY AND A

WORKABLE POLICY HERE.

     **THE COURT:**  AND WHAT WOULD THAT LOOK LIKE?

     **MS. WRIGHT:**  WELL, IT WOULD BE TRIGGERED --

IT WOULD BE TIED TO THAT 88-DEGREE THRESHOLD, WHICH I

THINK BOTH PARTIES AGREE IS THE THRESHOLD AT WHICH

HEAT BECOMES DANGEROUS TO HUMAN HEALTH.  BECAUSE OF

THE WAY THAT HEAT ILLNESS WORKS, AN INDIVIDUAL CAN GO

FROM ZERO TO 60 IN A MINUTE'S TIME.  SOMEBODY CAN BE

HEALTHY AND WALKING AND TALKING AND THEN SUDDENLY BE

VOMITING, PASSING OUT, EXHIBITING SYMPTOMS OF

INTOXICATION WHEN THEY'RE NOT ACTUALLY INTOXICATED.

     AND WHAT WE KNOW IS THAT THE PRISON

JUST SIMPLY DOES NOT HAVE AND IS NOT WILLING TO

IMPLEMENT THE ACTUAL TOOLS THAT IT WOULD NEED TO

MITIGATE THIS HARM.  THERE IS NO PPE.

     **THE COURT:**  BUT YOU DON'T DISAGREE THAT THE

PRISON HAS AGREED, AT LEAST THROUGH ITS POLICIES,

THAT ONCE THE HEAT INDEX HITS 88, EVERYBODY COMES OFF

THE LINE?

1    **MS. WRIGHT:**  THAT IS NOT THE POLICY.  BUT
2    IF -- THAT IS WHAT WE ARE ASKING FOR.  THAT IS THE
3    INJUNCTION THAT WE ARE ASKING FOR.
4         **THE COURT:**  WHAT'S YOUR UNDERSTANDING OF THE
5    POLICY?
6         **MS. WRIGHT:**  MY UNDERSTANDING OF THE POLICY
7    IS THAT WHEN THE HEAT INDEX REACHES 88 DEGREES, THE
8    PRISON RECORDS IT.  PEOPLE ARE STILL WORKING WHEN
9    THERE IS A HEAT-PRECAUTION POLICY.  OUR PLAINTIFFS
10   HEAR -- HEAR IT COMING THROUGH ON THE WALKIE-TALKIES,
11   AND THEY'RE STILL WORKING IN THE FIELDS.
12        **THE COURT:**  ALL RIGHT.  THANK YOU.
13        MR. BLANCHFIELD, WOULD YOU LIKE TO
14   ADDRESS THAT?
15        AND SPECIFICALLY AM I CORRECT THAT THE
16   POLICY MANDATES -- MAYBE THAT'S TOO STRONG A WORD.
17   MAYBE IT'S THE INAPPROPRIATE WORD HERE -- THAT ONCE
18   THE HEAT INDEX HITS 88 DEGREES, THEY COME OFF THE
19   LINE?
20        **MR. BLANCHFIELD:**  ONCE IT HITS 88, YOUR
21   HONOR, ANYONE WITH A HEAT-RELATED ISSUE IS TAKEN
22   INSIDE.
23        **THE COURT:**  BUT NOT ALL OFFENDERS?
24        **MR. BLANCHFIELD:**  NOT ALL OFFENDERS.
25        NOW, WE ARE -- WE MANDATE BREAKS EVERY

1  30 MINUTES, WATER AND THINGS LIKE THAT.  BUT THEY --

2  YOU KNOW, THERE IS WORK GOING ON.  IF THE HEAT INDEX

3  HITS 88 BY 11:30, THERE CAN BE SOME WORK DONE IN THAT

4  HEAT.

5          AND, YOU KNOW, JUDGE --

6      THE COURT:  WAIT, WAIT, WAIT.  LET ME

7  UNDERSTAND.

8          AFTER 11:30, HEAT INDEX IS 88 DEGREES

9  PLUS, YOU STILL KEEP -- OR YOUR CLIENT STILL KEEPS

10 OFFENDERS OUT IN THE FIELD?

11     MR. BLANCHFIELD:  BEFORE 11:30.

12     THE COURT:  BEFORE ELEVEN --

13     MR. BLANCHFIELD:  THEY'RE IN BY 11:30.

14     THE COURT:  11:30?

15     MR. BLANCHFIELD:  CORRECT.

16     THE COURT:  VERY WELL.  WOULD YOU LIKE TO

17 REPLY TO MS. WRIGHT'S ARGUMENTS WITH RESPECT TO THE

18 ELEMENTS OF THE TRO?

19     MR. BLANCHFIELD:  SURE, YOUR HONOR.

20         YOU KNOW, THE SUBSTANTIAL LIKELIHOOD OF

21 SUCCESS ON THE MERITS, YOU KNOW, THEY'VE GOT TO SHOW

22 A SUBSTANTIAL RISK OF SERIOUS HARM.  WE BELIEVE WE'VE

23 MITIGATED ANY SUBSTANTIAL RISK OF SERIOUS HARM.  I

24 DON'T SEE HOW THEY POSSIBLY GET PAST THE SUBJECTIVE

25 EQUATION HERE, IN LIGHT OF ALL THE THINGS THAT WE'VE

1    DONE WITH OUR POLICIES.

2            YOU KNOW, WE ARE 18,000 ACRES.  WE

3    MAINTAIN THE WHOLE PLACE.  WE HAVE PEOPLE BUILDING

4    ROADS, WE HAVE PEOPLE PAINTING BUILDINGS, FIXING

5    ROOFS ALL DAY LONG.  THEY DON'T GO IN AT 11:30.

6    WE'VE GOT FOLKS RUNNING CATTLE, WE'VE GOT FOLKS

7    RUNNING HORSES.  THEY WORK ALL DAY LONG.  THEY'RE IN

8    THE FIELDS.  THEY'RE WELDING.  THEY'RE IN THE YARDS.

9    THERE IS NO COMPLAINT FROM THESE PEOPLE.  IT'S JUST

10   THE 7:00 A.M. TO 11:30, THE THREE FARM LINES THAT

11   WE'RE COMPLAINING ABOUT.  I DON'T SEE HOW THEY

12   POSSIBLY MEET THAT REQUIREMENT.

13         **THE COURT:**  WE'RE TALKING ABOUT THOSE WHO

14   DON'T SUFFER FROM THE KIND OF ADA-PROTECTED

15   CONDITIONS?

16         **MR. BLANCHFIELD:**  CORRECT, YOUR HONOR.

17   CORRECT.

18            AND ACCORDING TO THE WAY I READ

19   DR. VASSALLO'S DECLARATION, IS THAT IT'S UNSAFE TO

20   EVERYBODY; THE YOUNG --

21         **THE COURT:**  BUT -- AND THAT'S A FAIR

22   READING.  I UNDERSTAND THAT.

23            BUT WITH RESPECT TO THE SUBCLASS, ARE

24   YOU TELLING ME THAT EVEN THOSE PERSONS IN THE

25   SUBCLASS -- THAT IS, THOSE WHO SUFFER ADA-RELATED

CONDITIONS -- EVEN THOUGH THEY'RE NOT ON THE FARM

LINE, ARE THEY TOO REQUIRED -- DOES THIS POLICY APPLY

TO THEM?  THAT IS, IF IT'S AFTER 11:30 -- AND I KNOW

THEY'RE NOT PART OF THIS CLASS.  I UNDERSTAND.  BUT

NONETHELESS, THEY WILL CONTINUE TO WORK UNDER THOSE

CONDITIONS?  OR YOU DO YOU KNOW?  IF YOU DON'T

KNOW --

      **MR. BLANCHFIELD:**  I DON'T KNOW.

      **THE COURT:**  THAT'S FINE.

      **MR. BLANCHFIELD:**  I DON'T KNOW THE ANSWER TO

THAT, JUDGE.  I DON'T KNOW.

      YOU KNOW, THE SUBSTANTIAL THREAT OF

IRREPARABLE INJURY -- AND, YOU KNOW, THE CASE LAW IS

PRETTY CLEAR; THEY DON'T HAVE TO SHOW THAT PEOPLE ARE

DYING FROM HEAT.  THEY NEED TO SHOW A SUBSTANTIAL

RISK OF SERIOUS HARM.

      BUT IN EVALUATING THAT RISK, JUST LIKE

WE DO IN EVALUATING ANY RISK, IF YOU'RE IN STATE

COURT ON A PREMISES LIABILITY, THE GENTLEMAN WHO

FALLS IN THE FOOTBALL BLEACHERS AND SAYS "THE

BLEACHERS ARE UNREASONABLY DANGEROUS" AND THE JUDGE

SAYS "WELL, LOOK, THESE BLEACHERS HAVE BEEN THERE FOR

25 YEARS.  NO ONE'S EVER HURT THEMSELVES," HOW CAN

THAT BE AN UNREASONABLE RISK OF HARM?

      YOU KNOW, THEY CITE THIS CASE FROM

1 TEXAS, THE *MCCOLLUM* CASE, SOME PRETTY SERIOUS

2 HYPERTHERMIA ISSUES, SOME PRETTY SERIOUS INJURIES. I

3 DON'T SEE THAT HERE. THERE IS -- YOU KNOW, WE'RE NOT

4 SEEING PEOPLE DIE FROM HEAT STROKE. THERE IS JUST

5 NOT THE HISTORY.

6      THE COURT: RIGHT. BUT, OF COURSE, DEATH

7 FROM HEAT STROKE IS NOT WHAT WE'RE CONCERNED ABOUT

8 HERE, OF COURSE, AS YOU ACKNOWLEDGE.

9      BUT WE ARE CONCERNED ABOUT WHETHER THE

10 MEDICAL RECORDS AND RECORDS OF MEDICAL TREATMENT,

11 MORE SPECIFICALLY, ARE ADEQUATELY DESCRIBED AND

12 MAINTAINED AND WHETHER THOSE RECORDS REVEAL THAT A

13 PERSON SHOULD HAVE BEEN TAKEN OFF THE LINE OR PERHAPS

14 WERE NOT TAKEN OFF THE LINE. OF COURSE, THAT'S ONE

15 OF THE THINGS YOU-ALL WILL HAVE TO TAKE UP IN

16 DISCOVERY.

17      MR. BLANCHFIELD: AGREEABLE, YOUR HONOR,

18 YES.

19      THE COURT: NOW, LET ME -- WOULD YOU LIKE TO

20 ADD ANYTHING ELSE AT THIS POINT?

21      MR. BLANCHFIELD: WELL, YOU KNOW, THERE IS

22 SOME ISSUE ABOUT THE THREATENED HARM. I MEAN, IF

23 THIS INJUNCTION WERE TO ISSUE, THAT'S THE END OF THE

24 FARM LINE. WE'VE -- YOU KNOW, WE ARE ABLE TO FEED

25 4,000 INMATES FRESH VEGETABLES DAILY. WHEN IT'S

1 LEFTOVER VEGETABLES, WE SEND IT TO ANOTHER

2 CORRECTIONAL FACILITY.  IF THERE IS LEFTOVER THERE,

3 WE SEND IT TO THE FOOD BANK.  AN INJUNCTION WOULD LET

4 THOSE CROPS ESSENTIALLY ROT IN THE FIELDS AND --

5       **THE COURT:**  UNDERSTOOD.  UNDERSTOOD.  THANK

6 YOU, MR. BLANCHFIELD.

7       **MR. BLANCHFIELD:**  THANK YOU, JUDGE.

8       **THE COURT:**  NOW, LET'S TALK JUST A COUPLE OF

9 OTHER MATTERS BEFORE WE WRAP UP.  FIRST, THE CLASS

10 CERTIFICATION.

11       MS. WRIGHT, LET'S TALK ABOUT THAT.

12 YOU'VE NOT FILED YOUR -- HAVE YOU FILED YOUR MOTION

13 TO DEFINE THE CLASS?

14       **MS. WRIGHT:**  WE HAVE NOT FILED OUR MOTION

15 FOR CLASS CERTIFICATION YET, BUT OUR CLASSES ARE

16 DEFINED IN OUR AMENDED COMPLAINT.

17       **THE COURT:**  AND TELL ME:  WHAT ARE THE

18 ELEMENTS OR THE PARAMETERS OF THE CLASS AS YOU WOULD

19 HAVE THEM -- AS YOU WOULD DESCRIBE IT?

20       **MS. WRIGHT:**  WELL, AT THIS POINT THE CLASS

21 IS -- THE OPERATIONAL CLASS DEFINITION THAT WE WOULD

22 PROPOSE IS ALL CURRENT AND FUTURE PERSONS WHO ARE

23 INCARCERATED AT THE LOUISIANA STATE PENITENTIARY AND

24 WHO CURRENTLY OR MIGHT IN THE FUTURE BE COMPELLED TO

25 PARTICIPATE IN COMPULSORY AGRICULTURAL LABOR, WITH A

1 DISABILITY SUBCLASS OF ALL CURRENT AND FUTURE PERSONS

2 WITH DISABILITIES AS DEFINED UNDER THE ADA AND

3 SECTION 504 OF THE REHABILITATION ACT WHO ARE

4 INCARCERATED AT LSP AND WHO ARE CURRENTLY OR MIGHT IN

5 THE FUTURE BE COMPELLED TO PARTICIPATE IN COMPULSORY

6 AGRICULTURAL LABOR.

7      **THE COURT:** VERY WELL.

8      AND, MR. BLANCHFIELD, OF COURSE, WHEN

9 AND IF THE MOTION FOR CLASS CERTIFICATION IS FILED,

10 YOU KNOW, YOU-ALL WILL HAVE AN OPPORTUNITY TO ADDRESS

11 THAT.

12      THE FINAL THING I WANT TO TAKE UP IS --

13 SECOND TO LAST THING -- AND I DON'T WANT TO BEAT A

14 DEAD HORSE. BUT IT'S GOING TO BE ABSOLUTELY CRITICAL

15 FOR YOU-ALL TO TRY TO AGREE UPON A HEAT INDEX DATA

16 COLLECTION PROTOCOL. AND AGAIN, I WILL GIVE YOU-ALL

17 -- I THINK I SAID, ANDREW, UNTIL FRIDAY FOR THAT;

18 FRIDAY, THE 21ST. SO BY FRIDAY, THE 21ST, YOU-ALL --

19 I WILL ORDER THAT YOU MEET AND CONFER BETWEEN NOW AND

20 THEN AND SUBMIT A JOINT MEMORANDUM ON THAT ISSUE.

21 OKAY?

22      ANDREW, LET ME SEE YOU.

23      **(OFF THE RECORD)**

24      **THE COURT:** ALL RIGHT. SO LET ME ASK YOU --

25 COUNSEL, I INTEND TO SET A TRIAL IN THIS CASE FOR

1 SEPTEMBER. IT WILL LIKELY BE SEPTEMBER 30TH. THAT'S

2 THE DATE I'M GOING TO SELECT, NOT LIKELY. BUT IT

3 WILL BE HELD ON SEPTEMBER 30TH.

4 THAT BEING THE CASE, I THINK IT'S

5 IMPORTANT FOR US TO FINISH UP DISCOVERY WELL BEFORE

6 THAT. I'D LIKE TO HAVE, YOU KNOW, A FEW WEEKS BEFORE

7 THAT TO ADDRESS ANY PRETRIAL MOTIONS THAT MIGHT

8 ARISE.

9 DO YOU THINK THAT YOU-ALL CAN CONCLUDE

10 DISCOVERY BY AUGUST 9TH?

11 **MS. WRIGHT:** YES, YOUR HONOR.

12 **THE COURT:** MR. BLANCHFIELD?

13 **MR. BLANCHFIELD:** YOUR HONOR, BASED ON THE

14 DISCOVERY THAT I'VE BEEN ISSUED, THERE IS NO WAY THAT

15 I CAN RESPOND TO -- I MEAN, IT'S PRETTY SIGNIFICANT.

16 **THE COURT:** OKAY. SO WHAT -- PRECISELY WHAT

17 IS THE -- WHAT'S BEEN REQUESTED THUS FAR?

18 **MR. BLANCHFIELD:** YOU KNOW, TAKE AWAY THE

19 REQUEST FOR EMAILS. OKAY? IF WE DO THAT, I'M IN WAY

20 BETTER SHAPE.

21 **THE COURT:** OKAY.

22 MS. WRIGHT, WOULD YOU LIKE TO RESPOND?

23 **MS. WRIGHT:** WE'VE AGREED TO PROVIDE THE

24 DEFENDANTS WITH SEARCH TERMS. AND I KNOW THAT THE

25 DOC IS WELL ACQUAINTED WITH ESI PROTOCOLS AND WAYS TO

1  SEARCH THEIR EMAILS.  THIS DOES NOT SEEM TO ME TO BE

2  AN INSURMOUNTABLE OR UNIQUE DISCOVERY OBLIGATION.

3          THE COURT:  LET'S GO ON AND TRY TO GET THAT

4  AS SOON AS POSSIBLE.  I SEED MR. VINING HERE.

5              I'M NOT CALLING YOU OUT, MR. VINING,

6  BUT YOU'VE ALWAYS BEEN GREAT ABOUT ASSISTING IN

7  MEETING THOSE DEADLINES, AND I'M SURE YOU WILL AGAIN

8  TODAY.  SO THANK YOU, IF YOU COULD WORK CLOSELY WITH

9  MR. BLANCHFIELD AND MS. WRIGHT.  IF NECESSARY, I'D

10  ASK YOU TO REEVALUATE YOUR SEARCH TERM REQUEST SO

11  THAT WE CAN MAKE THAT DEADLINE IF POSSIBLE.

12              BUT AGAIN, THE DISCOVERY DEADLINE WILL

13  BE RESET TO AUGUST 9TH; FRIDAY, AUGUST 9TH.  THE

14  TRIAL IN THIS MATTER, AGAIN, WILL BE SET FOR MONDAY,

15  SEPTEMBER 30TH.  AND I WILL SCHEDULE A PRETRIAL

16  CONFERENCE BEFORE THAT.  I WILL SET THAT AT A LATER

17  TIME.  THAT WILL BE CONTAINED IN THE AMENDED

18  SCHEDULING ORDER THAT THE COURT WILL ISSUE.

19              NOW, ANY OTHER QUESTIONS ABOUT

20  DEADLINES?

21          MS. WRIGHT:  NO, YOUR HONOR.

22          THE COURT:  AT LEAST AT THIS TIME.

23          MR. BLANCHFIELD:  NO, JUDGE.

24          THE COURT:  FINALLY LET ME ASK -- FIRST OF

25  ALL, AS I MENTIONED EARLIER, I COMMEND BOTH SIDES.

1    YOU KNOW, THE GOOD THING FOR THE COURT AND I THINK

2    FOR THE PARTIES, THAT THERE ARE OUTSTANDING COUNSEL

3    ON BOTH SIDES OF THIS CASE.  BOTH OF YOU HAVE A

4    STRONG TRACK RECORD OF WORKING WELL WITH YOUR

5    OPPONENTS AND CERTAINLY ACCOMMODATING THE COURT WHEN

6    THE COURT SHOULD BE ACCOMMODATED.

7              AND THE COURT WILL, OF COURSE, MR.

8    BLANCHFIELD, REQUIRE A VISIT TO ANGOLA TO INSPECT THE

9    CONDITIONS.  I WILL HAVE TO COORDINATE WITH THE U.S.

10   MARSHAL ABOUT THAT, OF COURSE.

11             AND, OF COURSE, MS. WRIGHT, YOU AND MR.

12   COMEAU WILL BE MADE AWARE OF THAT DATE AS WELL.

13             I WOULD URGE YOU TO CONTINUE TO DISCUSS

14   POSSIBLE SOLUTIONS, BECAUSE IT SOUNDS TO ME LIKE BOTH

15   SIDES ARE WILLING TO BE REASONABLE.  I DON'T THINK

16   EITHER SIDE HAS TAKEN AN UNREASONABLE APPROACH IN

17   THIS CASE.

18             I AM A LITTLE CONCERNED, HOWEVER, MR.

19   BLANCHFIELD, THAT NO SHADE IS PROVIDED TO THE

20   OFFENDERS OUT IN THE FIELD.  AND I WOULD ASK YOU TO

21   CONSIDER -- SPEAK TO YOUR CLIENT.  AND I'M SURE MR.

22   VINING CAN BE OF ASSISTANCE TO THIS AS WELL.  YOU

23   KNOW, SHADE IS ESSENTIAL.

24             AS YOU KNOW, I'M SURE, OSHA, THE

25   OCCUPATIONAL HEALTH AND SAFETY ADMINISTRATION,

1   STRONGLY URGES THAT FIELD WORKERS HAVE COOLING

2   SPACES, I GUESS, AS THEY CALL IT, SOME SHADE THAT

3   THEY CAN TAKE REFUGE IN FOR -- DURING INTERMITTENT

4   TIMES JUST TO GET OUT OF THE SUN.  SOMETIMES YOU NEED

5   TO JUST GET OUT OF THE DIRECT SUNLIGHT TO RECOVER AND

6   TO COMPLETE A TASK.

7               SO I WOULD ASK YOU TO, AT A MINIMUM,

8   COME UP IN THE NEAR TERM NOW -- AND I'M ASKING YOU.

9   I DON'T WANT TO HAVE TO ORDER THAT THIS BE DONE AFTER

10  TRIAL.  I'M NOT SUGGESTING THAT I AM PREDISPOSED TO

11  RULING ONE WAY OR ANOTHER.  BUT BASED UPON

12  RECOMMENDATIONS FROM VARIOUS GOVERNMENT AGENCIES AS

13  WELL AS INDUSTRY ORGANIZATIONS THAT REPRESENT FARMS

14  THEMSELVES AND AGRICULTURAL COMPANIES, THEY TOO

15  RECOMMEND FOR THE FIELD WORKERS -- AND YOU CAN LOOK

16  UP -- I MEAN, IT'S READILY AVAILABLE IN PUBLIC

17  SOURCES -- THEY TOO RECOMMEND SOME KIND OF COOLING

18  SPACES.  SO I WOULD ASK YOU TO DISCUSS THAT WITH YOUR

19  CLIENT.  OKAY?

20           **MR. BLANCHFIELD:**  YES, YOUR HONOR.

21           **THE COURT:**  ALL RIGHT.  AND THEN FINALLY

22  WITH RESPECT TO THE, YOU KNOW, QUALITY OF THE WATER

23  AND THAT SORT OF THING, I THINK THAT WOULD BE

24  IMPORTANT TO AT LEAST LOOK INTO.  BUT AGAIN, MR.

25  BLANCHFIELD, NO CHANGES MADE WITHOUT MY CONSENT.

1    AND I WOULD ALSO ASK YOU, MR.

2  BLANCHFIELD, TO DISCUSS WITH YOUR CLIENT A MEANS OF

3  DOCUMENTING THOSE OCCASIONS WHEN THE OFFENDERS TAKE

4  BREAKS OR ARE PERMITTED TO TAKE BREAKS.  I THINK THAT

5  WILL GO A LONG WAY.  BECAUSE RIGHT NOW I HAVE

6  ALLEGATIONS THAT WILL BE BASED, AS YOU-ALL KNOW, ON

7  PAROL EVIDENCE, ON TESTIMONY.  AND IT'S ALWAYS GOOD

8  TO SEE DOCUMENTATION OF SOME OF THESE FACTORS FOR THE

9  COURT TO ISSUE THE APPROPRIATE RULING.  OKAY?

10    **MR. BLANCHFIELD:**  YES, YOUR HONOR.

11    **THE COURT:**  MR. BLANCHFIELD, SINCE YOU'RE AT

12  THE PODIUM, ANY QUESTIONS GOING FORWARD, SIR?

13    **MR. BLANCHFIELD:**  I DON'T BELIEVE SO, YOUR

14  HONOR.

15    **THE COURT:**  OKAY.

16    MS. WRIGHT?

17    **MS. WRIGHT:**  NO, YOUR HONOR.  THANK YOU.

18    **THE COURT:**  OKAY.  THE COURT WILL ISSUE A

19  RULING -- OF COURSE, THIS IS A TRO, BUT I WILL ISSUE

20  A RULING ON THE TRO FORTHWITH.

21    BUT LET ME THANK BOTH OF YOU FOR COMING

22  ON IN TODAY, FOR BEING WELL-PREPARED.  THIS HAS BEEN

23  VERY HELPFUL TO ME.  I HAVE CERTAINLY A MUCH BETTER

24  UNDERSTANDING OF SOME OF THE FACTS THAT WILL INFORM

25  THE COURT'S DECISION.  AND SO I AGAIN APPRECIATE BOTH

1  OF YOU JOINING ME AND HELPING OUT WITH THESE MATTERS.

2  OKAY?

3         ALL RIGHT.  THERE BEING NO FURTHER

4  BUSINESS FOR THE COURT, COURT IS NOW ADJOURNED.

5         **THE LAW CLERK:**  ALL RISE.

6             COURT IS NOW ADJOURNED.

7         **(WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)**

8             **C E R T I F I C A T E**

9         **I CERTIFY THAT THE FOREGOING IS A CORRECT**

10  **TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE**

11  **ABOVE-ENTITLED NUMBERED MATTER.**

12  **S:/NATALIE W. BREAUX**

13  **NATALIE W. BREAUX, RPR, CRR**

14  **OFFICIAL COURT REPORTER**

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT D

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

DIRECT DIAL: (212) 373-3502
EMAIL: JBENJAMIN@PAULWEISS.COM

BEIJING        SAN FRANCISCO
BRUSSELS       TOKYO
HONG KONG      TORONTO
LONDON         WASHINGTON, DC
LOS ANGELES    WILMINGTON

June 21, 2024

Hon. Brian A. Jackson
Russell B. Long Federal Building and United States Courthouse
777 Florida Street, Suite 139
Baton Rouge, LA 70801

> Re:  *Voice of the Experienced, et al.*, v. *LeBlanc, et al.*, No. 3:23-cv-1304-BAJ-EWD

Dear Judge Jackson,

We write on behalf of all parties to provide a proposal for monitoring the heat index at Angola for purposes of this action and to update the Court concerning the status of the parties' negotiations to date regarding discovery and class certification.

As the Court directed during the June 18 motion hearing, counsel for all parties participated in a meet and confer on Thursday, June 20.  The conference was productive, and the parties are working together diligently on the many discovery-related matters required to prepare this matter for trial.  To this end, counsel have already scheduled a follow-up meet and confer for Monday, June 24, and will continue to meet and confer as needed throughout the discovery period.

***First***, as requested by the Court, the parties have agreed upon a joint proposal for monitoring heat conditions at Angola.  The parties agree that the heat data collected by the National Weather Service ("NWS") is the gold standard.  In addition, the parties have determined that the closest NWS data collection site to Angola is located at the New Roads False River Regional Airport, which is approximately 20 miles from Angola.  The NWS website for this location tracks and reports on relevant weather data, including temperature, relative humidity, and heat index, at 20-minute intervals over a three-day period.[1]  The parties believe that the NWS website adequately and accurately captures the information needed for the parties and this Court to determine the relevant heat index at Angola.  Accordingly, the parties propose that Defendants access and download the 3 Day History weather data chart from the New Roads False River Regional Airport page of the NWS website at the close of business each day that any Farm Line operates.  Defendants will provide these charts to Plaintiffs on a weekly basis.

---

[1]  This heat data is available by navigating to https://forecast.weather.gov/MapClick.php?lat=30.946791&lon=-91.570114 and selecting "3 Day History."  A sample 3-Day History chart covering the date range June 18–20, 2024 is attached as Ex. A to this letter.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Brian A. Jackson                                                                                      2

Additionally, on a weekly basis, or at whatever interval the Court prefers, the parties will submit a joint status update that shall include (a) a summary of the dates and time periods when the heat index met or exceeded 88 degrees Fahrenheit; (b) a statement from Defendants as to whether any Farm Line was operating at any of those dates and times; and (c) the NWS 3 Day History charts for the period covered by the status update.

**Second**, the parties have discussed their respective expert witness lists.  Both parties are working expeditiously to identify and disclose their expert witnesses and respectfully request an extension of time to retain and disclose the experts they intend to rely upon at trial:

- Plaintiffs have disclosed two experts in support of their heat-related Eighth Amendment claims, Dr. Susi Vassallo and Marguerite Green, each of whom submitted expert declarations in connection with Plaintiffs' emergency motion regarding the risks posed by laboring on the Farm Line under extreme heat conditions.

- Plaintiffs have also disclosed their intention to call Joshua Sbicca, a sociologist whose work focuses on, among other things, the historical and sociological underpinnings of prison agricultural economies.[2]

- Plaintiffs intend to call additional experts in support of their claim that the actual and substantial risk of psychological harm caused by the Farm Line—a disciplinary practice whose punitive power stems from its close resemblance to chattel slavery—is cruel and unusual punishment.  Plaintiffs are working to identify and retain experts to support these additional theories of harm and will promptly disclose those experts to Defendants.

- Defendants also require additional time to finalize their expert witness lists.  Defendants are diligently working to retain an expert witness regarding Plaintiffs' heat-related Eighth Amendment claim.  Defendants also reserve the right to retain experts to address any additional experts that Plaintiffs may disclose.

Accordingly, while the parties have agreed to disclose their expert witnesses to one another as expeditiously as possible, additional time is necessary.  The parties thus jointly request an extension of time to submit their expert witness lists, and intend to keep the Court fully apprised as this process develops.

**Third**, the parties have begun to serve deposition notices and to discuss deposition logistics and timing.  The parties have stipulated that due to the expedited discovery schedule and to increase efficiency, depositions will, when possible, be conducted remotely via Zoom.  The parties have also agreed to stipulate that each side may take a total of 15 depositions,

---

[2] Plaintiffs further disclosed Terrence Winn as a potential expert in this matter and are contemplating the Court's comments with respect to whether to offer Mr. Winn as a fact or expert witness at trial.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Hon. Brian A. Jackson                                                                                          3

including both fact and expert deponents, for a total of 30 depositions in the case.  The parties have further agreed, where practicable, to schedule multiple depositions in a single day.

*Fourth*, the parties have agreed that Plaintiffs, their counsel, and their experts and consultants will conduct an inspection of Angola and the Farm Line on July 22, 2024.

*Fifth*, because additional class discovery is required, the Plaintiffs[3] respectfully request that the class certification schedule be amended as follows:

- Opening briefs to be filed on or before August 16, 2024

- Opposition briefs to be filed on or before September 4, 2024

- Reply briefs to be filed on or before September 16, 2024.

*Lastly*, at the hearing on June 18, 2024, this Court encouraged LSP to provide sunscreen to any incarcerated person working the Farm Line and that shade be provided during breaks.  This Court also advised defense counsel that if any changes were made, defense counsel should advise the Court.  Beginning June 21, 2024, field officers will have sunscreen on their persons at all times and sunscreen will be offered at check out and available upon request when out in the field.  In addition, LSP has ordered 10 x 10-foot pop-up canopy tents to provide a shaded break area.  LSP anticipates that the tents will be available on Monday, June 24, 2024.  If the Court needs any additional information or has any questions, defense counsel is available for a status conference.

The parties stand ready to answer any questions the Court may have and thank the Court for its attention to this matter.

Respectfully submitted,

*/s/ Jeremy Benjamin*

Jeremy Benjamin

cc:    All Counsel of Record (via ECF)

---

[3] Defendants do not oppose Plaintiffs' request to extend the class certification deadlines.

# EXHIBIT E

# Exhibit 18

| Directive No. 13.067 | CHAPTER:<br>HEALTH CARE SERVICES |
| --- | --- |
| | SUBJECT:<br>HEAT PATHOLOGY |
| LOUISIANA<br>STATE<br>PENITENTIARY<br><br>March 21, 2019 | REFERENCE:<br>Department Regulation No. B-06-001 HC 45<br>(IS-D-2-HCP8) |
| | ACA STANDARD:<br>5-2D-4153 |

PURPOSE:  To establish provisions for the reduction of heat pathology and to reduce the exposure to offenders identified as more vulnerable to heat.

APPLICABILITY:    To the Louisiana State Penitentiary Security Staff and Medical Staff.

POLICY:    It is the Warden's policy that Louisiana State Penitentiary shall have a mechanism to identify offenders more vulnerable to heat and to enforce provisions to reduce heat pathology among all offenders. Offenders on certain types of medications may have increased sensitivity to heat and sunlight and are at a higher risk for developing heat pathology. In addition, offenders with specific chronic illnesses, such as morbid obesity, cardiovascular disease, respiratory disease and diabetes mellitus, may have a higher risk of heat pathology.

DEFINITIONS:

Altered Mental Status: an abnormal state of awareness or alertness that can include: drowsiness, confusion, disorientation, difficult to wake, or any strange behavior.

Apparent Temperature (Heat Index): The perceived temperature in degrees Fahrenheit derived from a combination of the temperature and humidity for the indicated hour.

Cool Water/Showers: Tap water supplied through an independent tap water supply line.

Health Care Practitioner/Provider: Clinicians trained to diagnose and treat patients, such as physicians, dentists, psychologists, podiatrists, optometrists, nurse practitioners, and physician assistants.

NOTE: This shall be in accordance with each health care practitioner/provider's scope of training and applicable licensing, registration, certification, and regulatory requirements.

Heat Alert: A designation when the apparent temperature (heat index) outdoors has exceeded 88 degrees Fahrenheit, requiring special provisions.

017895

Penitentiary Directive No. 13.067
March 21, 2019
Page 2 of 5

Heat Exhaustion: A condition whose symptoms may include heavy sweating and a rapid pulse, a result of your body overheating. It is one of three heat-related syndromes, with heat cramps being the mildest and heatstroke being the most severe.

Heat Pathology: Heat induced syndromes, such as heat stroke, muscle cramps and heat exhaustion, due to a failure of the heat regulating mechanisms of the body.

Heat Stroke: Core body temperature greater than 104 degrees Fahrenheit, with complications involving the central nervous system that occur after exposure to high temperatures. Other common symptoms include nausea, seizures, confusion, disorientation, loss of consciousness or coma.

Photosensitivity: An increase in the sensitivity to ultraviolet (UV) rays from the sun and other light sources. Some medications contribute to sensitivity to the sun.

PROCEDURE:

1.    Offenders identified by a healthcare practitioner with a chronic illness that may be affected by heat or those prescribed medication that may impact sensitivity to heat shall be evaluated and educated for potential adverse reactions concerning heat or photosensitivity related pathology. Implementation of appropriate measures will be taken, if indicated, to reduce the risk of adverse outcomes.

2.    During clinical encounters with offenders outlined in section 1. above, the Medical Director or designee shall ensure the following:

   A.    The health care practitioner/provider informs the offender of the risk of developing heat pathology and/or photosensitivity;

   B.    The health care practitioner/provider determines on a case-by-case basis if a heat precaution duty status is to be ordered based on the offender's chronic disease and/or prescribed medications;

        Should the health care practitioner/provider, in exceptional cases, determine a heat precaution duty status is not necessary, the rationale for this decision and additional offender education regarding heat pathology risks shall be documented in the offender's medical record.

   C.    The health care practitioner/provider orders heat precaution duty status if an offender is on a medication listed in Heat Pathology Medications (Attachment A).

017896

Case 3:23-cv-01304-BAJ-EWD   Document 37-38   05/13/24   Page 4 of 6

Penitentiary Directive No. 13.067
March 21, 2019
Page 3 of 5

3. Heat Precautions from May 1st through October 31st

   A. Heat Precaution Duty Status

      1. The Warden or designee shall ensure that the heat precaution duty status includes, but is not limited to the following:

         a. The offender must be brought indoors from May 1st through October 31st of each year; once the apparent temperature reaches 88 degrees;

         b. The offender shall not participate in sports once the apparent temperature reaches 88 degrees; and

         c. The offender shall not be re-assigned to jobs in environments that are typically hotter than normal indoor temperatures, such as kitchen or warehouse environments.

      2. The Warden or designee shall ensure a list of all offenders with a heat precaution duty status as outlined above in section 1. of this directive is provided weekly, from May 1st through October 31st of each year, to the designated supervisor responsible for their care and custody.

   B. Indoor Procedures

      1. The Warden or designee shall ensure the following indoor procedures are implemented for all offenders in all housing and work areas between the hours of 10:00 am and 8:00 pm, 7 days a week at a minimum during this Heat Precaution time frame (May 1st – October 31st).

         a. Cold water and/or ice is available;

         b. Additional cool showers and/or cool wet towels are available (cool showers is defined as tap water supplied through an independent tap water supply line); and

         c. Where possible, and if effective, increase ventilation by opening windows / doors (where security of the unit allows) and / or use of fans in housing areas to reduce housing area temperatures. (i.e. work ½ days in a.m.).

            EXCEPTION: These procedures need not to be implemented in areas that are climate controlled.

017897

C.    Outdoor Procedures

   1.    The Warden or designee shall ensure the following outdoor procedures are implemented for all offenders in all outdoor areas between 9:00 AM and 7:00 PM (May 1st- October 31st).

   2.    Outside temperatures are monitored using the National Weather Center website https://www.weather.gov/, recorded every two hours, and reviewed and approved by the Warden or designee;

   3.    When the apparent temperature (heat index) outdoors has exceeded 88 degrees Fahrenheit, a heat alert shall be announced;

   4.    Upon the announcement of a heat alert, the following measures shall be provided while working outdoors:

      a.    Water and ice is available at least every 30 minutes; and

      b.    A rest break at least 5 minutes long is offered every 30 minutes.

      NOTE: Work hours may be adjusted to accommodate extreme temperatures.

   5.    The Warden or designee shall ensure the heat precautions implemented from May 1st through October 31st of each year as outlined in section 3. above are documented and maintained at the facility.

      Note: Regardless of time of year or temperature, the above provisions in no way negate the standard requirements regarding the provision of adequate water and or ice for outdoor work crew and housing areas.

4.    Response to Heat Pathology Signs and Symptoms

   A.    The Warden or designee shall ensure offenders exhibiting signs and symptoms of heat pathology are immediately referred to the medical department for evaluation and/or treatment.

   B.    The Medical Director shall ensure that, if an offender is diagnosed with heat stroke, a written medical report on the diagnosis and surrounding incident is emailed to the Department's Medical/ Mental Health Director as soon as possible after the diagnosis, but no later than 24 hours (excluding weekends and holidays).

Penitentiary Directive No. 13.067
March 21, 2019
Page 5 of 5

5.    Offender Education

    A.    The Warden or designee shall ensure offenders outlined in Section 1. above receive heat pathology education that includes, but is not limited to, the following:

        1.    Increased consumption of liquids;

        2.    Avoidance of undue exposure to the sun;

        3.    Signs and symptoms of dehydration;

        4.    Signs and symptoms of dermatological conditions secondary to photosensitivity including sunburn and rashes;

        5.    Signs and symptoms of medication toxicity (any altered mental status); and

        6.    Avoidance of excessive exhausting activities in high temperatures.

    B.    The Warden or designee shall ensure offenders receiving heat pathology education document receipt of such education on Heat Pathology Offender Education (Form HC-45-A).

6.    Staff Training

    The Warden or designee shall ensure annual roll call training is provided to correctional officers during April of each year in the signs and symptoms and prevention of heat pathology as outlined in Heat Pathology Staff Training (Attachment B) and the provisions of this directive. Documentation of this training shall be maintained at the unit.

7.    Heat Pathology Medications

    The DPS&C Pharmacy and Therapeutics (P&T) Committee shall be responsible for annually reviewing and updating Heat Pathology Medications (Attachment A) as needed.



s/Darrel Vannoy
Warden

Attachments:    A -Heat Pathology Medications
                B -Heat Pathology Staff Training
Form:          HC-45-A Heat Pathology Offender Education

This policy supersedes Penitentiary Directive No. 13.067 dated February 1, 2010.

017899

# EXHIBIT F

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Health Care Policy**                                    **21 August 2018**
**No. HCP8**



**INSTITUTIONAL SERVICES / HEALTH CARE POLICIES**
**Health Care Policy – Pharmacy and Formulary**
**Heat Pathology**

1.    **AUTHORITY**: Secretary of the Department of Public Safety and Corrections as contained in Chapter 9 of Title 36.

2.    **REFERENCES:**    ACA Standard 4-4153 (Adult Correctional Institutions); Occupational Safety and Health Administration. (2018). *Using the Heat Index: A Guide for Employers.* Retrieved from http://osha.gov/SLTC/heatillness/heat_index/; Centers for Disease Control and Prevention. (2018). *Natural Disasters and Severe Weather: Extreme Heat.* Retrieved from https://www.cdc.gov/disasters/extremeheat/index.html; https://www.weather.gov/.

3.    **PURPOSE:** To establish provisions for the reduction of heat pathology and to reduce the exposure to offenders identified as more vulnerable to heat.

4.    **APPLICABILITY**: Deputy Secretary, Chief of Operations, Department's Medical/ Mental Health Director, Regional Wardens and Wardens. Each Warden is responsible for ensuring that appropriate unit written policy and procedures are in place to comply with the provisions of this policy.

5.    **POLICY:**   It is the Secretary's policy that each DPS&C facility shall have a mechanism to identify offenders more vulnerable to heat and to enforce provisions to reduce heat pathology among all offenders. Offenders on certain types of medications may have increased sensitivity to heat and sunlight and are at a higher risk for developing heat pathology.  In addition, offenders with specific chronic illnesses, such as morbid obesity, cardiovascular disease, respiratory disease and diabetes mellitus, may have a higher risk of heat pathology.

6.    **DEFINITIONS:**

A.    **Apparent Temperature (Heat Index)**:  The perceived temperature in degrees Fahrenheit derived from a combination of the temperature and humidity for the indicated hour.

**Health Care Policy No. HCP8**
**21 August 2018**
**Page Two**

B. **Cool Water/Showers**: tap water supplied through an independent tap water supply line

C. **Health Care Practitioner/Provider**: Clinicians trained to diagnose and treat patients, such as physicians, dentists, psychologists, podiatrists, optometrists, nurse practitioners, and physician assistants.

NOTE: This shall be in accordance with each health care practitioner/provider's scope of training and applicable licensing, registration, certification, and regulatory requirements.

D. **Heat Alert**: A designation when the apparent temperature (heat index) outdoors has exceeded 88 degrees Fahrenheit, requiring special provisions.

E. **Heat Exhaustion**: A condition whose symptoms may include heavy sweating and a rapid pulse, a result of your body overheating. It is one of three heat-related syndromes, with heat cramps being the mildest and heatstroke being the most severe.

F. **Heat Pathology**: Heat induced syndromes, such as heat stroke, muscle cramps and heat exhaustion, due to a failure of the heat regulating mechanisms of the body.

G. **Heat Stroke**: Core body temperature greater than 104 degrees Fahrenheit, with complications involving the central nervous system that occur after exposure to high temperatures. Other common symptoms include nausea, seizures, confusion, disorientation, loss of consciousness or coma.

H. **Photosensitivity:** An increase in the sensitivity to ultraviolet (UV) rays from the sun and other light sources. Some medications contribute to sensitivity to the sun.

7. **PROCEDURES:**

A. Offenders identified by a healthcare practitioner with a chronic illness that may be affected by heat or those prescribed medication that may impact sensitivity to heat shall be evaluated and educated for potential adverse reactions concerning heat or photosensitivity related pathology. Implementation of appropriate measures will be taken, if indicated, to reduce the risk of adverse outcomes

B. Clinical Encounters

017942

1) During clinical encounters with offenders outlined in Section 7.A. above, the Unit Medical Director or designee shall ensure the following:

    a. The health care practitioner/provider informs the offender of the risk of developing heat pathology and/or photosensitivity;

    b. The health care practitioner/provider determines on a case-by-case basis if a heat precaution duty status is to be ordered based on the offender's chronic disease and/or prescribed medications;

        NOTE: Should the health care practitioner/provider, in exceptional cases, determine a heat precaution duty status is not necessary, the rationale for this decision and additional offender education regarding heat pathology risks shall be documented in the offender's medical record.

    c. The health care practitioner/provider orders heat precaution duty status if an offender is on a medication listed in Heat Pathology Medications (Attachment A).

    NOTE: If medication is the sole basis for ordering a heat precaution duty status, medication compliance shall be considered when determining the need for a heat precaution duty status.

C. Heat Precautions from May 1st through October 31st

    1) Heat Precaution Duty Status

        a. The Warden or designee shall ensure that the heat precaution duty status includes, but is not limited to the following:

            i. The offender must be brought indoors from May 1st through October 31st of each year; once the apparent temperature reaches 88 degrees;

            ii. The offender shall not participate in sports once the apparent temperature reaches 88 degrees; and

            iii. The offender shall not be re-assigned to jobs in environments that are typically hotter than normal indoor temperatures, such as kitchen or warehouse environments.

**Health Care Policy No. HCP8**
**21 August 2018**
**Page Four**

      b.    The Warden or designee shall ensure a list of all offenders with a heat precaution duty status as outlined above in section 7.C. of this regulation is provided weekly, from May 1st through October 31st of each year, to the designated supervisor responsible for their care and custody.

2)    Indoor Procedures

      a.    The Warden or designee shall ensure the following indoor procedures are implemented for all offenders in all housing and work areas between the hours of 10:00 am and 8:00 pm, 7 days a week at a minimum during this Heat Precaution time frame (May 1st – October 31st).

          i.    Cold water and/or ice is available;

          ii.    Additional cool showers and/or cool wet towels are available (cool showers is defined as tap water supplied through an independent tap water supply line); and

          iii.    Where possible, and if effective, increase ventilation by opening windows / doors (where security of the unit allows) and / or use of fans in housing areas to reduce housing area temperatures. (i.e. work ½ days in a.m.)

          EXCEPTION: These procedures need not be implemented in areas that are climate-controlled.

3)    Outdoor Procedures

      a.    The Warden or designee shall ensure the following outdoor procedures are implemented for all offenders in all outdoor areas between 9:00 AM and 7:00 PM (May 1st- October 31st).

          i.    Outside temperatures are monitored using the National Weather Center website https://www.weather.gov/, recorded every two hours, and reviewed and approved by the Warden or designee;

017944

**Health Care Policy No. HCP8**
**21 August 2018**
**Page Five**

    ii.    When the apparent temperature (heat index) outdoors has exceeded 88 degrees Fahrenheit, a heat alert shall be announced;

    iii.    Upon the announcement of a heat alert, the following measures shall be provided while working outdoors:

    a)    Water and ice is available at least every 30 minutes;

    b)    A rest break at least 5 minutes long is offered every 30 minutes; and

Work hours may be adjusted to accommodate extreme temperatures.

4)    The Warden or designee shall ensure the heat precautions implemented from May 1st through October 31st of each year as outlined in section C. above are documented and maintained at the unit.

**Note* Regardless of time of year or temperature, the above provisions in no way negate the standard requirements regarding the provision of adequate water and or ice for outdoor work crew and housing areas.**

D.    Response to Heat Pathology Signs and Symptoms

1)    The Warden or designee shall ensure offenders exhibiting signs and symptoms of heat pathology are immediately referred to the medical department for evaluation and/or treatment.

2)    The Unit Medical Director shall ensure that, if an offender is diagnosed with heat stroke, a written medical report on the diagnosis and surrounding incident is emailed to the Department's Medical/ Mental Health Director as soon as possible after the diagnosis, but no later than 24 hours (excluding weekends and holidays).

E.    Offender Education

1)    The Warden or designee shall ensure offenders outlined in Section 7.A. above receive heat pathology education that includes, but is not limited to, the following:

a.    Increased consumption of liquids;

**Health Care Policy No. HCP8**
**21 August 2018**
**Page Six**

        b.      Avoidance of undue exposure to the sun;
        c.      Signs and symptoms of dehydration;
        d.      Signs and symptoms of dermatological conditions secondary to photosensitivity including sunburn and rashes;
        e.      Signs and symptoms of medication toxicity; and
        f.      Avoidance of excessive exhausting activities in high temperatures.

    2)    The Warden or designee shall ensure offenders receiving heat pathology education document receipt of such education on Heat Pathology Offender Education (Form HCP8-a).

F.    Staff Training

The Warden or designee shall ensure annual roll call training is provided to correctional officers during April of each year in the signs and symptoms and prevention of heat pathology as outlined in Heat Pathology Staff Training (Attachment B) and the provisions of this regulation. Documentation of this training shall be maintained at the unit.

G.    Heat Pathology Medications

The DPS&C Pharmacy and Therapeutics (P&T) Committee shall be responsible for annually reviewing and updating Heat Pathology Medications (Attachment A) as needed.


s/James M. Le Blanc
Secretary

Attachments:    A    Heat Pathology Medications
                 B    Heat Pathology Staff Training

Form:    HCP8-a    Heat Pathology Offender Education

This policy supersedes Health Care Policy No. HC-45 dated 10 July 2018.

Reviewed as of:  October 1, 2019

017946

**Department Regulation No. HCP8**
**Attachment A**
**21 August 2018**

## Heat Pathology Medications

Abilify            (aripiprazole)
Geodon             (ziprasidone)
Haldol             (haloperidol)
Navane             (thiothixene)
Prolixin           (fluphenazine)
Risperdal          (risperidone)
Seroquel           (quetiapine)
Stelazine          (trifluoperazine)
Thorazine          (chlorpromazine)
Zyprexa            (olanzapine)
Cogentin           (benztropine)
Loxitane           (loxapine)
Invega             (paliperidone)
Clozaril           (clozapine)
Trilafon           (perphenazine)
Latuda             (lurasidone)
Compazine          (prochlorperazine)
Saphris            (asenapine)
Mellaril           (thioridazine)
Serentil           (mesoridazine)
Lithobid           (lithium carbonate/lithium citrate)
Depakote           (divalproex sodium)

**HC-45**
**Attachment B**

## HEAT RELATED ILLNESS

Heat related deaths and illnesses are preventable. Despite this, around 618 people in the United States are killed by extreme heat every year. This document provides helpful tips, information, and resources to help you stay safe in the extreme heat this summer.

### WHAT IS EXTREME HEAT?

Extreme heat is defined as summertime temperatures that are much hotter and/or humid than average. Because some places are hotter than others, this depends on what's considered average for a particular location at that time of year. Humid and muggy conditions can make it seem hotter than it really is.

### WHAT CAUSES HEAT-RELATED ILLNESS?

Heat-related illnesses, like heat exhaustion or heat stroke, happen when the body is not able to properly cool itself. While the body normally cools itself by sweating, during extreme heat, this might not be enough. In these cases, a person's body temperature rises faster than it can cool itself down. This can cause damage to the brain and other vital organs.



017914

**HC-45**
**Attachment B**
**Page Two**

---

## WHO IS MOST VULNERABLE?

Older adults, the very young, and people with mental illness and chronic diseases are at highest risk. However, even young and healthy people can be affected if they participate in strenuous physical activities during hot weather.

Summertime activity, whether on the playing field or the construction site, must be balanced with actions that help the body cool itself to prevent heat-related illness.



## WHAT ARE HEAT CRAMPS?

Heat cramps are muscle pains or spasms – usually in the abdomen, arms, or legs – that may occur in association with strenuous activity. People who sweat a lot during strenuous activity are prone to heat cramps. This sweating depletes the body's salt and moisture. The low salt level in the muscles causes painful cramps. Heat cramps may also be a symptom of heat exhaustion. If you have heart problems or are on a low-sodium diet, seek medical attention for heat cramps.

## WHAT IS HEAT EXHAUSTION?

Heat exhaustion is a milder form of heat-related illness that can develop after several days of exposure to high temperatures and inadequate or unbalanced replacement of fluids. Those most prone to heat exhaustion are elderly people, those with high blood pressure, and those working or exercising in a hot environment.

## WHAT IS HEAT STROKE?

Heat stroke is the most serious heat-related illness. It occurs when the body becomes unable to control its temperature: the body's temperature rises rapidly, the sweating mechanism fails, and the body is unable to cool down. Body temperature may rise to 106°F or higher within 10 to 15 minutes. Heat stroke can cause death or permanent disability if emergency treatment is not provided.

## WHAT IS A HEAT RASH?

Heat rash is a skin irritation caused by excessive sweating during hot, humid weather. It can occur at any age but is most common in young children. Heat rash looks like a red cluster of pimples or small blisters.

017915

**HC-45**
**Attachment B**
**Page Three**

It is more likely to occur on the neck and upper chest, in the groin, under the breasts, and in elbow creases.

## HOW CAN HEAT-RELATED ILLNESSES BE PREVENTED?

STAY HYDRATED – Drink plenty of fluids during vigorous or outdoor activities (including sunbathing), especially on hot days; avoid alcohol and fluids with caffeine as these can lead to dehydration; and take frequent drink breaks and "wet down" or mist yourself with a spray bottle to avoid becoming overheated.

STAY COOL – Dress in lightweight, light-colored, loose-fitting clothing on hot days; schedule vigorous activity and sports for cooler times of the day; take rest periods in shady or cool areas; warm up and cool-down before and after exercise; protect yourself from the sun by wearing a hat and sunglasses; use a sunscreen that is at least SPF 15; and gradually increase time spent outdoors to allow your body to get acclimated to the heat.

STAY INFORMED – Learn the signs and symptoms of heat-related illnesses and how to treat them; spend as much time indoors as possible on hot and humid days; check your local news for extreme heat alerts and safety tips; and consult your doctor if you have a medical condition or are taking medication.

## REFERENCES

- ACA Standard 4-4153 (Adult Correctional Institutions); Occupational Safety and Health Administration (2018);
- *Using the Heat Index: A Guide for Employers* (2018); http://osha.gov/SLTC/heatillness/heat_index/;
- Centers for Disease Control and Prevention (2018); *Natural Disasters and Severe Weather: Extreme Heat*; https://www.cdc.gov/disasters/extremeheat/index.html; and
- https://www.weather.gov/.

DPS&C Facility Staff shall familiarize themselves with Department Regulation IS-D-HCP8, Heat Pathology; as well as any Institutional Policies regarding this matter, in order to properly monitor offender wellbeing.

**HC-45**
**Attachment B**
**Page Four**

## SYMPTOMS AND FIRST AID MEASURES FOR HEAT-RELATED INJURIES:

### HEAT STROKE



WHAT TO LOOK FOR
- High body temperature (103° F or higher)
- Hot, red, dry or damp skin
- Fast, strong pulse
- Headache
- Dizziness
- Nausea
- Losing conscoiusness
- Confusion

WHAT TO DO
- Call 911 right away - heat stroke is a medical emergency.
- Move the person to a cooler place.
- Help lower the person's temperature with cool cloths or a cool bath.
- Do not give the person anything to drink.

### HEAT EXHAUSTION

017917

**HC-45**
**Attachment B**
**Page Five**



WHAT TO LOOK FOR
- Heavy sweating
- Cold, pale, and clammy skin
- Fast, weak pulse
- Nausea or vomiting
- Muscle cramps
- Tiredness or weakness
- Dizziness
- Headache
- Fainting (passing out)

WHAT TO DO
- Move to a cool place
- Loosen your clothes
- Put cool, wet cloths on your body or take a cool bath
- Sip water

GET MEDICAL HELP IF
- You are throwing up
- Your symptoms get worse
- Your symptoms last longer than 1 hour

## HEAT CRAMPS

WHAT TO LOOK FOR
- Heavy sweating during intense exercise
- Muscle pain or spasms

WHAT TO DO
- Stop physical activity and move to a cool place
- Drink water or a sports drink
- Wait for cramps to go away before you do any more physical activity

GET MEDICAL HELP IF
- Cramps last longer than 1 hour
- You're on a low-sodium diet
- You have heart problems

## SUNBURN

017918

**HC-45**
**Attachment B**
**Page Six**



WHAT TO LOOK FOR
- Painful, red, and warm skin
- Blisters on the skin

WHAT TO DO
- Stay out of the sun until your sunburn heals
- Put cool cloths on sunburned areas or take a cool bath
- Put moisturizing lotion on sunburned areas
- Do not break blisters

## HEAT RASH



WHAT TO LOOK FOR
- Red clusters of small blisters that look like pimples on the skin (usually on the neck, chest, groin, or in elbow creases)

WHAT TO DO
- Stay in a cool, dry place
- Keep the rash dry
- Use powder (like baby powder) to soothe the rash

Reviewed as of:  October 1, 2019

017919